**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------X
UNITED STATES OF AMERICA,           :
                                    :   No. S3 08 Cr. 1213 (JFK)
    - against -                     :
                                    :   **Opinion & Order**
JAMAL YOUSEF,                       :
                                    :
              Defendant.            :
-----------------------------------X

APPEARANCES:

    FOR THE GOVERNMENT:

        Preet Bharara, Esq.
        UNITED STATES ATTORNEY FOR THE
        SOUTHERN DISTRICT OF NEW YORK
        Of Counsel: Jeffrey C. Brown, Esq.
                    Christopher L. Lavigne, Esq.


    FOR DEFENDANT JAMAL YOUSEF:

        Melinda Sarafa, Esq.
        SARAFA LAW, LLC


**JOHN F. KEENAN, United States District Judge:**

   Before the Court is defendant Jamal Yousef's ("Defendant" or "Yousef") motion to dismiss the Third Superseding Indictment. Yousef contends that the Due Process Clause of the Fifth Amendment requires dismissal because there is an insufficient nexus between his allegedly unlawful conduct and the United States to justify the extraterritorial application of United States law.  For the reasons that follow, Defendant's motion is denied.

## I. BACKGROUND

According to the Third Superseding Indictment (the "Indictment"), Yousef is a former member of the Syrian military and a known international arms dealer. (S-3 Indictment ¶ 7.) The Government alleges that Yousef and his unnamed co-conspirators agreed to provide a cache of military-grade weapons to an individual purporting to represent the Fuerzas Armadas Revolucionarias de Colombia (the "FARC") in exchange for thousands of kilograms of cocaine. (Id. ¶ 6.)

The FARC is designated as a terrorist organization by the United States Government pursuant to Section 219 of the Immigration and Nationality Act. (Id. ¶ 1.) According to the Indictment, the FARC is the world's largest supplier of cocaine and is dedicated to the violent overthrow of the democratically-elected government of Colombia. (Id.) The Indictment alleges that the FARC uses targeted acts of violence to protect its interest in the drug trade, such as attacks against coca fumigation aircraft and other Colombian infrastructure and the kidnapping and killing of United States nationals. (Id. ¶ 2.)

At the time of the charged conduct, Defendant was imprisoned in Honduras for actions unknown to the Court, but apparently unrelated to the instant matter. (Id. ¶ 7.) Because of Defendant's incarceration, the majority of the charged overt acts were made by co-conspirators on Defendant's behalf who kept

2

him apprised of the progress of the deal while he was in custody.  The following factual allegations regarding the charged conspiracy are taken from the Indictment and the transcripts of recorded conversations submitted to the Court by the Government in opposition to the instant motion:

On or about September 25, 2008, a confidential source ("CS-1") working for the United States Drug Enforcement Administration in Central America met with a co-conspirator not named in the Indictment ("CC-1") at CC-1's home in Honduras to discuss the charged arms-for-narcotics transaction. (Id. ¶ 10(a).)  CS-1 purported to represent the FARC and CC-1 indicated that he was acting on behalf of Yousef. (Id.)

At the meeting, CC-1 agreed in principle to sell weapons controlled by Yousef, including automatic rifles, M-60 machine guns, rocket propelled grenades, hand grenades, anti-tank munitions, and C-4 explosives. (Id. ¶¶ 6, 10(a).)  Based on representations by CS-1 during the course of the negotiations, Yousef and his co-conspirators believed that the cocaine would be supplied by the FARC and the weapons involved in the transaction would be used by the FARC. (Id. ¶ 6.)  CC-1 claimed that the weapons were stolen from Iraq and being stored in Mexico at the home of Yousef's relative, who, according to Yousef, is a member of Hezbollah. (Id. ¶¶ 6-7, 10(a).)  With regard to the source of the weapons, CC-1 stated specifically:

>    CC-1:  Look, what we have comes from . . . Most of them — as far as the M-16s, the AR-15s, the M-60s, the, uh, hand grenades, explosives, uh, the bullet-proof vests, uh, those come from Iraq.  They're totally new and it's the latest generation, what the 'gringos' are using in Iraq. How did we obtain them? From the gringos themselves[.]
>
>    CS-1:  You took . . . you took the question from my mouth, because it's . . . I'll repeat once again. It's . . . it's . . . not normal.  I'm saying to him, "Where am I going to get five thousand rifles in Central America?"
>
>                     *  *  *  *  *
>
>    CC-1:  So, I want to show you with the newspaper, look, and . . . and . . . with the video uh . . . what . . . what . . . what we have.  How did that get there?  I'll explain that as far as the American weapons are concerned, those were brought over from Iraq.  They were stolen and purchased in Iraq.

(Brown Decl., Ex. A, at 24, 27).

CC-1 and CS-1 continued to negotiate the transaction over the telephone, by e-mail, and in person over the next month. CS-1 often reiterated his affiliation with the FARC and in one instance detailed his organization's role in the drug trade, explaining that the FARC does not "have the infrastructure" to set itself "up on the highways and avenues of the United States" and so it "depend[s]" on "several organizations in Mexico" to deliver the product. (Brown Decl., Ex. D, at 83-85.)

On or about October 15, 2008, CC-1 sent CS-1 an e-mail which attached several photographs of the weapons cache, including one photograph of a man posing in front of the weapons

4

holding a Belizean newspaper dated September 21, 2008. (S-3 Indictment ¶ 10(d).)

On or about October 28, 2008, CS-1 met in Honduras with another co-conspirator ("CC-2") who identified himself as an associate of Yousef and CC-1. (Id. ¶ 10(g).) During that meeting, CC-2 called Yousef at the prison so that Yousef could participate in the meeting and speak with CS-1 regarding the logistics of the transaction. (Id.)  The transaction was finalized at a meeting of CS-1 and CC-1 on or about October 29, 2008, with CS-1 agreeing to provide and ship to Honduras between 7,000 and 8,000 kilograms of cocaine in exchange for the weapons. (Id. ¶ 10(h).)

After being released from custody in Honduras, Yousef was brought to and arrested in this district by federal agents.  He is charged for his alleged involvement in this "narco-terrorism conspiracy" under 21 U.S.C. § 960a, which provides a heightened sentence for those who engage in narcotics activity that would be punishable under 21 U.S.C. 841(a), or conspires or attempts to do so, while knowing or intending to provide "anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity . . . or terrorism."

## II. THE NEXUS STANDARD

Section 960a explicitly targets conduct occurring abroad. For example, the statute confers jurisdiction over offenses,

5

such as the conduct alleged here, where "an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States." 21 U.S.C. § 960a(b)(5).

"[A]s a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)).  There is a general presumption that federal criminal statutes are to apply only within United States borders, but where, as here, Congress has "expressly indicated its intent to reach" extraterritorial conduct, the Court is "bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir. 1983) (quotation omitted).  The constitutional challenge before the Court thus is limited to that narrow issue:  whether the application of the narco-terrorism statute to Defendant's conduct, which occurred entirely abroad, violates the Due Process Clause of the Fifth Amendment.

Although there is surprisingly little case law in this circuit addressing the extraterritorial application of federal

criminal law,[1] the standard to be applied by the Court is not in dispute.  In the Second and Ninth Circuits, "in order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Yousef, 327 F.3d at 111 (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)) (modification omitted).  The nexus test "ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." United States v. Al Kassar, 582 F. Supp. 2d 488, 494 (S.D.N.Y. 2008) (quoting United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998)).

The two courts in this circuit that recently have applied the "nexus" test in a criminal case have justified the extraterritorial application of federal law on the basis of a "substantial intended effect" in or on the United States.  The appeal in Yousef followed a trial at which it was established that the "defendants conspired to attack a dozen United States-

---

[1]  The Court is not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause. Cf. United States v. Ruemayr, 530 F. Supp. 2d 1210, 1223 (D. N.M. 2008) ("[I]t appears that no federal court has invalidated the extraterritorial application of U.S. law on due process grounds.").

flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy." Yousef, 327 F.3d at 112. Applying the "nexus" standard, the court held that in view of the "substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." Id. Similarly, in Al Kassar, a criminal prosecution with allegations somewhat resembling those in the instant action, the indictment charged the defendants "with voluntarily conspiring to sell millions of dollars worth of weapons to the FARC, with the expectation that those weapons would be used to kill United States nationals." Al Kassar, 582 F. Supp. 2d at 494. The court in Al Kassar held that although the defendants were alleged to be arms dealers — not the attackers as in Yousef — the intent to kill Americans was a "substantial intended effect" sufficient as to not make the application of United States law "arbitrary or fundamentally unfair." Id.

Yousef and Al Kassar's finding of a "substantial intended effect" in or on the United States is sufficient but not necessary to justify the extraterritorial application of federal criminal law. In determining whether a sufficient nexus exists, courts also have considered factors such as the "defendant's

8

citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States." Goldberg v. UBS AG, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010); see, e.g., United States v. Ruemayr, 530 F. Supp. 2d 1210, 1223 (D. N.M. 2008) (finding a sufficient nexus because the defendant allegedly "reached out into the United States during the planning stages of his attack numerous times via email" and "the alleged purpose of his criminal activity was to violently disrupt the United States petroleum and financial markets"); United States v. Clark, 315 F. Supp. 2d 1127, 1133 (W.D. Wash. 2004) (finding the "nexus" requirement satisfied in a case involving illicit sexual conduct with a child in a foreign country because the defendant, as an American citizen, "could reasonably anticipate being haled into Court in the United States" for such conduct); United States v. Rasheed, 802 F. Supp. 312, 317-19 (D. Haw. 1992) (finding a sufficient nexus between the United States and a defendant found on a St. Vincent registered vessel carrying 70 tons of hashish bound for Canada based on several factors including meetings and phone calls in the United States and criminal acts committed by co-conspirators in the United States).

**III. ANALYSIS**

The Government's interest in the charged conduct is obvious on two levels.  First, the United States Government has clear incentive to prevent the arming of an international terrorist organization which brazenly targets Americans with acts of violence and traffics narcotics into its borders.  The Government also has a legitimate interest in protecting the security of its military arsenal and prosecuting any individual who provides a market for stolen United States military hardware.

Defendant argues, though, that the application of United States criminal law would be unfair in this case because, unlike in Yousef and Al Kassar, the charged conduct does not include a "substantial intended effect" on the United States.  On this point, Defendant maintains that: (1) there is no evidence to suggest that the cocaine was to be shipped to, from, or through the United States; (2) there were no representations made to him or his co-conspirators that the weapons were intended for use against the United States or United States nationals; and (3) there is no evidence that he was aware that the FARC has a history of violence against United States nationals.

Although it may be true that the Defendant did not act with the specific purpose of harming interests of or related to the

10

United States, the evidence supports the conclusion that he was aware that the charged conduct would have such an effect.

First, the recorded conversations between the confidential source and a co-conspirator regarding the "American" weapons stolen from the "gringos . . . in Iraq" make clear that the weapons at issue were taken from the United States military arsenal.[2] Even if Defendant was not directly responsible for the theft, certainly he and his co-conspirators knew that brokering the black-market sale of American weaponry stolen from an active war-zone would affect the United States Government's military and security interests.

In addition, CS-1 represented to Defendant's co-conspirators that the FARC relies on Mexican drug cartels to transport narcotics into the United States. The recorded conversations further evidence that the co-conspirators negotiated the arms-for-narcotics transaction on Defendant's behalf and kept him apprised of the status of their negotiations and details regarding CS-1's identity. Therefore, even if Defendant did not have independent knowledge of the FARC's

---

[2] The Court is not persuaded by Defendant's argument that it cannot infer his knowledge from the recorded statements of his co-conspirator regarding the source of the weapons for sale. The statements would be admissible at trial under Federal Rule of Evidence 801(d)(2)(E) as one made by a "co-conspirator of a party during the course and in furtherance of the conspiracy," and Defendant provides no authority to support his claim that the Court cannot consider at this stage of the proceeding evidence that would be admissible against him at trial.

notorious drug activity relating to the United States, the Court concludes that CC-1 enlightened him. With such knowledge, it follows that in conspiring to provide weapons to the FARC, Defendant knew that arming an international drug-trafficking organization which smuggles narcotics across United States borders would have a considerable effect on United States interests.

Moreover, statements by Defendant's co-conspirators during the course of the investigation show that they worried about intervention by United States law enforcement. See, e.g., Brown Decl., Ex. C, at 57 ("When I was on my way to see you now I had my reservations about you. My reservations. I'm like 'hmm, the DEA, the FBI."). Whether the fear of an American law-enforcement presence stems from knowledge of the source of the weapons or knowledge of the FARC's narcotics activity in the United States, these statements further reinforce the conclusion that Defendant reasonably could have anticipated being haled into court in the United States for the charged conduct.

The clear government interest in the charged conduct and the convincing evidence that Defendant knew his alleged activity would have a pronounced effect on United States interests form a sufficient nexus between Defendant and the United States such that the extraterritorial application of the narco-terrorism

statute in this matter would be neither arbitrary nor fundamentally unfair. As such, the motion is denied.

## IV. CONCLUSION

The extraterritorial application of 21 U.S.C. § 960a to the charged conduct complies with the Due Process Clause of the Fifth Amendment. Accordingly, Defendant's motion to dismiss is denied.

SO ORDERED.

Dated:   New York, New York
         August 2̵3̵, 2010

                                      JOHN F. KEENAN
                            United States District Judge