UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                             :

UNITED STATES OF AMERICA         :

     v.                                   :        08-CR-1213 (JFK)

JAMAL YOUSEF,                    :        **DECLARATION IN SUPPORT OF MOTION**

                     Defendant.     :
------------------------------------------------------------------x

MELINDA SARAFA, pursuant to Title 18, United States Code, Section 1746, hereby declares the following under penalty of perjury:

1.    I am an attorney duly admitted to practice in the Southern District of New York, and represent defendant JAMAL YOUSEF ("Yousef") in the above-captioned case.

2.    I make this Declaration in support of the pretrial motions of Mr. Yousef seeking an order:

(a) compelling the government to produce additional discovery and exculpatory material;

(b) striking irrelevant and prejudicial surplusage from the Third Superseding Indictment regarding historical or other acts by Fuerzas Armada Revolucionares de Colombia ("FARC"), general information about FARC, and the underlying reasons for FARC's designation as a Foreign Terrorist Organization;

(c)    dismissing the Indictment and/or suppressing evidence, or granting an evidentiary hearing, due to outrageous government conduct in the illegal kidnapping and rendition of Mr. Yousef from Honduras to the United States; and

(d)    suppressing all fruits of the search warrant issued in connection with the sumasiempre123@yahoo.com email account, or granting an evidentiary hearing, based on the knowing or reckless omission of material information, in violation of the Fourth Amendment.

3. This Declaration is based upon personal knowledge, examination of available records, defense investigation, and, where noted, information and belief.

A. **The 2006 Phony Arms Transaction**

4. Jamal Yousef was born in Lebanon to a Lebanese mother and a Syrian father. He was the fourth of nine children born to his parents, and continues to have family ties in Lebanon. Ex. 1 ¶ 3 (May 3, 2011 Declaration of Jamal Yousef).

5. In early 2006, Mr. Yousef was living in Central America and looking to start a business selling wholesale goods to local merchants, with the goal of eventually opening his own retail store. He was in need of capital. Accordingly, when he learned that Jose Alejandro Espitia Monroy, known as "El Padrino," was seeking to purchase weapons, he saw an opportunity to make some fast money. *Id.* ¶ 16.

6. Mr. Yousef told El Padrino he could obtain weapons for him in Lebanon, but would need $200,000 in advance to cover travel and expenses. *Id.* ¶ 17. After receiving $100,000 of the advance, Mr. Yousef arranged a trip to Lebanon with El Padrino and others, during which Mr. Yousef paid local contacts to provide him access to a cache of military-grade weapons, and allow him to be photographed with the weapons. El Padrino was satisfied during the trip that Mr. Yousef could indeed supply the weapons, and paid the second $100,000 of the advance. *Id.* El Padrino also agreed to pay the balance due upon delivery of the weapons to Chetumal, Mexico, near the Belize border. *Id.* In reality, Mr. Yousef had no intention of delivering any weapons, or ability to do so, but planned to use the advance money to start a business in Honduras. *Id.*

7. During the trip to Lebanon, Mr. Yousef obtained detailed information about an arrangement that Yasser Yousef Safa ("Safa"), a Lebanese national with ties to Hezbollah, had to

obtain fraudulent Belizean passports. Mr. Yousef also learned information about a significant international terrorist for whom the United States was offering a substantial reward. *Id.* ¶ 18.

8. Mr. Yousef returned to Mexico and reached out to U.S. Government authorities using the photos he had taken of himself with the weapons in Lebanon. He was contacted by Assistant Legal Attaché ("ALAT") Marco Cordero of the FBI Legal Attaché office at the U.S. Embassy in Mexico City ("Legat Mexico City"). *Id.* ¶ 19.

B. **The June 2006 Interviews by ALAT Cordero**

9. ALAT Cordero interviewed Mr. Yousef on June 10, 2006. Ex. 2 (FBI Report of Interview with Jamal Yousef). Mr. Yousef presented for identification a Swedish passport in the name of Talal Hassan Ghantous, but advised that his true name was Jamal El Youssef, and provided an accurate date and place of birth. He truthfully acknowledged using the false Swedish passport. Mr. Yousef proceeded to provide detailed information and evidence to ALAT Cordero about the false Belizean passport operation run by Mr. Safa and his family. *Id.*; Ex. 1 ¶ 20.

10. Also during that meeting, or possibly during a follow-up meeting the next day, Mr. Yousef provided information to ALAT Cordero about the cache of weapons in Lebanon and his scheme to defraud El Padrino, including information about a California woman who helped transport payment to Mexico. Ex. 1 ¶ 20. Mr. Yousef did not provide information at this time about the wanted terrorist, as he hoped to establish a relationship of trust before offering such sensitive and valuable intelligence. Ex. 1 ¶ 21.

11. The government has produced in discovery a redacted copy of ALAT Cordero's report dated June 14, 2006, which memorializes only that portion of the interview with Mr. Yousef concerning the sale of Belizean passports, and does not include any reference to El Padrino or the fraudulent weapons transaction. *See* Ex. 2.

3

12.     Shortly after he met with ALAT Cordero, however, Mr. Yousef was contacted by both El Padrino and the woman in California. Both claimed to have been visited by the FBI and confronted with information allegedly provided by Mr. Yousef. El Padrino specifically claimed that ALAT Cordero told him that Mr. Yousef was attempting to defraud him. Mr. Yousef tried to protect himself by assuring El Padrino, falsely, that the weapons would be delivered. Ex. 1 ¶ 22.

C.      **Mr. Yousef's July 2006 Arrest (and Subsequent Conviction) In Honduras**

13.     Mr. Yousef did not deliver any weapons, but busied himself with preparations for opening his business in Honduras. Approximately two to three weeks after their meeting at Legat Mexico City, ALAT Cordero contacted Mr. Yousef in Honduras and requested another meeting in Mexico. Mr. Yousef, who had invested all of his funds in his business, proposed that they meet at the U.S. Embassy in Honduras instead. ALAT Cordero declined. Less than a week later, on or about July 7, 2006, Honduran authorities arrested Mr. Yousef for using a false name on a passport. He was also charged with unlawfully possessing a 9mm handgun that was found in his vehicle at the time of arrest.[1] Ex. 1¶ 23.

14.     Mr. Yousef was convicted of both charges and sentenced to six years on the false passport charge and four years on the firearm charge. *See* Ex. 3 (Interlocutory Order of Enforcement Court, Tegucigalpa Judicial Section).

D.      **The July 2006 Interviews by ALAT Cordero**

15.     On July 14, 2006, while Mr. Yousef was incarcerated in Tegucigalpa, Honduras, ALATs Cordero and Rafael Ruiz paid him a visit to interview him about a supposed "transnational shipment of weapons between Lebanon and Mexico." Ex. 4 (FBI Report of July

---

[1] The handgun actually belonged to Colonel Miguel Ramirez Lanza, one of the unindicted co-conspirators in this case. Col. Lanza explained during a recorded phone conversation with a confidential source that the gun was engraved with his name and had been inadvertently left at Mr. Yousef's house by Col. Lanza's son. Mr. Yousef apparently was in the process of returning it to Col. Lanza when he was arrested for the passport fraud.

4

14, 2006 Interview with Jamal Yousef).[2] ALAT Cordero's report of this interview, a redacted version of which was produced in discovery, references Mr. Yousef's trip to Lebanon, and states that Mr. Yousef "was adamant that he traveled to Lebanon with four individuals, not two as suggested by 'El Padrino,' identified as Jose Alejandro Espitia Monroy, born . . . in Mexico." *Id.*

16.  It is clear from this report that ALAT Cordero had learned about Mr. Yousef's trip to Lebanon with El Padrino prior to the July 14, 2006 interview, had conducted additional investigation, and had interviewed El Padrino. Despite specific requests from defense counsel, the Government has declined to produce any reports leading to or related to the July 14, 2006 interview of Mr. Yousef. *See* Ex. 5 (Apr. 12, 2010 Discovery Letter from Melinda Sarafa to AUSA Jeffrey Brown, Req. 13); Ex. 6 (Apr. 30, 2010 Discovery Response from AUSA Jeffrey Brown to Melinda Sarafa); Ex. 7 (Mar. 8, 2011 Discovery Letter from Melinda Sarafa to AUSA Jeffrey Brown, Req. 2).

E.  **The Prosecutor's Reference to Potential Classified Exculpatory Information**

17.  On or about April 9, 2010, AUSA Jeffrey Brown advised undersigned counsel by telephone that, while reviewing classified materials in connection with this case, he found one piece of potential *Brady*[3] material concerning a scam weapons transaction "not related" to the transaction charged in this case. However, counsel has not yet received from the government such materials, or any other *Brady* material in this case.

F.  **The Transaction(s) Alleged in the Indictment in This Case**

18.  Mr. Yousef continued to serve his sentence in Honduras for the remainder of 2006 and into 2007. On November 28, 2007, his four-year sentence on the unlawful possession of a

---

[2] Although Mr. Yousef provided the name and four telephone numbers for his attorney in Honduras, neither ALAT Cordero nor ALAT Ruiz spoke with her. *Id.*
[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

firearm charge was commuted by cash payment. Ex. 3. Mr. Yousef continued to serve his sentence on the false passport charge.

19.     In July 2008, while Mr. Yousef was still incarcerated, U.S. Drug Enforcement Administration ("DEA") agents in Bogota, Colombia, learned from a confidential source ("CS-2") that CS-2 was negotiating the purchase of weapons in exchange for narcotics from Mr. Yousef, described as the "head of a Honduras-based drug trafficking organization," and two of his associates. Ex. 8, at Bates 27 (Jan. 29, 2009 Affidavit in Support of Search Warrant).[4] According to CS-2, he was introduced to the "organization" by CS-1, who presented CS-2 as a potential buyer of weapons to be supplied to the FARC. *Id.* CS-2 supposedly was in communication directly with Mr. Yousef and engaged in a series of meetings to negotiate the sale, which was contingent upon the provision of photographic evidence of the weapons. *Id.* at Bates 27-28.

20.     As revealed through additional discovery materials, the two "associates" engaged in the negotiations were Colonel Miguel Ramirez Lanza ("Lanza") and Zenin Membrano ("Membrano"). A number of recorded conversations occurred during September 2008, in which Col. Lanza represented that a cache of military weapons, stolen and purchased from Iraq, were stored in Mexico and available for purchase through himself and Mr. Yousef. In October 2008, Col. Lanza informed CS-1 that he possessed photographic evidence of the weapons, and requested an email address where he could send it.

21.     On October 16, 2008, an email with 11 jpeg attachments was sent to CS-1. *See* Ex. 9. The attachments depicted a cache of weapons, including at least one image that appeared to depict a man holding a Belize newspaper, dated September 21, 2008, in a room full of

---

[4] "Bates [number(s)]" refers to the Bates number(s) stamped on certain discovery materials produced by the Government in this case.

weapons. *Id.* That image, as well as several others, appears on its face to be a composite of different photographs and *not* a single photograph of a man in actual proximity to a cache of weapons. The man in the image is Hassan Rammal ("Rammal"), and he attended at least one subsequent meeting with CS-1 and CS-2. *See* Ex. 8, at Bates 29.

22. On December 8, 2008, a grand jury in the Southern District of New York returned an indictment in this case charging one individual with conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. *Id.*; Ex. 10 (Docket Report).

### G. The December 2008 Interview of Mr. Rammal

23. Also in December 2008, Rammal requested a meeting with agents from the DEA's Belize office. Ex. 8, at Bates 29. The agents who met with Mr. Rammal confirmed that he was the individual in the photo. *Id.* Mr. Rammal stated during the meeting that he had participated in negotiations for the sale of a large cache of weapons, but intended only to steal money from unsuspecting customers. *Id.* He claimed that he used the email account sumasiempre123@yahoo.com to conduct what he described as a scam. *Id.* at Bates 29-30.

24. Undersigned counsel has requested production of any reports and notes of interviews with Mr. Rammal by or on behalf of U.S. government authorities. Ex. 6 (Req. 7). The government has not produced the requested documents.

### H. The U.S. Search Warrant for the sumasiempre123@yahoo.com Email Account

25. On January 29, 2009, in the Southern District of New York, a DEA special agent submitted an affidavit in support of a search warrant for the email account sumasiempre123@yahoo.com. As part of the section setting forth the facts presented to establish probable cause, the affiant recounted information obtained from CS-2 in July 2008, the September 2008 meetings involving weapons negotiations, the transmission of images allegedly

7

depicting the weapons for sale (which were not sent from the sumasiempre123@yahoo.com account), the December 2008 indictment in the Southern District of New York, and the December 2008 meeting with Mr. Rammal. Ex. 8, at Bates 27-30.

26. It was only during the meeting with Mr. Rammal that authorities learned of the sumasiempre123@yahoo.com email account, and Mr. Rammal himself stated that he used the account to conduct "what he described as a scam." *Id.* at Bates 30. Nevertheless, the affidavit states that "agents believe, based on the investigation to date and their training and experience," that the activity is "not a scam but rather sincere engagement in weapons trafficking to, among others, the FARC." *Id.* The affidavit provides no further explanation for the agents' determination that the activity was not a scam.

27. The search warrant was obtained, *id.* at Bates 34. Among other content obtained were several email communications and numerous attached jpegs containing images of weapons, including the images purporting to show Mr. Rammal with a weapons cache as well as images of another individual resembling Mr. Yousef with various weapons.

**I.      The Interpol "Red Notice" Authorizing Mr. Yousef's Arrest In Honduras**

28. On July 6, 2009, a third superseding indictment was filed under seal in this case. That indictment – the current accusatory instrument – charges Mr. Yousef with one count of conspiring to violate 21 U.S.C. § 960a, the so-called "narco-terrorism" statute, which prohibits engaging in unlawful drug activity knowing or intending to provide anything of pecuniary value to a terrorist or terrorist organization. A true and correct copy of the third superseding indictment is attached hereto as Ex. 11. A warrant for Mr. Yousef's arrest was signed that same day. Ex. 12.

29. On July 20, 2009, AUSAs Jeff Brown and Rebecca Ricigliano signed a Prosecutor's Agreement to Extradite in connection with the application of the U.S. Department

of Justice for an Interpol Red Notice for Mr. Yousef. Ex. 13. On July 21, 2009, the U.S. Department of Justice, Interpol – U.S. National Central Bureau, forwarded a copy of the approved Interpol Red Notice application for Mr. Yousef to the U.S. Attorney's Office for the Southern District of New York. Ex. 14. The cover letter expressly noted: "As previously noted, the Red Notice is a firm commitment by your office, and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." *Id.* at Bates 12.

30. The United States has had a bilateral extradition treaty with Honduras since 1909. 18 U.S.C. § 3181. A copy of the current bilateral extradition between the United States and Honduras, available from the Organization of American States at http://www.oas.org/juridico/mla/en/traites/en_traites-ext-usa-hnd.pdf, is attached hereto as Ex. 15. Among other offenses for which the treaty provides for extradition are "[c]rimes against the laws for the suppression of the traffic in narcotic products." *Id.* at 370.10.

### J.     Mr. Yousef's August 18, 2009 Abduction from Honduras to the U.S.

31. The evening of August 18, 2009, in Honduras, Mr. Yousef was released on parole for the passport fraud offense.[5] *See* Ex. 16 (Aug. 18, 2009 Writ of Release on Parole for Jamal Yousef from Enforcement Court, Tegucigalpa Judicial Section); Ex. 1 ¶ 5. As Mr. Yousef exited the prison, which was located approximately 25 kilometers outside Tegucigalpa, he encountered an extended cab, four-door pick-up truck, with four masked and armed men inside the truck bed. Ex. 1 ¶ 5. Two other men, also masked and armed, were in the street next to the truck. *Id.* The two men on the street took Mr. Yousef by force and placed him in the back seat of the truck cab, between them. *Id.* ¶ 6. Two other men were sitting in front. All eight men in the truck were

---

[5] As previously noted, Mr. Yousef's sentence for the illegal possession of a firearm charge had been commuted in November 2007.

masked and armed, and they did not identify themselves or explain where they were taking Mr. Yousef. *Id.*

32.     The harrowing details Mr. Yousef's abduction are set forth in his attached Declaration. *Id.* ¶¶ 5-15. In brief, he was driven off-road to a spot where a military helicopter arrived and flew him approximately 10 to 15 minutes away to a small airstrip. *Id.* at ¶¶ 8-11.  Mr. Yousef was removed from the helicopter and escorted toward a small jet on the airstrip. Before he was put aboard the plane, some of the men took photographs with him with the plane in the background. *Id.* at ¶ 11.  Mr. Yousef was taken aboard the plane, where he learned for the first time that he was in the company of U.S. DEA agents who were taking him to the United States where a case was pending against him.  *Id.* at ¶ 12.

33.     Although Mr. Yousef was not extradited from Honduras, DEA Special Agent Gregory Ball prepared a DEA-6 report, dated August 19, 2009, titled: "Arrest and Extradition of Talal HASSAN-Ghantou, a.k.a. Jamal El Yousef (hereafter to as HASSAN) on August 19, 2009; Fugitive Cancellation of HASSAN." This report is specifically referenced in a separate DEA-6 prepared by SA Ball on August 19, 2009 concerning Mr. Yousef's post-arrest statements. *See* Ex. 17 (DEA-6 Report of Aug. 19, 2009 Post-Arrest Interview of Jamal Yousef).

34.     Undersigned counsel requested, on April 12, 2010, production of the DEA-6 concerning Mr. Yousef's "arrest and extradition." *See* Ex. 5 (Req. 3). The government has declined to produce this document. *See* Ex. 6.

**K.     Mr. Yousef's Post-Arrest Statements**

35.     Mr. Yousef signed a Spanish-language waiver of *Miranda* rights and speedy presentment. Ex. 18 (Aug. 19, 2009 Waiver of Speedy Presentment and *Miranda* Rights (Spanish)). During his interview on the airplane, conducted by DEA Special Agents Gregory

Ball and Federico Alvarez, Mr. Yousef, stated, among other things, that his arrest may have had something to do with his 2006 visit to the U.S. Embassy in Mexico City when he spoke with ALAT Marco Cordero. Ex. 17. Mr. Yousef told SA's Ball and Alvarez that he had shown ALAT Cordero six pictures he took with various weapons at the house of a Lebanese colonel in Lebanon. *Id.* Mr. Yousef added that, despite whatever statements he may have made in the interview with ALAT Cordero, he never bought or sold any weapons in Mexico, and was negotiating with criminals only in order to steal money. *Id.* According to the FBI report of this interview, Mr. Yousef characterized his activities with Col. Lanza and Hassan Rammal as a "fraud." *Id.*

36. In October 2010, while detained at the MCC, Mr. Yousef made a number of phone calls to contacts in Lebanon and Syria. These calls, conducted in Arabic, were made to gather and document information related to the wanted terrorist referenced in ¶ 10, *supra*, and are relevant to any trial testimony Mr. Yousef may provide in that regard. Upon information and belief, these calls were monitored and recorded by the MCC. Undersigned counsel notified AUSA Brown of these conversations in October 2010, including approximate dates and times, and requested recordings and transcripts of the calls. AUSA Brown provided a draft transcript of one of the calls, but no other transcripts have been produced, nor have any of the recordings.

WHEREFORE, counsel respectfully requests that the relief requested in the accompanying motion, and supported by the facts herein and the accompanying memorandum of law, be granted.

Dated: May 3, 2011
New York, NY

                                                                     s/Melinda Sarafa
                                                                     Melinda Sarafa