**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                           **:**

**UNITED STATES OF AMERICA**     **:**

                                           **:**

        **v.**                          **:**       **08-CR-1213 (JFK)**

                                           **:**

**JAMAL YOUSEF,**                   **:**       **(Filed Electronically)**

                                           **:**

               **Defendant.**    **:**
------------------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF THE
# PRETRIAL MOTIONS OF JAMAL YOUSEF

Melinda Sarafa, Esq.
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575

Joshua L. Dratel, Esq.
Lindsay Lewis, Esq.
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: 212-732-0707

*Attorneys for Defendant Jamal Yousef*

– Of Counsel –

Melinda Sarafa
Joshua L. Dratel
Lindsay A. Lewis

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ...........................................................................................2

POINT I

THE COURT SHOULD COMPEL THE GOVERNMENT
TO PRODUCE TO MR. YOUSEF THE DEMANDED
DISCOVERY, AS WELL AS ANY *BRADY* MATERIAL............................................2

    A.     Discovery ...................................................................................................2

    B.     *Brady* Material ........................................................................................4

POINT II

THE COURT SHOULD STRIKE IRRELEVANT AND PREJUDICIAL
SURPLUSAGE FROM THE THIRD SUPERSEDING INDICTMENT .....................6

    A.     Applicable Law Regarding Surplusage ................................................6

    B.     All References to FARC's Historical or Others Acts Contained in Paragraphs One
Through Five of the Indictment Are Irrelevant to the Charged Offenses and Must
Be Struck as Unduly Prejudicial Surplusage, and to Protect Mr. Yousef's Right to
Due Process and a Fair Trial Guaranteed by the Fifth and Sixth Amendments ......8

        1.     References to FARC's Activities Must Be Struck from the
Indictment as Irrelevant and Prejudicial Surplusage ...................................9

        2.     References to FARC's Activities Must Be Struck from the
Indictment to Protect Mr. Yousef's Fifth and Sixth
Amendment Rights to Due Process and a Fair Trial.................................12

POINT III

THE COURT SHOULD DISMISS THE INDICTMENT
AND/OR SUPPRESS EVIDENCE AND/OR CONDUCT
AN EVIDENTIARY HEARING DUE TO THE OUTRAGEOUS
GOVERNMENT CONDUCT IN THE ILLEGAL RENDITION
OF MR. YOUSEF FROM HONDURAS TO THE UNITED STATES .......................12

    A     The Circumstances of Mr. Yousef's Illegal Rendition from Honduras
to the U.S. ..............................................................................................13

B.      The U.S. Engaged in Outrageous Governmental Conduct When It Illegally Rendered Mr. Yousef from Honduras to the U.S. in Violation of U.S. Law, the Interpol Red Notice, International Law, and the Terms of the Treaty Between the U.S. and Honduras. ..........................................................................13

     1.    Applicable Law Regarding Outrageous Government Conduct ................13

     2.    The Nature of the Government's Outrageous Conduct in this Case..........16

          a.    Violation of the Extradition Treaty Between the U.S. and Honduras ..................................................................................16

          b.    The U.S.'s Disregard for Its Firm Commitment to Request Mr. Yousef's Extradition Pursuant to the Interpol Red Notice .....17

          c.    Violations of International Law ....................................................19

          d.    Bringing Mr. Yousef to the U.S. by Forcible Abduction..............19

C.      Dismissal of the Indictment Against Mr. Yousef is the Proper Remedy for the U.S. Government's Outrageous Conduct in Illegally Kidnapping and Rendering Mr. Yousef...................................................................................21

D.      In the Alternative, Any and All Fruits of the Government's Seizure and Rendition of Mr. Yousef Should Be Suppressed .............................23

E.      The Court Should Conduct an Evidentiary Hearing on the Issue.........................23

POINT IV

EVIDENCE OBTAINED PURSUANT TO THE SEARCH OF THE SUMASIEMPRE123@YAHOO.COM EMAIL ACCOUNT SHOULD BE SUPPRESSED UNDER THE FOURTH AMENDMENT ....................................................25

A.      Applicable Principles of Law.............................................................................25

B.      All Fruits of the Search of the Target Account Should be Suppressed Because Material Information was Deliberately or Recklessly Omitted from the Search Warrant Affidavit ......................................................................28

CONCLUSION..............................................................................................................31

## INTRODUCTION

This Memorandum of Law is submitted on behalf of defendant Jamal Yousef, in support of his pretrial motions seeking the following relief:

(a)     additional discovery and exculpatory material the government is obligated to produce pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny;

(b)     pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, the striking of irrelevant and prejudicial surplusage from the Third Superseding Indictment regarding historical or other acts by the Fuerzas Armadas Revolucionarias de Colombia (hereinafter "FARC"), general information about FARC, and the underlying reasons for FARC's designation as a Foreign Terrorist Organization (hereinafter "FTO");

(c)     dismissal of the Indictment and/or suppression of evidence – or an evidentiary hearing – due to outrageous government conduct in the illegal kidnapping and rendition of Mr. Yousef from Honduras to the United States, in violation of the Fifth Amendment's Due Process guarantee, and in contravention of an Extradition Treaty between the U.S. and Honduras regarding respect for sovereignty and human rights; and

(d)     suppression of the fruits of the search of the sumasiempre123@yahoo.com email account, on the ground that the search warrant was obtained in violation of the Fourth Amendment.

For the reasons set forth below, as well as in all papers and proceedings previously had herein, it is respectfully requested that the Court grant Mr. Yousef's motions in their entirety.

## STATEMENT OF FACTS

In order to avoid repetition, Mr. Yousef respectfully incorporates by reference the contents of the accompanying Declaration of Melinda Sarafa, Esq. ("Sarafa Decl.") and the Exhibits attached thereto, which include, as Exhibit 1, the May 3, 2011 Declaration of Jamal Yousef ("Yousef Decl.").

## POINT I

## THE COURT SHOULD COMPEL THE GOVERNMENT TO PRODUCE TO MR. YOUSEF THE DEMANDED DISCOVERY, AS WELL AS ANY *BRADY* MATERIAL

The discovery and *Brady* material[1] requested by Mr. Yousef encompass certain evidentiary material that has not yet been provided by the government, but which is nevertheless relevant and material not only to Mr. Yousef's defense at trial, but also to his (1) suppression motion with respect to the contents of the sumasiempre123@yahoo.com email account, set forth *infra* in POINT IV;  and (2) his motion challenging his rendition to the U.S., set forth *infra* in POINT III.

**A.    Discovery**

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the U.S. Constitution, the Court should compel the government to produce the following discovery:

(a)    any FBI (or other U.S. agency) reports of all meetings with and interviews of Mr. Yousef in Mexico in or about June and July 2006;

(b)    communications between and information shared by the governments of the U.S. and Honduras (relevant to Mr. Yousef's motion challenging his rendition to the

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

U.S., *see infra* POINT III) regarding:

(1)     Mr. Yousef's arrest in Honduras for passport fraud (both before and after his arrest); and

(2)     Mr. Yousef's seizure and rendition by U.S. authorities from Honduras to the U.S. on or about August 19, 2009;

(c)     the DEA-6 Report prepared by U.S. Drug Enforcement Agency ("DEA") Special Agent Gregory Ball regarding the seizure, rendition, and transport of Mr. Yousef from Honduras to the U.S. on or about August 19, 2009 (which report counsel has specifically requested in discovery);

(d)     the prior three Indictments in this case (*i.e.*, the initial Indictment, S1, and S2), which the government has declined to produce despite a formal request by counsel (by letter dated April 27, 2011);

(e)     copies of photographs taken of Mr. Yousef:

(1)     in Honduras August 18, 2009, on the runway in front of the plane that would transport Mr. Yousef to the U.S. (*see* Yousef Decl. ¶ 11;

(2)     during immigration processing of Mr. Yousef at Westchester County Airport (upon his arrival in the U.S. August 19, 2009) (*see id.* ¶ 14); and

(3)     in the DEA offices in New York August 19, 2009, inside a holding cell, with DEA Special Agent Federico Alvarez;

(f)     copies of the intercepted telephone calls (and any translations and/or transcripts) Mr. Yousef made from the Metropolitan Correctional Center, 150 Park Row, New York, New York 10007, in October 2010.  *See* Fed. R. Crim. P. 16(a)(1)(C);

(g)     a copy of the "Interpol Writ" pursuant to which Mr. Yousef was allegedly seized

3

in Honduras, and all communications related to the issuance and execution of that
Writ (to the extent not previously provided);

(h)    any agreements, formal or otherwise, memorialized or not, between the U.S. and
Col. Miguel Ramirez Lanza, or between the U.S. and Honduras with respect to
Col. Lanza; and

(i)    any interviews – including notes, reports, memoranda, or any other form of
memorialization – of persons who provided exculpatory information, including,
specifically, Hassan Rammal.

**B.**    ***Brady* Material**

The prosecution is required to provide the accused with all information and material
known to the government which may be favorable to the defendant on issues of guilt or
punishment, without regard to materiality. *See Brady v. Maryland*, 373 U.S. 83 (1963); *United
States v. Bagley*, 474 U.S. 667, 678 (1985) (prosecution's duty under *Brady* includes the
obligation to disclose contingent inducements to informants which would have been helpful in
cross-examination); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) (evidence of bias or a motive to
lie); *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (individual prosecutor has responsibility to
learn of any favorable evidence known to others acting on government's behalf in case); *Stickler
v. Greene*, 527 U.S. 263, 280-81 (1999) (due process duty of the prosecution under *Brady* to
disclose any evidence favorable to the defense includes the duty to disclose impeachment
evidence and material known only to the police officer and not immediately known to the
prosecuting attorney).

Accordingly, it is respectfully submitted that the government should be compelled to
provide any and all *Brady* material, including discovery of any of the above-requested materials

that qualifies as *Brady* material (*e.g.*, the 2006 report, any interviews of persons who provided exculpatory information, and any agreements involving Col. Lanza).[2]  In addition, the government should be compelled to disclose any other information, from whatever source, that in any way may exculpate Mr. Yousef with respect to the charges levied against him in the Indictment.

---

[2] Of course, if any of the requested information is exculpatory, constituting *Brady* and/or *Giglio* material, *see Giglio v. United States*, 405 U.S. 150 (1972), it must be produced immediately.  *See, e.g. United States v. Crozzoli*, 698 F. Supp. 430, 436 (E.D.N.Y. 1988) (holding that *all Brady* material must be produced upon request, and *not* at or just before trial, since the Court "reject[ed] the blanket assertion that *Brady* imposes no pretrial obligation on . . . the Government . . .  We perceive the due process implications of *Brady* as obligating the Government to disclose exculpatory information *as soon as the character of such information is recognized*") (quoting *United States v. Goldman*, 439 F. Supp. 337 (S.D.N.Y. 1977) (emphasis added)).

As the Second Circuit concluded in *Grant v. Aldredge*, 498 F.2d 376, 382 (2d Cir. 1974), *Brady* material must be produced sufficiently in advance of trial to permit "full exploration and exploitation by the defense."  Thus, as the Court in *Crozzoli* explained,

> if exculpatory evidence is produced for the first time at trial, the defendant may not have an adequate opportunity to effectively utilize the material, particularly if it points to the existence of other evidence helpful to the defendant.

439 F. Supp. at 436; *see also United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) (disclosure "must be made at such time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case"); *United States v. Deutsch*, 373 F. Supp. 289, 290 (S.D.N.Y. 1983) ("[i]t should be obvious to anyone involved with criminal trials that exculpatory information may come too late if it is given only at trial"); *United States v. Gleason*, 265 F. Supp. 880, 885 (S.D.N.Y. 1976).  *But see United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001) ("as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner").

Nor does the fact that *Giglio* material may also qualify as Jencks Act, 18 U.S.C. §3500, statements allow the government to withhold its production until the later Jencks Act deadline.  *See United States v. McVeigh*, 923 F. Supp. 1310, 1315 (D. Colo. 1996) (government's disclosure duties under *Brady* neither trumped nor modified by fact that information is contained within witness statements and/or grand jury testimony).

**POINT II**

**THE COURT SHOULD STRIKE IRRELEVANT AND PREJUDICIAL
SURPLUSAGE FROM THE THIRD SUPERSEDING INDICTMENT**

The Third Superseding Indictment (hereinafter "the Indictment") includes extraneous and
unduly prejudicial information regarding historical or other acts by FARC, and the underlying
reasons for FARC's designation as an FTO. While the fact of FARC's designation as an FTO is
relevant to the charged violation of 21 U.S.C. § 960a, which requires the government to prove
that the defendant engaged in a prohibited drug offense knowing or intending to provide
something of pecuniary value to a person or organization that has engaged in terrorist activity, the
nature of such activity and the underlying reasons for a terrorist designation are not. By detailing
the reasons underlying FARC's FTO designation, the Indictment improperly seeks to amplify that
designation.  Any reference to FARC's designation that goes beyond the mere fact of its
designation is unnecessary, irrelevant, and unduly prejudicial.

Thus, this Court must strike language contained in paragraphs 1 to 5 of the Indictment
pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, and to protect Mr. Yousef's
right to due process and a fair trial as guaranteed by the Fifth and Sixth Amendments to the U.S.
Constitution.

**A.      Applicable Law Regarding Surplusage**

Rule 7(d) of the Federal Rules of Criminal Procedure provides that upon motion of a
defendant, the Court may strike extraneous matter, or "surplusage," from an Indictment.  Fed. R.
Crim. P. Pursuant to Second Circuit case law, "[a] defendant's motion to strike surplusage from an
indictment will be granted so long as the language is not relevant to the offenses and is either

prejudicial or inflammatory." *United States v. Malachowski*, 604 F.Supp.2d 512, 518 (N.D.N.Y.

2009) (granting defendant's motion to strike surplusage based on irrelevance and the "danger of

unfair prejudice") (citing *United States v. Mulder*, 273 F.3d 91, 99 (2d Cir.2001)); *see also United

States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir.1990).

   In addition, any surplusage that remains in an indictment implicates the defendant's right

to due process and to a fair trial under the Fifth and Sixth Amendments because, as is well-settled

among the circuit courts, the government, to sustain a conviction, is under no obligation to prove

statements in the indictment that constitute surplusage. *See, e.g., United States v. Greene*, 497

F.2d 1068, 1086 (7th Cir. 1984) ("The language of the indictment, insofar as it goes beyond

alleging elements of the statute, is mere surplusage. Such surplusage in an indictment need not be

proved."); *United States v. Archer*, 455 F.2d 193, 194 (10th Cir. 1972) ("It is not essential that

everything in an indictment be proved."); *Milentz v. United States*, 446 F.2d 111, 114 (10th Cir.

1971) ("mere surplusage . . . need not be proved"); *Gawne v. United States*, 409 F.2d 1399, 1403

(9th Cir. 1969) ("allegation of the indictment was surplusage [because it was not an element of the

offense] and need not have been proved"). Accordingly, to leave such language in an indictment

is inherently unfair and a denial of due process.

   Indeed, in applying the "exacting standard" of Rule 7(d), *see Scarpa*, 913 F.2d at 1013,

this Court recently identified the very type of language that constitutes surplusage, and therefore

must be deleted from an indictment. *See United States v. Kassir*, No. S2-04-CR-356 (JFK), 2009

WL 995139 (S.D.N.Y. Apr. 9, 2009).

   In *Kassir*, the defendant argued that references in each count to Usama Bin Laden as the

leader of al Qaeda were both irrelevant to the charges and prejudicial. *Id.*, at *2. The defendant

7

also argued that broadening phrases, such as "others known and unknown," "among others," and "elsewhere," sprinkled throughout the indictment, impermissibly expanded the charges against the defendant. *Id.*, at *3.

In granting in part and denying in part the motion, this Court concluded that Bin Laden's leadership of al Qaeda was relevant, not prejudicial, and should not be struck, because "*the government plan[ed] to offer evidence* that the Defendant committed the charged conduct with the intent to support Bin Laden, which is relevant for the inference that Defendant also intended to support al Qaeda." *Id.* at *2 (emphasis added).[3]

Here, in contrast, the historical recitation of FARC's violent activities will not be offered in connection with any element of the offense, or to establish Mr. Yousef's knowledge and intent. Such evidence would not be admissible unless, as in *Kassir*, it can be tied to the defendant specifically (as it was there through a laudatory letter to Mr. Bin Laden the defendant took with him when he traveled to the U.S. to establish a jihad training camp). *Id.*

Thus, the rationale in *Kassir* illustrates why the litany of FARC violence constitutes surplusage in the Indictment here, and why the government should not be able to influence the jury through the "back door" with information it cannot introduce or prove through the "front door," *i.e.,* that it can ascribe to Mr. Yousef's knowledge or intent.

**B.    All References to FARC's Historical or Others Acts Contained in Paragraphs One Through Five of the Indictment Are Irrelevant to the Charged Offenses and Must Be Struck as Unduly Prejudicial Surplusage, and to Protect Mr. Yousef's Right to Due Process and a Fair Trial Guaranteed by the Fifth and Sixth Amendments**

Paragraphs One through Five of the Indictment allege a laundry list of historical and other acts allegedly committed by FARC, many of which the Indictment alleges were affected or were intended to affect, or to be directed at, the U.S., and *none* of which Mr. Yousef has been

---

[3] In *Kassir,* this Court did strike as surplusage certain "broadening phrases" in certain charging paragraphs because "the language could impermissibly expand the specific charges returned by the grand jury." *Id.*, at *3.

charged with in this Indictment.

Information about FARC's activities must be struck from the Indictment as irrelevant and prejudicial surplusage, pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, and also to preserve Mr. Yousef's constitutional rights to a fair trial.  In addition, as detailed below, analysis pursuant to Rule 403 of the Federal Rules of Evidence establishes that the language in question does not possess probative value, and is unduly prejudicial to Mr. Yousef.

1.     **References to FARC's Activities Must Be Struck from the Indictment as Irrelevant and Prejudicial Surplusage**

It is well-settled that surplusage should be struck from an indictment pursuant to Rule 7(d) when such language is both irrelevant and prejudicial. *See Mulder*, 273 F.3d at 99.  Here, references to FARC's activities clearly meet both of these prongs.  As noted, FARC's past activities and acts are not at issue in this trial.

Thus, the following information about FARC and the specific nature of FARC's past acts against American citizens and others, all of which is included in the Indictment, and none of which is related in any way to Mr. Yousef, is irrelevant and can serve only to unnecessarily inflame the jury, which, of course will be comprised solely of American citizens:

1.     . . . while continuing to engage in bombings, massacres, kidnappings, and other acts of violence within Colombia . . .

2.     During at lest the five years prior to the date of the filing of this Indictment, the FARC has directed violent acts against United States persons and property interests in foreign jurisdictions, including, but not limited to, Colombia. In order to protect its financial interests in the cocaine trade, the FARC leadership has ordered its members to take counter-measures against the Government of Colombia's cocaine fumigation campaign, including, among other actions: attempting to shoot down fumigation aircraft; forcing members and supporters to publicly rally against fumigation; and attacking the Colombian infrastructure. Having recognized that the United States contributed significantly to Colombian fumigation efforts, the FARC leadership has ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to

fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

       3.     The FARC's violent acts directed against the United States and United States interests have included: (1) the murder of United States nationals; (2) the kidnapping of United States nationals; and (3) the bombing of a restaurant in Bogota, Columbia, frequented by United States nationals.

       4.     The FARC is a highly structured terrorist organization, styled as a military group and comprised of approximately 12,000 to 18,000 armed guerillas organized into seven "blocs," 68 numbered "fronts," nine named fronts, and four urban "militias."

       5.     To further its terrorist activities and its goals to overthrow the democratically elected Government of Colombia, the FARC actively attempts to obtain automatic rifles, ammunition, machine guns, explosives and other types of weapons from other organizations.

Sarafa Decl., Ex. 16.

Rule 401 of the Federal Rules of Evidence defines relevant conduct as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Moreover, in criminal trials, all facts presented to the jury must be "strictly relevant to the particular offense charged." *Williams v. New York*, 337 U.S. 241, 247 (1949).

Here, the government must prove that the defendant engaged in prohibited drug activity "knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity . . . . or terrorism." 21 U.S.C. § 960a. Thus, the fact of FARC's FTO designation is relevant, but the reasons for such designation, and the validity of such designation, are not.

Case law related to material support of terrorism cases under 18 U.S.C. § 2339B are instructive on this point. To prove a violation of §2339B, the government must establish that the defendant "knowingly provide[d] material support or resources to a foreign terrorist

organization, or attempt[ed] or conspire[d] to do so." 18 U.S.C. § 2339B. Thus, "[t]he element of

the offense is the designation of [the organization] as an FTO, *not the correctness of the*

*determination*, and the Government would be required to prove at trial that [the organization]

was in fact designated as an FTO." *United States v. Sattar*, 272 F. Supp. 2d 348, 367 (S.D.N.Y.

2003) (emphasis added).

Moreover, even though the government must prove Mr. Yousef;s knowledge of FARC's

terrorist activity, general references to such activity, without any connection to Mr. Yousef, are

entirely irrelevant to the charge.

In addition, the information regarding FARC is unduly prejudicial under the standard set

forth in Rule 403 of the Federal Rules of Evidence, which provides for the exclusion of even

relevant evidence when its "probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues or misleading the jury." Fed. R. Evid. 403.

The danger of unfair prejudice is overwhelming in this case, because although Mr.

Yousef has not been charged with the acts committed by FARC set forth in the Indictment, and

the Indictment does not allege that Mr. Yousef had any knowledge of such acts, the inclusion of

information about FARC's activities in the Indictment provides the government with an

unearned opportunity to suggest such a connection without benefit of any competent evidence.

Correspondingly, the offending language also presents the jury with an improper basis for

conviction of Mr. Yousef, *i.e.*, the general dangerousness of FARC to the U.S. and its interests.

Thus, the Indictment misleads the jury to ignore the factual issue of whether Mr. Yousef knew of

FARC's activities, and invites the jury to convict simply because of Mr. Yousef's alleged

association with FARC. The irrelevant and highly prejudicial nature of the references to FARC's

activities requires, pursuant to Rule 7(d), that such language be struck in its entirety from the

Indictment.

      2.      **References to FARC's Activities Must Be Struck from the Indictment to Protect Mr. Yousef's Fifth and Sixth Amendment Rights to Due Process and a Fair Trial**

The inclusion in the Indictment of FARC's acts against the U.S. is not only irrelevant and inflammatory under Rule 7(d), but also violates Mr. Yousef's constitutional rights to due process and a fair trial. Since it is undisputed that the government need not prove FARC's activities as alleged in the Indictment to convict Mr. Yousef of violating 21 U.S.C. §960a, as they do not constitute an element of the crime charged, the government, through its inclusion of this surplusage, invites the jury to conclude that Mr. Yousef was aware that such activities by FARC were aimed at the U.S., without having to connect such acts or information to Mr. Yousef's knowledge. *See, e.g., Greene*, 497 F.2d at 1086.

Whether Mr. Yousef possessed the requisite intent or knowledge with respect to FARC's activities cannot be proved simply by including in the Indictment a litany of FARC's misdeeds against the U.S.  Listing such activities without the predicate allegation and/or proof that they contributed to Mr. Yousef's knowledge constitutes a denial of Due Process. Consequently, the language must be struck to preserve Mr. Yousef's constitutional protections of Due Process and a fair trial.

**POINT III**

**THE COURT SHOULD DISMISS THE INDICTMENT AND/OR SUPPRESS EVIDENCE AND/OR CONDUCT AN EVIDENTIARY HEARING DUE TO THE OUTRAGEOUS GOVERNMENT CONDUCT IN THE ILLEGAL RENDITION OF MR. YOUSEF FROM HONDURAS TO THE UNITED STATES**

The U.S. government committed outrageous government conduct by kidnapping and illegally rendering Mr. Yousef from Honduras to the U.S. in violation of (a) the terms of the

Extradition Treaty between the U.S. and Honduras; (b) the firm commitment by the U.S.

Attorney's Office for the Southern District of New York and the U.S., expressed in the approved

application for the Interpol Red Notice, to request Mr. Yousef's extradition in all but the most

exceptional circumstances; (c) Mr. Yousef's Fifth Amendment right to Due Process; and

(d) international law.  Accordingly, the Court should dismiss the Indictment against Mr. Yousef.

In the alternative, the Court should suppress evidence obtained as a result of Mr. Yousef's illegal

seizure and rendition, and/or conduct an evidentiary hearing on the issue.

**A.**     **The Circumstances of Mr. Yousef's Illegal Rendition From Honduras to the U.S.**

Again, in order to avoid repetition, the facts relevant to this point are respectfully

incorporated by reference from Mr. Yousef's accompanying Declaration at ¶¶ 5-15.

**B.**     **The U.S. Engaged in Outrageous Governmental Conduct When It Illegally
Rendered Mr. Yousef from Honduras to the U.S. in Violation of U.S. Law, the
Interpol Red Notice, International Law, and the Terms of the Treaty Between the
U.S. and Honduras**

Due Process does not permit the U.S. to engage in the abduction and rendition of Mr.

Yousef when the legitimate and established mechanism for extradition, pursuant to treaty and

international law, was available and well-known to the government, and when the government

had expressly agreed in writing to pursue extradition as the avenue for securing the defendant's

presence. As a result, the government's misconduct in kidnapping and rendering Mr. Yousef

from Honduras to the U.S. rises to the level of outrageous government conduct, warranting relief.

**1.**     **Applicable Law Regarding Outrageous Government Conduct**

As the Second Circuit has recognized, "[i]t has been suggested by both the Supreme

Court and this Court that Government involvement may become so outrageous in a prosecution

that the due process clause of the Constitution would forbid conviction." *United States v.

Alexandro*, 675 F.2d 34, 39 (2nd Cir. 1982).

Indeed, in *United States v. Russell*, 411 U.S. 423 (1973), the Supreme Court

acknowledged that there could exist

> a situation in which the conduct of law enforcement agents is so
> outrageous that due process principles would absolutely bar the
> government from invoking judicial processes to obtain a
> conviction.

411 U.S. at 431-32, *citing* [*cf.*] *Rochin v. California*, 342 U.S. 165 (152).

Likewise, in *United States v. Schmidt*, 105 F.3d 82 (2d Cir. 1997), the Second Circuit,

referring back to *Russell*, explained that

> [t]he concept of fairness embodied in the Fifth Amendment due
> process guarantee is violated by government action that is so
> fundamentally unfair or shocking to our traditional sense of justice,
> *see Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246
> (1960), or conduct that is 'so outrageous' that common notions of
> fairness and decency would be offended were judicial processes
> used to invoke a conviction against the accused." *United States v.
> Russell,* 411 U.S. 423, 431-432 (1973).

105 F.3d at 91.

Also, while many of the "outrageous government conduct" cases involve government

involvement in the commission of the charged offense, the courts have made it unmistakably

clear that the doctrine extends well beyond entrapment cases. Indeed, the Second Circuit has

repeatedly held that "predisposition," and/or a *defendant's* conduct, is not a factor in evaluating

the propriety of the government's behavior.

For example, in *United States v. Chin*, 934 F.2d 393 (2d Cir. 1991), the Second Circuit

instructed that:

> whether investigative conduct violates a defendant's right to due
> process cannot depend on the degree to which the government
> action was responsible for inducing the defendant to break the law.
> Rather, the existence of a due process violation must turn on
> whether the government conduct, standing alone, is so offensive
> that it "shocks the conscience," regardless of the extent to which it

led the defendant to commit his crime.

943 F.2d at 398 (quoting *Rochin v. California,* 342 U.S. 165, 172 (1952)); *see also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("[t]he outrageousness of the government's conduct must be viewed 'standing alone' and without regard to the defendant's criminal disposition") (citing *Chin*, 934 F.2d at 398).[4]

Similarly, in *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999), the Second Circuit reiterated that

> [t]he Supreme Court has suggested that in an extreme case, Government involvement in criminal activity might be "so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction." Such an argument might in principle prevail even where . . . the defendants were not entrapped by the Government.

189 F.3d at 131 (citing *United States v. Russell,* 411 U.S. at 431-432); *see also United States v. Archer*, 486 F.2d 670, 676-77 n. 6 (2d Cir. 1973) ("Court made it clear [in *Russell*] that the entrapment defense would not be the only means for a defendant to contest the propriety of police practices utilized to apprehend him").

In addition, the concept of "outrageous government conduct" is not limited to *physical* misconduct. As the Second Circuit pointed out in *Cuervelo*, "there is no meaningful distinction between physical and psychological harm inflicted upon the defendant." 949 F.2d at 565 (citing *Chin*, 934 F.2d at 399 n. 4 ("there may, of course be cases where psychological torture rises to the level of outrageousness that would constitute a violation of the Due Process Clause)); *see also, United States v. Kelley,* 707 F.2d 1460, 1477 (D.C. Cir. 1983) (noting that "psychological

---

[4] Nor have any of the courts balanced the government's conduct against the seriousness of the alleged offense. As Justice Frankfurter remarked in *Joint Anti-Facist Refugee Comm. v. McGrath*, 341 U.S. 123, 161-63 (1951) (Frankfurter, J., *concurring*) the Due Process guarantee "is not a fair-weather or timid assurance[,]" and "[i]t must be respected in periods of calm and in times of trouble. . .").

coercion" as well as physical coercion, or the infliction of pain, may constitute outrageous conduct under the Due Process Clause).

2.       **The Nature of the Government's Outrageous Conduct in this Case**

Here, the government's outrageous conduct has manifested itself case in several forms. In particular, it has included: (1) violation of the terms of the Extradition Treaty between the U.S. and Honduras; (2) disregard for its firm and express commitment, as set forth in the approved application for the Interpol Red Notice, to request Mr. Yousef's extradition in all but the most exceptional circumstances; (3) violation of International Law; and (4) bringing Mr. Yousef to the U.S. by forcible abduction.

a.       **Violation of the Extradition Treaty Between the U.S. and Honduras**

The U.S. government's abduction and rendition of Mr. Yousef from Honduras to the U.S. constituted outrageous government conduct because it represented a deliberate and calculated violation of the terms of the extradition treaty between the U.S. and Honduras.

The standing Extradition Treaty between the U.S. and Honduras (37 Stat. 1616;  Treaty Series 569) (*see* Sarafa Decl., Ex. ___) states that "the U.S. and the Government of Honduras shall . . . deliver up to justice any person who may be charged with or may have been convicted of any of the crimes specified in Article II of this Convention" so long as:  (1)  the offense was "committed within the jurisdiction of one of the Contracting Parties while said person was actually within such jurisdiction when the crime was committed;" (2) the person "shall . . . be found within the territories of the other;" and (3) "evidence of criminality as, according to the laws of the place where the . . . person so charged shall be found, would justify his apprehension and . . . trial if the crime . . . had been there committed." *Id.*

The "Supplementary Extradition Convention Between the United States of America and

the Republic of Honduras" (45 Stat. 2489; Treaty Series 761, entered into force June 5, 1928, and proclaimed by the President of the U.S. June 7, 1928), specifies that "Crimes against the laws for the suppression of the traffic in narcotics products" are "punishable acts" pursuant to Article II for which extradition is appropriate.

Thus, the charges against Mr. Yousef and the specific circumstances of his case meet all the criteria for extradition pursuant to the treaty between the U.S. and Honduras: (1) the offense against Mr. Yousef, which requires the trafficking in narcotics products, is within the list of extraditable offenses; (2) the offense was committed by Mr. Yousef within the jurisdiction of Honduras, while Mr. Yousef was himself in Honduras (indeed, he was incarcerated until the day of his kidnapping and rendition); (3) Mr. Yousef was found within Honduras, a signatory to the treaty; and (4) Mr. Yousef's alleged crimes would have justified his apprehension and trial in Honduras.

Accordingly, Mr. Yousef should have been extradited through proper channels, and it was outrageous governmental conduct for the U.S. government to instead kidnap Mr. Yousef illegally.

**b.    The U.S.'s Disregard for Its Firm Commitment to Request Mr. Yousef's Extradition Pursuant to the Interpol Red Notice**

In addition, the U.S. government's outrageous conduct was aggravated by its brazen abrogation of its *express commitment, in writing, to request Mr. Yousef's extradition absent "exceptional circumstances."*

That commitment to request Mr. Yousef's extradition was reflected both in the Prosecutor's Agreement to Extradite, signed and dated July 20, 2009, *see* Sarafa Decl., Ex. 13, and the Interpol Red Notice application approval letter, dated July 21, 2009 (hereinafter "the Interpol Red Notice"), *see* Sarafa Decl., Ex. 14.  As the Interpol Red Notice declares, "the Red

17

Notice is a firm commitment by [the U.S. Attorney's Office for S.D.N.Y.], and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." *Id.*

That representation was accompanied by a citation to a section in the U.S. Attorney's Manual, which provides that,

> [a]n Interpol Red Notice is the closest instrument to an international arrest warrant in use today.  Please be aware that if a Red Notice is issued, the prosecutor's office is obligated to do whatever work is required to produce the necessary extradition documents within the time limits prescribed by the controlling extradition treaty whenever and wherever the fugitive is arrested.

United States Attorney's Manual, at §9-15.635.

In addition, the Interpol Red Notice emphasized that

> EXTRADITION WILL BE REQUESTED FROM ANY COUNTRY WITH WHICH THE REQUESTING COUNTRY IS LINKED BY A BILATERAL EXTRADITION TREATY, ANY EXTRADITION CONVENTION OR BY ANY OTHER CONVENTION OR TREATY CONTAINING PROVISIONS EXTRADITION.

Interpol Red Notice, Sarafa Decl., Ex. 14 at Bates 17 (uppercase in original).

Here, a valid and operable extradition treaty between the U.S. and Honduras certainly existed.  Nor were there *any* exceptional circumstances present (or cited), much less those sufficient to justify abrogating the U.S's firm commitment to extradite Mr. Yousef pursuant to the terms of the treaty and the promise(s) in the Interpol Red Notice and Agreement to Extradite. Thus, by so profoundly and without cause reneging on its assurance that it pursue extradition, the U.S.'s conduct was outrageous by any standard.[5]

---

[5]  It should be noted that the government also engaged in outrageous conduct in the procurement of the Interpol Red Notice.  That notice, based on information provided by the U.S. government, states that Mr. Yousef, in July 2009, was "currently incarcerated in Tamara Prison in Tegucigalpa, Honduras, and serving a sentence for a weapons offense."  Bates 15.  In fact, Mr. Yousef's sentence on the weapons offense was commuted in November 2007.  In addition, the Interpol Red Notice states that Mr. Yousef "is the leader of a weapons and narcotics trafficking organization responsible for the importation of weapons and explosives into Central America."  *Id.*, at 15-16.  However, there is not any evidence that such an "organization" existed, much less that Mr. Yousef was its "leader,"

### c.      Violation of International Law

Moreover, the U.S's abduction and rendition of Mr. Yousef unquestionably violated international law. The issue whether an international kidnapping violates international law (by violating the U.N. Charter) was definitively settled by the United Nations (hereinafter "U.N.") Security Counsel debates following the 1960 illegal kidnapping of Adolf Eichmann from Argentina by Israeli "volunteer groups." *See United States v. Toscanino*, 500 F.2d 267, 277 (2d Cir. 1974).

In the Eichmann case, "in response to a formal complaint filed by the U.N. representative from Argentina pursuant to article 35 of the U.N. Charter the Security Counsel . . . adopted a resolution condemning the kidnapping and requesting 'the Government of Israel to make appropriate reparation in accordance with the Charter of the United Nations and rules of international law[.]'" *Id.* (quoting U.N. Doc. S/4349 (June 23, 1960)) (additional citations omitted).

The effect of this resolution, as explained by the Second Circuit in *Toscanino*, was "merely recogni[tion] of a long standing principle of international law that abductions by one state of persons located within the territory of another violate the territorial sovereignty of the second state and are redressable usually by the return of the person kidnapped." 500 F.2d at 277 (additional citations omitted).

### d.      Bringing Mr. Yousef to the U.S. by Forcible Abduction

The forcible abduction of Mr. Yousef by the U.S. government may also constitute outrageous governmental conduct and violate due process under the principles of U.S. law established in *Toscanino*. *Id.*, at 275, 281 (requiring an evidentiary hearing with respect to defendant's allegations of forcible abduction, if founded, on the basis that such conduct "shocks

and/or that it imported weapons and/or explosives into Central America.

the conscience" and requires that that the defendant be returned "to his status quo ante").[6]

In *Toscanino*, the Second Circuit found that "the term [due process] has been extended to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial." *Id*. at 272 (citing *Russell*, 411 U.S. at 430-31) (additional citations omitted); *see also id.* at 273 (citing *Rochin v. California*, 342 U.S. 165 (1952)).

In so holding, the Court in *Toscanino* determined that the "so-called '*Ker-Frisbie*' rule" – based on two Supreme Court cases, *Ker v. Illinois*, 119 U.S. 436 (1886) and *Frisbie v. Collins*, 342 U.S. 519 (1952), which limited due process to the guarantee of a constitutionally fair trial and held that "the government's power to prosecute a defendant is not impaired by the illegality of the method by which it acquires hold over him" – had eroded over time.  *Toscanino*, 500 F.2d at 271-72.

In circumstances such as *Toscanino* – just as in Mr. Yousef's situation herein – "where a defendant had been brought into the district court's jurisdiction by forcible abduction in violation of a treaty," the Second Circuit held that *Ker* did not apply at all. *Id*., at 278, *citing Ford v. United States*, 273 U.S. 593, 605-606 (1927).

While Second Circuit and Supreme Court case law subsequent to *Toscanino* continue to uphold the decisions in *Ker* and *Frisbie* – despite *Toscanino's* denunciation of these cases – recent case law nonetheless clarifies that "the Second Circuit has never explicitly overruled *Toscanino*" and, under the right circumstances, *Toscanino* may provide relief for a defendant – such as Mr. Yousef – who has been brought illegally into the jurisdiction of U.S. district court by

---

[6]  Counsel recognize that this aspect of Mr. Yousef's challenge to his seizure and rendition may be undermined by the recent decisions in *United States v. Ghailani*, 751 F.Supp 2d 502 (S.D.N.Y. 2010), and *In Re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157 (2d Cir. 2008).  However, because neither the Second Circuit nor the Supreme Court have expressly overruled *Toscanino*, the issue is presented to, at a minimum, preserve the objection to Mr. Yousef's forcible abduction.

forcible abduction.  *See United States v. Umeh*, ___ F.Supp.2d ___, 2011 WL 9397, at *3

(January 3, 2011) ("[t]o be sure, [*United States ex rel.] Lujan [v. Gengler*, 510 F.2d 62 (2d Cir.

1975)] might be read to implicitly support [the defendant's contention] that *Toscanino* still

applies when the abduction is accompanied by torture or the like").

### C. Dismissal of the Indictment Against Mr. Yousef is the Proper Remedy for the U.S. Government's Outrageous Conduct in Illegally Kidnapping and Rendering Mr. Yousef

In *Bell v. Hood*, 327 U.S. 678 (1946), the Court directed that "where federally protected

rights have been invaded, it has been the rule from the beginning that courts will be alert to

adjust their remedies so as to grant the necessary relief."[7] *Id.* at 684 (footnote omitted). In light

of the egregiousness of the government's conduct, it is respectfully submitted that the Indictment

in this case should be dismissed. Such dismissal is authorized and appropriate under pursuant

either to the Fifth Amendment's Due Process guarantee, and/or this Court's supervisory powers.

*See United States v. Mosley*, 965 F.2d at 909 n. 2; *United States v. Maturo*, 982 F.2d 57, 60 (2d

Cir. 1992); *United States v. Archer*, 486 F.2d at 678.

Indeed, mere suppression of illegally seized evidence does not adequately address the

impact of the government's outrageous conduct. Nor does it fully vindicate Mr. Yousef's

constitutional rights the government has violated in deliberate and calculated fashion.

In *United States v. Marshank*, 777 F. Supp. 1507 (N.D. Cal. 1991), the district court

dismissed the indictment, recognizing that dismissal was required "where continuing prejudice

from the constitutional violation cannot be remedied by suppression of the evidence." *Id.* at

1521-22 (citing *United States v. Morrison*, 449 U.S. 361, 365-66 n. 2 (1981), and *United States

v. Rogers*, 751 F.2d 1074, 1078 (9th Cir. 1985)); *see also Toscanino*, 500 F.2d at 275

---

[7] The Court's cited authority for that proposition dated back to *Marbury v. Madison*, 1 Cranch (US) 137, 162 (1803).  327 U.S. at 684 n. 6.

(government conduct that "shocks the conscience" would "as a matter of fundamental fairness"

require returning the defendant to his position *status quo ante*, as court "must be guided by the

underlying principle that the government should be denied the right to exploit its own illegal

conduct") (citing *Wong Sun v. United States,* 371 U.S. 471, 488 (1963)).

Indeed, here the jurisdictional foundation of the prosecution against Mr. Yousef is

vitiated by the government's outrageous conduct, as its very ability to hale Mr. Yousef into a

U.S. court was dependent on the illegal seizure and rendition accomplished in violation of the

extradition treaty, the explicit avowal(s) in the Interpol Red Notice and Agreement to Extradite,

international law, and Mr. Yousef's Fifth Amendment right to Due Process.[8]

Recently, in *United States v. Ghailani,* 743 F. Supp.2d 261 (S.D.N.Y. 2010), the district

court precluded a government witness's testimony because that witness's identity, and the

government's access to him, were procured by impermissible government conduct.  *Id.* at 287-

88.  As the Court in *Ghailani* explained, " [i]f the government is going to coerce a [defendant] to

provide information to our intelligence agencies, it may not use that evidence – or fruits of that

evidence that are tied as closely related to the coerced statements as [the witness's] testimony

would be here – to prosecute the [defendant] for a criminal offense."  *Id.* at 288.

Thus, while in *Hampton v. United States*, 425 U.S. 484 (1976), the Supreme Court noted

that "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only

when the Government activity in question violates some protected right of the *defendant*[,]" *id.* at

490 (emphasis in original), here it is in fact *the defendant* – Mr. Yousef – who has been

victimized directly by the outrageous government conduct.

Indeed, the fruits of the "outrageous government conduct" include the government's

---

[8]  In *Toscanino*, the Court noted that "when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its illegal conduct."  500 F.2d at 275.

capacity to try Mr. Yousef at all.  As the Supreme Court instructed in *Terry v. Ohio*, 392 U.S. 1

(1968):

> Courts which sit under our Constitution cannot and will not be
> made party to lawless invasions of the constitutional rights of
> citizens by permitting unhindered governmental use of the
> fruits of such invasions.

392 U.S. at 13.

Here, it is respectfully submitted that due to the government's outrageous conduct, the

only sufficient and appropriate relief for Mr. Yousef is dismissal of the Indictment against him.

**D.      In the Alternative, Any and All Fruits of the Government's
          Seizure and Rendition of Mr. Yousef Should Be Suppressed**

Assuming *arguendo* that the Indictment is not dismissed, all fruits – evidentiary and

otherwise – of the government's illegal seizure and rendition of Mr. Yousef should be

suppressed.  Those fruits include Mr. Yousef's statements en route to the U.S., any property

seized from him, or any other information or evidence obtained as a result of the government's

outrageous conduct.

In *Marshank*, the District Court pointed out that the "fruit of the poisonous tree" doctrine

applies "to evidence obtained in violation of the Sixth Amendment right to counsel as well as the

Fifth Amendment right to due process."  777 F. Supp. at 1519 n. 11 (citations omitted).  The

same principle applies here, and the sanction of suppression should be applied.

**E.      The Court Should Conduct an Evidentiary Hearing on the Issue**

In the alternative, if the Indictment is not dismissed and/or evidence suppressed outright,

the Court should conduct an evidentiary hearing, as the Due Process guarantee, augmented by

the mandate set forth in *Bell v. Hood*, is sufficiently flexible to provide a remedy for Mr. Yousef.

Moreover, as the Second Circuit explained in *Cuervelo*, "[c]learly, [ ] a review [of a claim of

"outrageous government conduct"] is facilitated when a hearing on the issues presented has been held by the district court and a record has been constituted." 949 F.2d at 567 (citations omitted); *see also United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992); *United States v. Cuervelo,* 949 F.2d 559 (2nd Cir. 1991); *United States v. Chin,* 934 F.2d 393 (2nd Cir. 1991); *Toscanino*, 500 F.2d at 281 (remanding for evidentiary hearing).

As the Second Circuit explained,

> [a] hearing allows for a searching inquiry into the particulars . . .
> employed by the government, as the court undertakes to sort
> through the various conflicting claims, and permits factual
> determinations to be made by the district judge.

*Id.*

The Court added that "[a] hearing also provides the district judge with an opportunity to observe the demeanor and assess the credibility of various witnesses." *Id*. Ultimately, the Second Circuit advised, "[m]ost often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist." *Id.*[9]  Since determining "[w]hether outrageous government conduct exists turns on the totality of the circumstances[,]" *United States v. Marshank*, 777 F. Supp., at 1523 (quoting *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981)), a hearing is necessary to decide the issue.  *See also Mosley*, 965 F.2d at 910.

Here, the government violated Mr. Yousef's Fifth Amendment rights in the course of its pervasive misconduct, and reached a "demonstrable level of outrageousness." *Hampton*, 425 U.S. at 495 n. 7; *see also Cuervelo*, 949 F.2d at 565. Thus, at the very least the Court should conduct an evidentiary hearing on the issue and determine an appropriate remedy for the government's outrageous conduct in its illegal seizure and rendition of Mr. Yousef from Honduras to the U.S.

---

[9] In *Cuervelo*, the Second Circuit also determined that "[a] motion to dismiss an indictment alleging outrageous governmental conduct is a question of law directed to the trial judge . . ."  949 F.2d at 567.

## POINT IV

## EVIDENCE OBTAINED PURSUANT TO THE SEARCH OF THE SUMASIEMPRE123@YAHOO.COM EMAIL ACCOUNT SHOULD BE SUPPRESSED UNDER THE FOURTH AMENDMENT

On January 29, 2009, the government applied for, and obtained, a search warrant for the contents and records of the Yahoo! electronic mail account sumasiempre123@yahoo.com (the "Target Account"). Sarafa Decl., Ex. 8. The affidavit in support of the search warrant, however, omitted information material to the probable cause determination. First, the affidavit did not reveal that the supposed photographs of the weapons cache purportedly for sale appear on their face to be altered images. Second, the affidavit did not reveal that the government had information that Mr. Yousef had been involved in a weapons scam in 2006. Considered in conjunction with the fact that the individual in the photos told agents that the weapons sale at issue in this case was a scam – a fact that the affiant stated, but claimed agents rejected – the omitted information was clearly critical to the probable cause determination. The information, moreover, was known or should have been known to affiant at the time he prepared the affidavit.

Because the warrant was obtained in violation of Mr. Yousef's Fourth Amendment rights, all the fruits of the search should be suppressed. At a minimum, an evidentiary hearing should be held to determine whether the affiant made knowing or reckless material omissions from the affidavit.[10]

### A.    Applicable Principles of Law

Governmental access to electronic communications is governed by the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2712. Pursuant to the SCA, governmental

---

[10] The government obtained three separate orders in connection with the sumasiempre123@yahoo.com email account. As stated in the Notice of Motion, this motion seeks to suppress only evidence obtained pursuant to the January 29, 2009 search warrant, as the government has represented to defense counsel that it does not intend to introduce evidence obtained pursuant to other orders. Should the government's position change, counsel respectfully seeks leave to file additional motions.

access to the contents of electronic communications, without regard to the length of time they have been in storage and without required notice to the subscriber or customer, can be obtained only upon issuance of a warrant in compliance with the Federal Rules of Criminal Procedure. 18 U.S.C. § 2703. The Federal Rules of Criminal Procedure, in turn, consistent with the Fourth Amendment of the United States Constitution, require a showing of probable cause before a warrant may issue. Fed. R. Crim. Pro. 41(d); U.S. Const. amend. IV.

The January 29, 2009 application for a search warrant in this case sought unrestricted access to all stored electronic mail and other stored content information, as well as all transactional information and business records related to the sumasiempre123@yahoo.com email account, without notice to the account subscriber. *See* Sarafa Decl., Ex. 8. Accordingly, the affidavit in support of the requested search warrant had to set forth sufficient information from which a neutral and detached magistrate judge could, based upon the totality of the circumstances, make an informed probable cause determination. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).

A search warrant affidavit must provide the magistrate judge with a "substantial basis" for determining the existence of probable cause. *Id.* at 239. Where the officer requesting the warrant relies on a confidential informant, the "informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Id.* at 230.  In addition, "corroboration of details of an informant's tip by independent police work" is of considerable value in analyzing the totality of the circumstances for a probable cause determination. *Id.* at 241-42. Accordingly, reliance on hearsay in an affidavit is not *per se* insufficient "so long as a substantial basis for crediting the hearsay is presented." *Jones v. United States*, 362 U.S. 257, 269 (1960).

A magistrate's determination of probable cause is generally accorded "great deference," *Spinelli v. United States*, 393 U.S. 410, 419 (1969), but it is by no means immune from scrutiny. *United States v. Leon*, 468 U.S. 897, 914 (1984). Most notably, "the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Id.* Where an affidavit contains inaccuracies, "the issuing judge's probable cause determination is not due *any* deference because he did not have an opportunity to assess the affidavit without the inaccuracies." *United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) (emphasis added).

It is well-established that a defendant may challenge the veracity of a sworn statement used by law enforcement authorities to obtain a search warrant. *Franks v. Delaware*, 438 U.S. 154 (1978). A defendant is entitled to a hearing when he makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. Intentional or reckless omissions of material information, like false statements, may serve as the basis for a *Franks* challenge. *Rivera v. United States*, 928 F.2d 592, 604 (2nd Cir. 1991); *United States v. Campino*, 890 F.2d 588, 592 (2d Cir. 1989). Recklessness may be inferred where the omitted information was "'clearly critical'" to the probable cause determination. *Id.* (citing *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990); *Hale v. Fish*, 899 .2d 390, 400 (5th Cir. 1990); *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

To determine whether the false information or omissions were necessary to the issuing judge's determination of probable cause, the court should correct the affidavit by disregarding the erroneous information and accounting for the material omissions, then conduct a *de novo*

review to determine whether the corrected affidavit supports probable cause. *Canfield*, 212 F.3d at 718.

Where a magistrate judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, suppression of the fruits of the search is the appropriate remedy. *Leon*, 468 U.S. at 923. Omissions of material information from an affidavit are subject to the same inquiry. *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985). To suppress evidence obtained pursuant to an affidavit containing erroneous information or material omissions, the defendant must show that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998); *see also Canfield*, 212 F.3d at 717-18.

### B. All Fruits of the Search of the Target Account Should be Suppressed Because Material Information was Deliberately or Recklessly Omitted from the Search Warrant Affidavit

The search warrant affidavit in this case was prepared by a Special Agent of the DEA ("Affiant"), who states that he based it upon conversations with "other law enforcement officers involved in the investigation" and the Affiant's "review of documentary and other evidence." *See* Sarafa Decl., Ex. 8. It relies heavily upon information supplied by a confidential source, CS-2, but does not indicate that the Affiant ever spoke directly with CS-2 or personally worked with CS-2.

The affidavit sets forth hearsay information about weapons negotiations that CS-2 supposedly was engaged in with Mr. Yousef (referred to as "Ghantou" in the affidavit) and two others. According to this information, another confidential source, CS-1, introduced CS-2 to the

group as a potential buyer of weapons who intended to supply them to FARC. The affidavit

states that negotiations took place during September 2008, and that the transaction was

contingent upon the production of photographic evidence of the weapons cache to CS-2. It goes

on to state that CS-1 sent CS-2 a series of photos in October 2008 depicting various weapons and

explosives, and in which an Arab male posed in front of the weapons with a recent Belize

newspaper. The Arab male, according to the affidavit, attended a subsequent meeting with CS-1

and CS-2, who identified him as the individual in the photos.

The Affiant does not indicate that any of this information was independently

corroborated. Both CS-1 and CS-2 are described as paid informants who have provided

information "which has proven to be reliable in the past," but no details of their past work is

included.

The affidavit goes on to state that, in December 2008, the Arab male in the photos

requested a meeting with agents from the DEA's Belize Country Office. Agents at the meeting

verified that this individual was indeed the man in the photos. This man, who voluntarily

approached the DEA, stated that the weapons negotiations in which he participated were a

"scam" to steal money from unsuspecting customers. He provided the

sumasiempre123@yahoo.com email account information, and stated that he used this account in

furtherance of the scam, at times to disseminate pictures of himself posing with weapons.

The affidavit indicates, however, that "agents believe, based on the investigation to date

and their training and experience," that this was "not a scam but rather sincere engagement in

weapons trafficking to, among others, the FARC." The affidavit does not provide any further

information to explain the agents' rejection of the man's statement that this was a scam.

Two critical pieces of information were omitted from this affidavit. First, the affidavit

does not reveal that the weapons photos it references are, on their face, visibly altered images. The man in the photos said himself that the entire undertaking was a scam.[11] The Affiant claims to have conferred with other law enforcement agents and reviewed documentary and other evidence. Surely the Affiant had access to the photos, or should have inquired into the photos upon learning that the man said the negotiations were a scam. This would have been especially important in light of the fact that agents chose to reject the man's statement about what was really going on.

Second, the affidavit does not disclose that the U.S. government had information that Mr. Yousef – the purported leader of the group, according to the affidavit – had previously engaged in a scam weapons transaction. As set forth in the accompanying Declaration, U.S. government agents had information from 2006 about Mr. Yousef's fraudulent weapons transaction with El Padrino. *See* Sarafa Decl. at ¶¶ 5-17. (Notes and reports related to such information are requested in Point I.) The Affiant either had knowledge of such information, or should have learned of it during the course of his investigation.

An affiant may not suppress facts that would cast doubt upon the existence of probable cause. *Rivera*, 928 F.2d 604-05. It is clear in this case, where the affidavit sets forth no independent corroboration of information from confidential sources and contains affirmative information casting doubt upon the validity of the purported weapons negotiations, that the omitted facts were material to the probable cause determination. At a minimum, a hearing is required in this case to examine the veracity of the sworn statement upon which the magistrate judge relied in finding probable cause.

Because the affidavit either intentionally or recklessly omitted information material to the

---

[11]   The man, Hassan Rammal, may also have provided information about the creation of the photos during his interview, which could be ascertained upon production of the interview notes and reports, as requested in Point I.

probable cause determination, the ensuing search of the sumasiempre123@yahoo.com email account violated Mr. Yousef's rights under the Fourth Amendment and the fruits of the illegal search – any email communications and attachments obtained pursuant to the search warrant – must be suppressed.

## **CONCLUSION**

For the reasons set forth above, as well as in all the accompanying papers filed previously and herewith, it is respectfully submitted that the Court should grant Mr. Yousef's pretrial motions in their entirety.

Dated:  May 3, 2011
         New York, NY

                                        Respectfully submitted,


                                        s/Melinda Sarafa
                                        Melinda Sarafa
                                        SARAFA LAW LLC
                                        80 Pine Street, Floor 33
                                        New York, NY 10005
                                        Tel: 212-785-7575


                                        s/Joshua Dratel
                                        Joshua L. Dratel, Esq.
                                        JOSHUA L. DRATEL, P.C.
                                        2 Wall Street, 3rd Floor
                                        New York, NY 10005
                                        Tel: 212-732-0707

                                        *Attorneys for Defendant Jamal Yousef*