UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                           :

UNITED STATES OF AMERICA           :

                                         :

             v.                     :      **08-CR-1213 (JFK)**

                                         :

JAMAL YOUSEF,                :

                                         :

                   **Defendant.**      :
-------------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF THE
## PRETRIAL MOTIONS OF JAMAL YOUSEF

Melinda Sarafa, Esq.
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575

Joshua L. Dratel, Esq.
Lindsay Lewis, Esq.
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: 212-732-0707

*Attorneys for Defendant Jamal Yousef*

– Of Counsel –

Melinda Sarafa
Joshua L. Dratel
Lindsay A. Lewis

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

POINT I

THE COURT SHOULD STRIKE IRRELEVANT AND PREJUDICIAL
SURPLUSAGE FROM THE THIRD SUPERSEDING INDICTMENT ......................................1

      A.      In the Context of the Charged Weapons Transaction, FARC's Past
             Terrorist Activities Are Irrelevant to Proving Any Element of the Offense............2

            1.      A Stipulation that FARC Engaged in Terrorist Activity Would
                        Render the Recitation of FARC's Violent Acts of Terrorism
                        Unnecessary and Irrelevant to Proving Any Element of the Charged
                        Offense .................................................................................................2

            2.      The Government Has Not Connected the Catalog of Violence in the
                        Indictment to Mr. Yousef's Knowledge of FARC's Activities ...................3

      B.      Inclusion of FARC's Historical Acts of Terrorism in the Indictment
             Is Inflammatory and Unduly Prejudicial.................................................................4

POINT II

THE UNITED STATES GOVERNMENT IS RESPONSIBLE FOR THE
UNLAWFUL RENDITION OF MR. YOUSEF, WARRANTING DISMISSAL
OF THE INDICTMENT, SUPPRESSION OF POST-ARREST STATEMENTS
AND/OR AN EVIDENTIARY HEARING .....................................................................................6

POINT III

EVIDENCE OBTAINED FROM THE TARGET EMAIL ACCOUNT
SHOULD BE SUPPRESSED DUE TO DELIBERATE OR RECKLESS
MATERIAL OMISSIONS FROM THE SEARCH WARRANT AFFIDAVIT ...........................13

      A.      Mr. Yousef Had a Reasonable Expectation of Privacy in the Target Account
             and Standing to Challenge the Search ..................................................................13

      B.      The Omitted Information from the Warrant Affidavit Was
             Material to the Probable Cause Determination ......................................................14

      C.      The Government Cannot Credibly Claim that the Omissions
             Were Not Deliberate or Reckless...........................................................................17

POINT IV

THE GOVERNMENT SHOULD BE COMPELLED TO PRODUCE
REQUESTED DISCOVERY AND *BRADY* MATERIAL...........................................................18

CONCLUSION..................................................................................................................20

### INTRODUCTION

This reply memorandum of law is respectfully submitted on behalf of Jamal Yousef in further support of his pretrial motions to strike irrelevant and prejudicial surplusage from the indictment, dismiss the indictment or grant other relief based on outrageous government conduct, suppress evidence, and obtain additional discovery and exculpatory material.

In addition to the facts set forth in the previously filed Declaration of Melinda Sarafa ("Sarafa Decl."), and the Exhibits attached thereto, this Reply Memorandum incorporates by reference the contents of the accompanying Supplemental Declaration of Jamal Yousef ("Supp. Yousef Decl.").[1]

### POINT I

### THE COURT SHOULD STRIKE IRRELEVANT AND PREJUDICIAL SURPLUSAGE FROM THE THIRD SUPERSEDING INDICTMENT

In response to Mr. Yousef's motion to strike irrelevant and prejudicial surplusage from the Indictment, the government claims that "[t]he FARC's past terrorist acts . . . are directly relevant and essential to proving an element of the charged offense" – namely, "that the defendant engaged in a drug offense knowing or intending to provide something of pecuniary value *to a person or organization that has engaged in terrorist activity*" – and that "these acts are not inflammatory and prejudicial in the context of the charged weapons transaction." Gov. Memo at 23-24 (emphasis in original).

The government is wrong. A lengthy catalog of FARC's past terrorist acts is *not* essential to proving the bare fact that FARC has engaged in terrorist activity. Indeed, a stipulation by the parties that FARC has engaged in terrorist activity under the terms of the applicable statutes, 8

---

[1]  Mr. Yousef respectfully requests that the Court accept this brief for filing, although it exceeds the Court's 10-page limit for reply briefs. Prior briefing on these motions has been extensive, and this reply must also account for additional discovery provided in response to the initial motion.

U.S.C. §1182(a)(3)(B) and 22 U.S.C. § 2656f(d)(2), would render the recitation of FARC's violent acts of terrorism entirely unnecessary to proving that fact. Mr. Yousef would agree to such a stipulation.

Nor is a recitation of FARC's past terrorist acts relevant to *Mr. Yousef's knowledge* of whether FARC engaged in terrorist activity. The Indictment makes no connection between FARC's past activities and Mr. Yousef's awareness of them. Accordingly, the inclusion of such language in the Indictment substantially and unfairly prejudices Mr. Yousef.

**A.      In the Context of the Charged Weapons Transaction, FARC's Past Terrorist Activities Are Irrelevant to Proving Any Element of the Offense**

**1.      A Stipulation that FARC Engaged in Terrorist Activity Would Render the Recitation of FARC's Violent Acts of Terrorism Unnecessary and Irrelevant to Proving Any Element of the Charged Offense**

The government asserts that "[t]he references Yousef seeks to strike from the Indictment are plainly relevant; if proved at trial, they support an essential element of the charged Narco-terrorism offense." Gov. Memo at 24. Mr. Yousef does not dispute that the fact of FARC's engagement in terrorism is relevant to an essential element of the crime alleged in the Indictment – namely, that the defendant knew or intended to provide something of pecuniary value to "any person or organization that has engaged or engages in terrorist activity (as defined in section 1182(a)(3)(B) of Title 8) or terrorism (as defined in section 2656f(d)(2)." 21 U.S.C. § 960a(a).

However, the nature and extent of the proof relevant and appropriate for that purpose should be limited to a stipulation that FARC engaged in acts of terrorism and terrorist activity as defined in the applicable statutes. Such a stipulation would foreclose any government argument that evidence of actual FARC activities is necessary to proving that element of the charged offense.

**2.    The Government Has Not Connected the Catalog of Violence in the Indictment to Mr. Yousef's Knowledge of FARC's Activities**

The government urges that Mr. Yousef's surplusage motion be denied because, *inter alia*, his "primary argument in this regard – that the actual activities of the FARC are irrelevant to the question of what Yousef and his co-conspirators knew and understood about the FARC's activities – is facially unpersuasive and patently meritless." Gov. Memo at 27. Yet the Indictment fails to connect the catalog of FARC violence delineated in the Indictment to Mr. Yousef's *knowledge* of those activities, and resorts to the illogical claim that a listing of FARC violence somehow provides circumstantial proof of what Mr. Yousef knew.

The government acknowledges that "what *Yousef knew* about the FARC" is what is "relevant" and "essential to an element of the offense." *Id.* at 25. The Indictment nevertheless includes a laundry list of FARC's activities on the basis that such activities were "well known in Central and South America." I*d.* at 27. The government further claims that "evidence of actual FARC activities tends to prove, circumstantially, what Yousef knew about the FARC." *Id.* at 25.

The government is simply incorrect. The knowledge standard in this case focuses exclusively on what *Mr. Yousef* knew and believed about the FARC and its activities. As a result, general evidence of particular FARC activities, absent evidence that Mr. Yousef knew about those activities, does *not* tend to prove Mr. Yousef's knowledge of them.

Thus, even if the FARC's activities "are well-known in Central and South America," they fail "to prove, circumstantially, what Yousef knew about the FARC" because that does not establish Mr. Yousef's personal knowledge. Since there is no basis to connect the catalog of violence in the Indictment to Mr. Yousef's knowledge of the FARC's activities, the government should not benefit from having such information included in the Indictment.

The government incorrectly asserts that "[Mr.] Yousef's Surplusage Motion is only

3

meaningful . . . if evidence of the FARC's past activities will be excluded from trial." *Id.* at 27. By including in the Indictment a list of FARC's terrorist acts, the government attempts to sidesteps it burden to connect such acts to Mr. Yousef's knowledge, and substitutes information and activity that (a) do not bear on Mr. Yousef's knowledge or intent, but (b) could very well, because of their inclusion in the Indictment, cause the jury to provide that critical but missing link in improper fashion.

Also, contrary to the government's suggestion, this motion is not an *in limine* motion. It would be premature at this stage to determine which of FARC's violent activities were known to Mr. Yousef, and therefore could be admissible at trial. However, the Indictment fails abjectly to make *any* allegation that Mr. Yousef was aware of *any* of the FARC activities recounted therein. Thus, that language must be stricken regardless whether the government ultimately may be able to provide a sufficient link between any such activities and Mr. Yousef's knowledge.

**B.    Inclusion of FARC's Historical Acts of Terrorism in the Indictment is Inflammatory and Unduly Prejudicial**

The government contends that "because the evidence of the FARC's past and present terrorist activity is clearly relevant to the charged offense, the government cannot be asked to present only certain evidence of that past and present activity, or be limited to presenting the evidence – the fact of the designation – that Yousef believes is the least prejudicial to him." *Id.* at 29 (citing *Old Chief v. United States*, 519 U.S. 172 (1997)).

However, that assertion ignores the government's inability to allege that Mr. Yousef had knowledge of any particular terrorist activities of FARC, and that it instead chose to include in the Indictment its own preferred assortment of FARC violence. Not surprisingly, since this case is pending in a U.S. court, the government chose to focus on FARC terrorism against the U.S. and U.S. nationals, even though the statute does not require that the terrorist acts be directed

against the U.S. The government cannot insist on carte blanche to select the most prejudicial acts available. To the extent that the government insists that it should be able to include specific terrorist acts of FARC, those acts must be limited to those the government can link to Mr. Yousef. Otherwise the selection is entirely arbitrary and at the whim of the prosecutors.

In *Old Chief*, the Supreme Court made clear that a court can compel stipulations to avoid undue prejudice. 519 U.S. at 183-84; *see also United States v. Gallo*, 668 F. Supp. 736, 756-57 (E.D.N.Y. 1987). As discussed above, a stipulation that FARC engaged in acts of terrorism forecloses any need for introduction of "evidence of the FARC's past and present terrorist activity" that would be highly prejudicial.

Moreover, in *Old Chief* the Supreme Court explained that the government does not have the right to introduce the *most* prejudicial evidence if less prejudicial evidence will accomplish the same purpose. 519 U.S. at 183-84. Rather, if the trial court were called upon to decide whether "a particular item of evidence raised a danger of unfair prejudice[,]" it would "go on to evaluate the degrees of probative value and unfair prejudice not only for the item in question but for any actually available substitutes as well." *Id.* at 182.

In addition, in *Old Chief*, which involved the government's refusal to accept a stipulation that would have been far less prejudicial than admission of the nature of the defendant's prior offense, the Supreme Court quoted with approval the Advisory Committee's Notes to Rule 404(b) of the Federal Rules of Evidence that:

> "[t]he determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under [Rule] 403 [of the Federal Rules of Evidence]."

*Id.* at 184.[2]

---

[2]  Rule 403 of the Federal Rules of Evidence provides:

Since Rule 403 considerations act as a brake on the government's prerogative, there is no basis for introducing the litany of FARC's violent terrorist acts (the most prejudicial evidence), when the same purpose would be served (less prejudicially) by simply stipulating to FARC's engagement in terrorist activity. Accordingly, the requested portions of the Indictment must be stricken to protect Mr. Yousef's constitutional rights to Due Process and a fair trial.

**POINT II**

**THE UNITED STATES GOVERNMENT IS RESPONSIBLE FOR THE UNLAWFUL RENDITION OF MR. YOUSEF, WARRANTING DISMISSAL OF THE INDICTMENT, SUPPRESSION OF POST-ARREST STATEMENTS AND/OR AN EVIDENTIARY HEARING**

In response to Mr. Yousef's motion to dismiss the Indictment or suppress his post-arrest statements, the government undertakes considerable effort to imply that the U.S. is not legally responsible for what occurred on August 18, 2009 – namely, Mr. Yousef's forcible removal from Honduras and transfer to U.S. custody. Rather, the government asserts that Mr. Yousef "was arrested based on an Interpol 'Red Notice' in Honduras and, because he is not a Honduran citizen, was subsequently lawfully expelled from Honduras by the Honduran Government." Gov. Memo at 3 (citing the May 31, 2011 Declaration of Special Agent Gregory S. Ball) ("Ball Decl.").

That contention, reviewed at face value, would suggest that shortly thereafter Mr. Yousef fortuitously fell into the U.S.'s lap. That, of course, does not conform to the facts, and raises serious questions regarding why the government would make such a preposterous claim. In fact, while Agent Ball's Declaration maintains that "no U.S. law enforcement agent was present when

---

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

6

Yousef was first arrested or during his subsequent processing at a Honduran Immigration facility," Ball Decl. ¶ 4, it thereafter concedes *in the very same sentence* that "DEA Agents from the Tegucigalpa, Honduras DEA Country Office performed surveillance as those Interpol and National Police agents transferred Yousef from the prison to the immigration facility." *Id.*

Also, according to Agent Ball, those U.S. Drug Enforcement Administration ("DEA") agents monitored the situation most carefully as it evolved that evening:

> From conversations with those DEA agents, I am informed that Yousef was arrested by Honduran Interpol agents and Honduran National Police Officers inside Tamara prison in Tegucigalpa, Honduras as he finished out-processing after being released from the prison earlier that day by order of a judge. He was then taken to a Honduran immigration facility by vehicle convoy where the paperwork for his expulsion was completed. . . .
>
> . . . I have been informed that after his processing at Honduran immigration, Yousef's custody was officially transferred to Interpol, and he was accompanied by an Interpol agent – Carlos Leonardo Enriquez – and DEA agents to a waiting helicopter. . . . An Interpol agent, a DEA agent, and Yousef boarded the helicopter, which then flew to Soto Cano air force base, where a jet chartered by DEA was waiting.

*Id*. ¶¶ 4-5.

Obviously, that sequence of events – the DEA agents' presence at the scene when Mr. Yousef was first apprehended in Tegucigalpa, their accompanying him to a helicopter with an agent from Interpol, and their transfer of Mr. Yousef, via helicopter, to an air base where a DEA-chartered jet was waiting – was neither accidental, coincidental, nor spontaneous.[3]

Instead, it was just as obviously planned, orchestrated, directed, and implemented by and/or at the behest and for the benefit of the U.S. in order to gain custody of Mr. Yousef. Having set that inexorable course in motion, the U.S. cannot suggest that enlisting surrogates to

---

[3] The U.S. Government's transparent direction and control of Mr. Yousef's apprehension and transfer renders inexplicable the government's assertion that the U.S. "is not responsible for ensuring that a foreign sovereign complies with its own internal requirements in issuing an extradition or expulsion." Gov. Memo at 15 (citations omitted).

forcibly abduct Mr. Yousef somehow shields the U.S. from accountability for their misconduct and violations of Due Process, the Interpol Red Notice, the extradition treaty between the U.S. and Honduras, and international law. *See* Yousef Memo at 16-19.

In fact, the Second Circuit has ruled that U.S. constitutional standards apply when: (1) there is a "joint venture" between the United States and foreign enforcement officials; or (2) foreign officers act as agents of U.S. authorities. *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992).

Courts have consistently recognized that when U.S. agents are "substantially" involved in interrogations and other investigative activities with foreign law enforcement officials, those acts constitute "a joint venture" and constitutional standards apply to the admission of evidence obtained as a result. *See United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) (finding "joint venture" and Fourth Amendment applicable to wiretap by Thai police agents given that U.S. law enforcement played a "substantial role" in assessing and utilizing fruits of wiretaps); *see also Maturo*, 982 F.2d at 61 (stating that evidence obtained by foreign officials may be excluded from U.S. courts pursuant to constitutional standards "where the cooperation between the United States and foreign law enforcement officials is designed to evade constitutional requirements applicable to American officials") (quoting *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983)); *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir. 1984).

Thus, for example, interrogations conducted through the combined efforts of U.S. and foreign officials clearly qualify as a "joint venture" requiring non-*Mirandized* statements to be suppressed. *See United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003) (stating that "statements elicited during oversees interrogations by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in

8

questioning conducted by foreign authorities"); *see also Bagaric*, 706 F.2d at 69; *Pfeifer v.*

*United States Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980) (holding "evidence obtained

through activities of foreign officials, in which federal agents substantially participated and

which violated the accused's Fifth Amendment or *Miranda* rights, must be suppressed in a

subsequent trial in the United States").

Even when U.S. officials do not participate in foreign interrogations in surreptitious

ways, U.S. constitutional imperatives apply when "conduct of foreign law enforcement officials

renders them agents, or virtual agents, of United States officials." *United States v. Karake*, 281 F.

Supp. 2d 302, 308 (D.D.C. 2003); *see also Maturo*, 982 F.2d at 61; *United States v. Busic*, 592

F.2d 13, 23 n.7 (2d Cir. 1978) (suggesting Fourth Amendment could apply if foreign authorities

acted "as agents of American authorities"). As a result, the government cannot evade judicial

scrutiny pursuant to U.S. constitutional standards simply by delegating the performance of the

conduct itself to foreign agents and authorities.

Indeed, the government's presentation of its patently incredible pretense that it was not

the principal and operative force behind Mr. Yousef's "expulsion" from Honduras, and its failure

to acknowledge its direct involvement in Mr. Yousef's abduction dramatically highlights the

need not only for the discovery Mr. Yousef requested in his motion,[4] but also an evidentiary

hearing to determine the nature and scope of the U.S.'s direction of Honduran and Interpol

personnel in effecting Mr. Yousef's transfer to U.S. custody.

In that context, it is noteworthy that Agent Ball's Declaration – which constitutes, at the

very least, a second-hand account, and therefore should not be sufficient to establish the facts in

---

[4]  In the context of this issue, Mr. Yousef's motion seeks communications between and information shared by the governments of the U.S. and Honduras regarding: (1) Mr. Yousef's arrest in Honduras for passport fraud (both before and after his arrest); and (2) Mr. Yousef's August 2009 seizure by U.S. authorities and transport to the U.S. *See* Yousef Memo at 2-3.

a manner that would preclude an evidentiary hearing on the issue – *creates* rather than resolves material issues of fact. For example, in contrast with Mr. Yousef's May 3, 2011 Declaration, Agent Ball contends that Mr. Yousef was arrested *inside* the prison in Honduras, was transported to a Honduran immigration facility where he was ordered expelled from Honduras, and was taken to a "waiting helicopter" at that location.

Indeed, the exhibits to Agent Ball's Declaration raise serious questions about that latter claim. For instance, Exhibit 2, a letter from Police Commissioner Rommel Armando Martinez Torres (of Central National Office, National Police of Honduras) transferring Mr. Yousef to Interpol custody "in accordance with the decision issued by the authorities at the [Honduras] Department of Immigration and Alien Affairs[,]" is dated August *19*, 2009, as is Agent Ball's handwritten notation on the letter. It is beyond dispute, however, that *Mr. Yousef was arrested in Honduras and transferred to Interpol custody the day before, on August 18, 2009.*[5]  Nor is Mr. Yousef's signature or acknowledgment of the expulsion reflected on the expulsion order, or *any* indication that he was even served with it or provided any notice thereof.

Also, Mr. Yousef plainly was denied any opportunity to contest the expulsion. He was not provided counsel, or the right to appeal, or any process *at all*.[6] Thus, the *bona fides* of Mr. Yousef's expulsion, and whether the letter transferring his custody by Honduran authorities to Interpol was contemporaneous with his apprehension and transport to the U.S., are very much in

---

[5]  Agent Ball notes that the DEA jet from Honduras transporting Mr. Yousef "flew overnight" to the U.S. Naval Station at Guantanamo Bay, Cuba, for refueling before resuming its journey to New York, where Mr. Yousef "was presented before a Magistrate Judge in the Southern District of New York on the afternoon of August 19, 2009, the same day he landed in the United States." Ball Decl. ¶ 8. In addition, Exhibit C to the May 31, 2011 Declaration of Assistant United States Attorney Jeffrey A. Brown ("Brown Decl."), a redacted DEA Form-6 report, notes that the interrogation of Mr. Yousef by Agent Ball commenced "August 19, 2009, at approximately 12:15 a.m. EST[.]" Brown Decl., Ex. C at 1. According to Agent Ball's Declaration, that would have been *after* Mr. Yousef was already *en route* to the U.S. on the DEA-chartered jet following his arrest in Honduras on August 18, 2009.

[6]  This is particularly troubling, as it appears, based on documents in Mr. Yousef's possession when he was arrested (and which were produced in discovery), that he had a petition for asylum pending in Honduras at the time.

question.

In addition, the government's argument with respect to its blatant abrogation of its commitment in the Interpol Red Notice – that it would request Mr. Yousef's extradition absent "exceptional circumstances," *see* Yousef Memo at 17-18 & Sarafa Decl., Ex. 14 – is unavailing. The government asserts that

> the Prosecutor's agreement to "extradite" is not a commitment to use *the specific vehicle of extradition* to take custody of an arrested defendant, but rather, properly understood, a pledge to do whatever is required to take custody of the defendant upon his arrest, in order to justify the efforts of foreign law enforcement officials to arrest him. While what is required is often to pursue formal extradition of the defendant, where the arresting country agrees to waive extradition and expel the defendant, it should be self-evident that the U.S. Government is not required, by virtue of any commitment in the Red Notice, to decline the offer and instead insist on lengthy and burdensome extradition proceedings.

Gov. Memo at 16 (emphasis in original).

Yet that claim, which suffers from several fundamental logical and legal defects set forth below, is the very definition of impunity: that the U.S. government is not bound by what it commits to in writing, that it can change its mind whenever and for whatever reason it pleases (or, in effect, no reason at all), and act in contravention of law and its express agreements.

Thus, according to the government, the specific legal term "extradite" does *not* mean "extradite," but something else much broader. That defies logic, language, and the law, and, naturally, the government's breathtaking claim is not accompanied by any legal citation. Instead, it is contradicted later in the *very next sentence in the same paragraph*, in which the government reveals that it knows full well what "extradition" means, noting the distinction between the means by which it accomplished jurisdiction over Mr. Yousef, and "lengthy and burdensome extradition proceedings." *Id.* (emphasis added).[7]

---

[7] The Uniform Criminal Extradition Act adopted by most states, *see, e.g.,* Article 570 of the New York Criminal

11

Similarly, the government's claim that its pledge meant merely that it was obliged only to do "whatever is required in order to justify the efforts of foreign law enforcement officials to arrest him[,]" ignores that those "foreign officials" were acting at the behest and direction of *U.S. officials* in the contrived arrest and expulsion from Honduras. That represents "bootstrapping" at is most elemental. Likewise, rationalizing the abrogation of the Red Notice commitment as simply not "declin[ing] the offer" by Honduras to hand Mr. Yousef over absent legal proceedings again defies the fact that the U.S. effected custody of Mr. Yousef without affording him his rights under Due Process, the extradition treaty, or international law, and not as the result of a genuine and independent "offer" by Honduras.

Also, while the government describes extradition proceedings as "lengthy and burdensome," *see id.*, and therefore dispensable at the government's whim without any opportunity for independent judicial review, that characterization applies as well to discovery, trials, and other forms of process that are designed to ensure that governments – and not just individuals – abide by the rule of law.

The government also challenges Mr. Yousef's reliance on *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974). However, Mr. Yousef's motion is based on *Toscanino* to only a limited extent, and acknowledges that *Toscanino*'s continued vitality has been subject to question. *See* Yousef Memo at 20 & n. 6. Nevertheless, as the cases cited by the government note by their precise and careful language, *see* Gov. Memo at 9-10, however dubious *Toscanino*'s viability may be, it has not yet been reversed and, notwithstanding the number of district court and other circuit opinions sounding its death knell, can be repudiated conclusively only by the Second Circuit.

---

Procedure Law, contemplates *court procedures*, and not one state plucking persons from another state and characterizing it as "extradition." Indeed, in the international context, the latter has a term of its own in counterpoint to the legal procedures attendant to extradition: *rendition*.

Accordingly, for all the reasons set forth above, as well as those set forth in Mr. Yousef's initial Memorandum of Law and accompanying papers, it is respectfully submitted that the Court should dismiss the Indictment and/or suppress evidence due to outrageous government conduct in the illegal kidnapping and rendition of Mr. Yousef from Honduras to the United States. At the very least, the Court should conduct an evidentiary hearing on the issue and determine an appropriate remedy for Mr. Yousef.

## POINT III

**EVIDENCE OBTAINED FROM THE TARGET EMAIL ACCOUNT
SHOULD BE SUPPRESSED DUE TO DELIBERATE OR RECKLESS
MATERIAL OMISSIONS FROM THE SEARCH WARRANT AFFIDAVIT**

The government contends that Mr. Yousef's motion to suppress the fruits of the search of the email account sumasiepre123@yahoo.com (the "Target Account") should be denied on two grounds: first, that Mr. Yousef lacks standing to challenge the search; and second, that the information omitted from the warrant affidavit would have strengthened the probable cause determination, not undermined it. The government is wrong on both points.

**A.    Mr. Yousef Had a Reasonable Expectation of Privacy in the Target Account
and Standing to Challenge the Search**

Mr. Yousef had an expectation of privacy in the Target Account, and therefore has standing to challenge the search of the account. As documented in Mr. Yousef's  Supplemental Declaration, he had a subjective expectation of privacy in the contents of the Target Account. At the time that the warrant was sought and obtained, Mr. Yousef was one of a small number of individuals who were authorized by the account subscriber to use the account, and able to access it with the account name and password. Supp. Yousef Decl. ¶ 4. He expected that the contents and records of the account would be accessed only by the people authorized by the subscriber to use it, and that it would remain free from outside intrusion. *Id.* ¶ 5. At no time did Mr. Yousef

13

expect that the account would be accessed by government agents. *Id.*

Mr. Yousef's expectation of privacy in the account was reasonable. A subscriber enjoys a reasonable expectation of privacy in the contents of emails that are stored with, or sent or received through, a commercial Internet service provider. *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010). The fact that more than one individual may use an account does not alter the reasonableness of the expectation of privacy, or, as the government suggests, waive the expectation of privacy. *See* Gov. Br. at 30. Notably, the government is unable to cite any authority for such a novel proposition. This is not surprising, as the government's theory runs afoul of well-founded principles of Fourth Amendment law.

For example, a defendant may demonstrate his own legitimate expectation of privacy by showing that he owned the premises searched or that he occupied them and had dominion and control over them by leave of the owner. *United States v. Villegas*, 899 F.2d 1324, 1333 (2d Cir. 1990). Co-occupants of a dwelling maintain legitimate expectations of privacy in their shared home, and even an overnight guest has a reasonable expectation of privacy in his host's home. *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990).

Mr. Yousef's shared use of an email account with others does not waive his legitimate expectation of privacy in the account, but rather creates a legitimate expectation of privacy on the part of each user. Accordingly, Mr. Yousef has standing to challenge the search of the Target Account.

**B.     The Omitted Information from the Warrant Affidavit Was Material to the Probable Cause Determination**

As discussed in Mr. Yousef's initial Memorandum of Law, the search warrant affidavit omitted two material pieces of information: (1) that the weapons photos it references were fake; and (2) that the U.S. government knew that Mr. Yousef had previously engaged in a scam

14

weapons transaction. The government's strained efforts to refute the materiality of such information are unavailing.

As the defense suspected, and recently produced reports of interviews with Hassan Rammal confirm, Mr. Rammal explicitly told DEA agents in Belize in December 2008 and January 2009 that the weapons photos in which he appeared were fraudulent, and that he was not in fact in possession of any weapons. *See* Brown Decl., Ex. B. The photos themselves, which the agents who conducted the interviews had access to and the Affiant likely reviewed, are visibly altered images that certainly corroborate this aspect of Mr. Rammal's interview. *See* Sarafa Decl., Ex. 9.[8] The search warrant affidavit, however, contains no indication that the photos it references were fraudulent. To the contrary, it clearly suggests that the photographs depicted actual weapons that were the subject of sincere negotiations. *See* Sarafa Decl., Ex. 8 ¶¶ 8-9. The Affiant in fact recounts the December 2008 meeting with Mr. Rammal, during which Mr. Rammal admitted that he only pretended to be in possession of weapons, yet fails to disclose the fabricated nature of the photos.

The government, in its response, argues that Mr. Rammal was attempting to scam Mr. Yousef, and therefore the fact that the photos were fraudulent does not diminish the sincerity of Mr. Yousef's engagement in the weapons negotiations.

There are several fatal problems with the government's argument. First, while the government now contends for purposes of this motion that Mr. Rammal provided credible information about a scam against Mr. Yousef, the Affiant states that the investigating agents did *not* believe the scam theory. *See* Sarafa Decl., Ex. 8 ¶11. The government cannot have it both ways.

---

[8] In order to facilitate review of the evidence, defense counsel will provide to the Court, in conjunction with a courtesy copy of this brief, a DVD containing the actual emailed images.

15

Two things are clear from a review of the interview reports and the photos themselves: (1) Mr. Rammal was being truthful about the photos being fraudulent; and (2) Mr. Rammal's claim to be perpetrating a scam against Mr. Yousef, as opposed to being in on a scam *with* Mr. Yousef against the potential buyers, is not credible. The former is clear from the photos themselves. The latter is apparent because Mr. Rammal was unable to answer numerous questions posed to him about why Mr. Yousef would believe that Mr. Rammal would be able to supply a large cache of weapons. *See* Brown Decl., Ex. B. In addition, the reports reveal that Mr. Rammal had a clear motive to turn law enforcement against Mr. Yousef. Mr. Rammal is identified as a relative of Yasser Safa, the individual who Mr. Yousef informed the FBI in 2006 was behind an elaborate scheme to create false Belizean passports. *See* Sarafa Decl., Ex. 2, at 3.[9] According to the December 12, 2008 report, it was Mr. Safa who initiated contact with the DEA and requested the initial meeting attended by both Mr. Safa and Mr. Rammal.

The second problem with the government's revised scam theory is that it is not clear until Mr. Rammal's second interview, on January 12, 2009, that Mr. Rammal's purported scam is supposedly against Mr. Yousef, as opposed to in concert with Mr. Yousef against the potential weapons purchasers. The notes of that interview were not prepared until January 28, 2009, just one day prior to the date that the search warrant affidavit was sworn and the warrant issued. It is not clear from available records when the affidavit was prepared, or whether the Affiant even had access to the January 28, 2009 report. A hearing is necessary to clarify these issues.

Third, even if the government's revised scam theory could be used to support an

---

[9]  Mr. Safa was in fact arrested by Panamanian authorities on or about January 31, 2007, in possession of three kilos of cocaine. It was reported that he was wanted in his home country, Lebanon, for international drug trafficking. *See* www.policia.gob.pa/NOTICIA_archivos/News%202007/Enero/n310107%202.htm. Defense counsel has a good faith basis to believe that Mr. Yousef contributed information to Mr. Safa's arrest, and that Mr. Safa later escaped from jail in Panama. DEA agents in Belize likely would have been aware of these events; a hearing would help establish the extent of their knowledge about Mr. Safa and his credibility.

16

argument that Mr. Yousef was genuinely engaged in negotiating a weapons transaction, it does not cure the defect in the search warrant affidavit. The affidavit purports to set forth probable cause to find evidence of a crime in the contents and records of the Target Account. Nothing in Mr. Rammal's interview notes suggests that any evidence concerning Mr. Yousef or his intent would be found in the Target Account. To the contrary, the notes indicate that the Target Account was likely to contain nothing more than fraudulent weapons photos, yet the Affiant gave no hint of this in the affidavit.

The government attempts to minimize the significance of the second omission – Mr. Yousef's prior participation in a scam weapons transaction – by arguing that it is only relevant if there is any indication that Mr. Yousef's involvement in the current transaction is insincere. As discussed above, there are plenty of indications that Mr. Yousef's involvement in the transaction was insincere, and the government cannot prevail by reinterpreting what is plain from the interview reports and the Affiant's statement that Mr. Rammal's version of events was not found to be credible by the investigating agents.

When the omitted material is included in the search warrant affidavit, the affidavit lacks probable cause to believe that a search of the Target Account will yield evidence of a genuine weapons transaction.

**C.    The Government Cannot Credibly Claim that the Omissions Were Not Deliberate or Reckless**

The government makes no attempt in its response to argue that the omissions were inadvertent or otherwise not deliberate or reckless. It is clear that the Affiant had actual access to the information about the fake photos but chose not to include it. It is also apparent from the government's response that the Affiant had access to, at a minimum, the two FBI reports of interviews with Mr. Yousef that have been produced in discovery. As already discussed, those

17

reports indicate that Mr. Yousef provided information about a weapons transaction, and any responsible agent with access to those reports would have sought the additional information that Mr. Yousef now seeks in discovery. Unlike Mr. Yousef, a U.S. government agent investigating a purported weapons transaction would have had access to such information. Accordingly, failure to include it was at best reckless.

Because the search warrant affidavit contained deliberate or reckless material omissions, all fruits of the search must be suppressed.

POINT IV

**THE GOVERNMENT SHOULD BE COMPELLED TO PRODUCE
REQUESTED DISCOVERY AND *BRADY* MATERIAL**

Mr. Yousef has moved for production of numerous items of discovery and *Brady* material that are necessary to his defense and relevant to certain of the motions herein. *See* Yousef Memo at 2-4. While the government has produced some additional items in response to the initial motion, several items remain outstanding and the government has failed to provide any meaningful justification for its refusal to produce them. The grounds for production of three key document requests are discussed below.

1.    Missing Report(s) from 2006 Interview(s) of Mr. Yousef.. The government conspicuously ignores the fact that AUSA Brown previously notified defense counsel of potential *Brady* material concerning a scam weapons transaction that Mr. Yousef engaged in prior to the events giving rise to the current charge. *See* Sarafa Decl. ¶ 17. As set forth in the Sarafa Declaration, the report of the July 14, 2006 interview of Mr. Yousef clearly indicates that Mr. Yousef provided information about a supposed weapons transaction, and that the FBI conducted follow-up interviews about the supposed transaction. *See id.* ¶¶ 15-16. Counsel specifically requested copies of any reports leading to the July 14, 2006 interview of Mr. Yousef,

18

*see id.*, Ex. 5, Req. 13, but the government has refused to produce any such reports, claiming that this is "not the proper subject of Rule 16 discovery." *Id.*, Ex. 6.

The requested material must be produced pursuant to both Rule 16 and *Brady*. First, to the extent that such reports contain relevant statements made by Mr. Yousef, the government is obligated to produce them pursuant to Rule 16(a)(1)(B). Second, if, as AUSA Brown indicated, such information documents a prior scam weapons transaction by Mr. Yousef, it would be relevant to Mr. Yousef's intent and be admissible under Rule 404(b), and thus its production would be mandated by Rule 16(a)(1)(E)(i) as material to preparing the defense. Third, the requested information is relevant to Mr. Yousef's pending motion to suppress, providing another ground for its production pursuant to Rule 16(a)(1)(E)(i). Finally, as AUSA Brown himself suggested, evidence of a prior scam weapons transaction tends to exculpate Mr. Yousef, and thus must be produced pursuant to *Brady*.

2.      Communications Between the U.S. and Honduran Governments. Mr. Yousef has requested that the government produce "[a]ny and all communications between the U.S. Government and any governmental authorities in Honduras concerning Mr. Yousef, including, but not limited to, any and all communications concerning his transfer from Honduras to the United States by agents of the DEA." Sarafa Decl., Ex. 5, Req. 4. The government has refused to provide the requested communications on the ground that it is "not properly the subject of Rule 16 discovery." *Id.*, Ex. 6.

As discussed above, documents concerning Mr. Yousef's seizure and rendition are clearly material to his motion to dismiss the indictment or suppress statements, and thus must be produced pursuant to Rule 16(a)(1)(E)(i).

19

3.      <u>DEA Form-6 Concerning Mr. Yousef's Seizure and Rendition</u>. Mr. Yousef has requested that the government produce the DEA Form-6 dated August 21, 2009 and titled "Arrest and Extradition of Talal HASSAN-Ghantou, a.k.a. Jamal El Yousef . . . on August 19, 2009; Fugitive Cancellation of HASSAN," which was referenced in other discovery materials. *Id.*, Ex. 5, Req. 3. The government has refused to produce this document on the ground that it is "not properly the subject of Rule 16." *Id.*, Ex. 6. As with the request for communications between the U.S. and Honduran governments, the requested document is clearly material to Mr. Yousef's motion to dismiss the indictment and suppress statements, and thus must be produced pursuant to Rule 16(a)(1)(E)(i).

## CONCLUSION

For the foregoing reasons, Mr. Yousef respectfully urges this Court to grant the relief requested, and: (1) order the government to produce additional discovery and exculpatory material; (2) strike irrelevant and prejudicial surplusage from the indictment; (3) dismiss the indictment or grant alternative relief based on the government's outrageous conduct in the illegal rendition of Mr. Yousef; and (4) suppress all evidence obtained pursuant to the search of the sumasiempre123@yahoo.com email account. Mr. Yousef respectfully requests an evidentiary hearing in connection with his arguments concerning outrageous government conduct and the deliberate or reckless omission of material information from the search warrant affidavit.

Dated: June 10, 2011
        New York, NY

20

Respectfully submitted,


s/Melinda Sarafa
Melinda Sarafa
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575


s/Joshua Dratel
Joshua L. Dratel, Esq.
JOSHUA L. DRATEL, P.C.
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: 212-732-0707

*Attorneys for Defendant Jamal Yousef*

21