**Exhibit C**

08adyoum

MOTION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

             v.                              S3 08 Cr. 1213 (JFK)

JAMAL YOUSEF, a/k/a "Talal
Hassan Ghantou,"

             Defendant.

-------------------------------x

                                             August 10, 2010
                                             11:00 a.m.

Before:

                   HON. JOHN F. KEENAN,

                                   District Judge

                       APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JEFFREY BROWN
     CHRISTOPHER LAVIGNE
          Assistant United States Attorneys

MELINDA SARAFA
     Attorney for Defendant


       - also present -

Jordan Fox,
     Spanish Language Interpreter

08adyoum

MOTION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                 v.                          S3 08 Cr. 1213 (JFK)

JAMAL YOUSEF, a/k/a "Talal
Hassan Ghantou,"

                 Defendant.

------------------------------x

                                             August 10, 2010
                                             11:00 a.m.

Before:

                    HON. JOHN F. KEENAN,

                                      District Judge

                         APPEARANCES

PREET BHARARA
        United States Attorney for the
        Southern District of New York
BY:  JEFFREY BROWN
     CHRISTOPHER LAVIGNE
            Assistant United States Attorneys

MELINDA SARAFA
        Attorney for Defendant

        - also present -

Jordan Fox,
        Spanish Language Interpreter

SOUTHERN DISTRICT REPORTERS, P.C.
        (212) 805-0300

08adyoum

MOTION

THE COURT:  All right.  This is in the matter of the United States of America against Jamal Yousef.  The indictment number is S3 08 Criminal 1213.

This is a motion to dismiss the Indictment brought by defense counsel on the grounds that the statute as applied here is unconstitutional, and there is no jurisdiction, as it were, over the defendant because allegedly there is no nexus between the crime charged in the Indictment and the United States.

That I think sums up your motion, Ms. Sarafa.  And I'll hear your argument.

MS. SARAFA:  Thank you very much, your Honor.

THE COURT:  The defendant is present.

Come on up to the lectern and use the lectern and make yourself at home.

MS. SARAFA:  Sure.

I have to apologize, your Honor, I am recovering from a cold so I'll do my best.

As your Honor knows, every case is a great responsibility, but some cases present greater challenges than others.  And this is one of those cases where I really think it calls for very, very careful review by the Court.

This is a case that involves all of the elements that I think play into some of our worst fears in this country.  We have a defendant who is a foreign national with ties to the Middle East.  There are allegations involving terrorism.  We

08adyoum

MOTION

have claims of weapons being stolen from the United States Military. We have claims about drugs pouring into the United States at the hands of the FARC in Colombia. We have a number of frightening scenarios that the government raises in connection here, and they play on elements of fear. But viewed soberly, in light of established law, and in light of the actual evidence cited here, they really amount to no more than that, just fear.

What we have here is a motion, and I want to be very clear about what the motion is. This is a Fifth Amendment due process challenge to the extraterritorial application of the narco-terrorism statute to Mr. Yousef. This is not a subject matter jurisdiction challenge. This is a due process claim.

Based on the law --

THE COURT: I understand that.

MS. SARAFA: Based on the law that in order to apply the statute extraterritorially to Mr. Yousef, there has to be a sufficient nexus between him and the United States so that --

THE COURT: Between the conduct charged and the United States.

MS. SARAFA: Between the defendant himself --

THE COURT: And the conduct charged and allegedly attributable to the defendant, right?

MS. SARAFA: Correct. Well, there has to be a connection between the defendant and the U.S., whether it is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

08adyoum

MOTION

through his conduct or his citizenship or whatever.

THE COURT:  Let me ask you something and let me cut to what I believe is in great measure the heart of this.

You've read the Indictment, right?

MS. SARAFA:  Absolutely.

THE COURT:  OK.  You've read the government's Memorandum of Law in opposition to your motion, right?

MS. SARAFA:  Very carefully.

THE COURT:  And at page 24 of Exhibit A of the government's answer, the co-conspirator allegedly says, "look, what we have come from, most of them as far as the M16s" -- does anybody make M16s other than the United States government?

MS. SARAFA:  I don't know, your Honor.  But I'll assume for purposes of this that it is an American-made weapon.

THE COURT:  Will you assume, and are you assuming, that these weapons that were allegedly stolen, according to the co-conspirator, are American weapons?

MS. SARAFA:  Let's presume for purposes of this motion that they're American-made weapons.

THE COURT:  And they were American weapons, not just American made but American weapons?

MS. SARAFA:  I don't think it is at all clear that they came from the United States Military.

THE COURT:  Mm-hmm.  Well --

MS. SARAFA:  There is really nothing in here to

08adyoum
MOTION

establish that.

THE COURT:  Well, who else has American weapons in Iraq but Americans?

MS. SARAFA:  There could very well be Iraqis who have been armed by the Americans who have American-made weapons. There is really nothing here to establish the actual provenance of the weapons, and it bears emphasis that there are no actual weapons that have been produced in this case.

THE COURT:  But there is a statement by the co-conspirator.  And the statement by the co-conspirator is the same as the statement by the defendant during the course of the conspiracy, is it not?

MS. SARAFA:  Well, I would disagree that that's true for purposes of the due process analysis.  I believe that the government would have to show that Mr. Yousef -- that Mr. Yousef himself has a reason to believe that the weapons are American-made weapons, and there is no link between this statement and Mr. Yousef that the government has cited.

THE COURT:  So a statement by a co-conspirator is not binding on him on a motion like this is what you are saying?

MS. SARAFA:  I believe for the purposes of due process, the government would have to show that Mr. Yousef had a reason to believe the weapons were American-made weapons.

THE COURT:  All right.  Go ahead.

MS. SARAFA:  The government is really asking the

6

08adyoum
MOTION

United States to stretch the boundaries of due process very, very thinly in this case. This is not a case where there is anything to demonstrate that Mr. Yousef expected that the conduct here would have effects on the United States or on United States nationals.

It may be -- it may be, for purposes of subject matter jurisdiction, that having a United States-made weapon gives the United States subject matter jurisdiction. But that's a different question from the due process question here, which is is it arbitrary or fundamentally unfair for Mr. Yousef to expect to be brought to court in the United States? It's like -- it really is like a German national driving a United States -- driving a Ford truck to a drug deal in Germany with Russians and expecting to be prosecuted for that drug transaction in the United States because one of the instrumentalities happened to have a connection to the United States. It's not something that we do for good reason, because there really isn't a sufficient connection.

I cited in my brief an example of a Russian national selling a United States gun to a Chinese national in Moscow with the expectation that it would be used in China. We don't expect -- and neither individual expects to be prosecuted in the United States because there isn't a sufficient connection between either one of them and the United States.

The fact there may be American-made weapons here --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

08adyoum
MOTION

and, again, I emphasize --

THE COURT:  But the statement by the co-conspirator -- let me read it to you.

MS. SARAFA:  I have read it.

THE COURT:  Well, let me read it to you.

"I'll explain" -- this is at page 27 of Exhibit A -- "I'll explain that as far as the American weapons are concerned, those were brought over from Iraq.  They were stolen and purchased in Iraq."

The statement is they are American weapons.

MS. SARAFA:  The statement by a co-conspirator who is trying to establish his credentials to a potential buyer is that these are American weapons.  There are several problems with this.  It is a multi-layered problem.  It is incredibly attenuated.

Number one, it is not Mr. Yousef making the statement. Number two, we don't have the actual weapons.  Number three, this is an act that occurred in the past and has nothing to do with the actual conduct that is at issue in this case, which is selling weapons to an organization in Colombia in exchange for drugs that are going to be delivered in Honduras.

This is not a prosecution for stealing weapons from the United States Military.  It is not a prosecution for possessing United States weapons unlawfully --

THE COURT:  I understand that.  But in paragraph 6 of

SOUTHERN DISTRICT REPORTERS, P.C.<br>(212) 805-0300

08adyoum
                              MOTION

the Indictment, of the only count in the Indictment, it reads:

"The conspirators claim that the weapons had been stolen from

Iraq and were stored in Mexico."

          So it's charged in the Indictment.

          MS. SARAFA:  It's charged that the weapons which are

not produced here are stolen from Iraq.  The indictment itself

doesn't even charge that they are American weapons.  It says

that they were stolen from Iraq.  The United States --

          THE COURT:  That is something that I am going to ask

Mr. Lavigne about.  I don't know why it doesn't.

          MS. SARAFA:  Iraq is a sovereign nation --

          THE COURT:  It is correct, what you say, that

paragraph 6 of the Indictment does not specifically allege that

the weapons are American weapons.  That is true.  And what I

was starting to say was that I can't understand why, when we

are now with Superseding Indictment No. 3 and when the exhibit

supplied on the motion refers to them as American weapons, why

the Indictment doesn't charge it.  And that's something that I

want to find out from Mr. Lavigne, but he is not up yet.

          MS. SARAFA:  Judge, Iraq is a sovereign nation.  The

United States has some role there.  But the United States is

*(co-extensive)*
not close centered with Iraq.  The United States is not the

only entity in Iraq that may own or possess American-made

weapons.

          The statement by the co-conspirator is not inclusive

08adyoum

MOTION

by any means.  It is not directly linked to Mr. Yousef.  It concerns the purported instrumentality of the offense here but not the offense itself, which really is supplying weapons to an organization in Colombia that has never in the course of this alleged conspiracy made any representation about its intent to use these weapons against the United States or contrary to United States' interests or directly against U.S. nationals. This case stands in marked contrast to the allegations in -- to the activities in Yousef and allegations in Al Kassar in which it was made explicitly clear, and the Indictment explicitly alleged, that the weapons to be sold in that case were to be used to kill United States nationals.

That is not the case here.  This is an historic -- this is a comment by a co-conspirator who is trying to make a sale to a confidential source, a potential buyer.  This has nothing to do with what Mr. Yousef intended with respect to the charges at issue here.  Those are supplying weapons in exchange for drugs, neither of which was to pass through the United States or ultimately wind up in the United States.

In every case where due process has been satisfied, it is because the defendant intended his acts to have some effect in the United States.  That is absolutely not what we have here.

And this case is a tremendously significant case, and I believe it has the potential to create very, very, very

08adyoum

MOTION

negative precedent, because it opens the door -- it really erodes the due process protection for all practical purposes, it really does, because there is no meaningful distinction here between what happened in this case and the examples I've cited where a United States-made automobile, a United States-made weapon, perhaps an American-made computer might be used by a foreign national in a foreign country to commit a crime that has no intended effect in the United States or against United States nationals.  That's really what this boils down to.

And just because we all have a great fear of terrorism and because the United States might have an interest in protecting the weapons -- protecting its military arsenal or preventing drugs from crossing into our borders, those are interests that may give rise to subject matter jurisdiction, but those are not interests that really address the due process concerns in this case.

THE COURT:  Well, are you arguing that the defendant himself must be aware of and must intend to create a nexus?

MS. SARAFA:  The defendant must have some meaningful connection to the United States.  He has to be a U.S. citizen. He has to have -- or he has to intend that his acts are going to have an effect in the United States.

THE COURT:  Where is that in the Yousef case, what you just said?

MS. SARAFA:  In the Yousef case, what the court says,

08adyoum

MOTION

the Court stated -- there were a couple of different acts in the Yousef case.  One was a conspiracy to attack an United States-flagged aircraft in an effort to inflict injury on the United States and its people and affect U.S. foreign policy. That the Court said had a clear nexus to the United States, and the defendants who were charged with that count were found to have no due process problem and to have a sufficient nexus.

The other acts that created a more challenging situation for the Court involved the defendant charged with the bombing of a Philippine-flagged -- a Philippine Airlines flight from Manila to Japan in which a Japanese passenger was killed and some others were injured.

THE COURT:  I know the Yousef case.

MS. SARAFA:  That act the Court found created a sufficient nexus because it was a test run in furtherance of the conspiracy to attack the U.S.-flagged aircraft.  What the Court said was "Given the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendant's conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair."

"The substantial intended effect."

Every case has had a substantial intended effect on the United States or United States nationals.

THE COURT:  Let me ask you two more questions and then

08adyoum

MOTION

I'll try not to interrupt you anymore.

The first question:  Are you suggesting that the nexus standard that is set forth by the Second Circuit requires as a matter of law an element of knowledge or intent with respect to the defendant's ties to the United States?

MS. SARAFA:  Not necessarily, your Honor, because if the defendant were a United States citizen, I believe that would satisfy the nexus requirement.  There has to be something to ensure that it's not arbitrary or fundamentally unfair for this defendant to expect to be prosecuted in a United States court.  And I submit that in this case we do not have that.

THE COURT:  All right.  And the second question I have is this:  How can it be argued, or how can it -- I'll change the question.  How can it be said that the defendant could not reasonably anticipate being tried here in the United States when the recorded statements of the co-conspirators show that they feared the presence of United States law enforcement officers throughout the alleged negotiations?

They refer to the DEA and the FBI, don't they?

MS. SARAFA:  That has nothing -- the co-conspirators do make reference to that, but that has nothing to do with whether there is a nexus between the defendant and the United States.  I submit that finding a sufficient nexus based on that really makes a mockery of the due process standard.  There has to be a connection between the defendant and the United States;

08adyoum
MOTION

there just does.  The law is absolutely clear and the facts here are clear, and I can't overemphasize the implications of finding a sufficient nexus in this case.  It opens the door to prosecution of any individual of any nationality around the world who ever uses any, you know, any item that has a United States provenance in furtherance of any crime that does not have to have any other connection to the United States.  It opens a tremendous door, and in all seriousness, that is not an exaggeration.  That is what -- that is the situation that this case presents.

And I urge the Court to take a very careful and considered look at this and consider the implications of keeping this case here on the docket.  I submit that it should be dismissed, and Mr. Yousef should be released.  He has no business being prosecuted here in the United States.

THE COURT:  Thank you.

MS. SARAFA:  Thank you, your Honor.

THE COURT:  All right.  Oh, I thought Mr. Lavigne was going to argue.

MR. BROWN:  He will be here in case I get in any trouble, Judge.  I will be at least the first one to argue.

THE COURT:  All right.  Mr. Brown, I am happy to hear you.

MR. BROWN:  Judge, I don't want to go on at great length about this in part because we think that it is a very

08adyoum
MOTION

straightforward case where the nexus to the U.S. is established.

THE COURT: What is the nexus?

MR. BROWN: The nexus is that this is an organization that is selling stolen military weapons from Iraq, as alleged in the --

THE COURT: Wait a minute. You don't allege that they are American weapons.

MR. BROWN: We don't, Judge, and that is --

THE COURT: Why not?

MR. BROWN: Because it is not an allegation that is meant to go toward the due process analysis. In other words, it is not an allegation that is meant to satisfy that question.

THE COURT: But this is the fourth indictment. This is the third superseding indictment. I come from up the street. Now, that is a long time ago; it is nearly 27 years ago. I love to talk to former Manhattan assistants back from my time about how many times did they get superseding indictments. I was an assistant up there for nearly, I guess, 18 years, and I think in 18 years I got three superseding indictments. You people do it every week.

And why didn't you put in that they were American weapons? I mean, you put that in your answering papers. Your allegation is "The conspirators claim that the weapons had been stolen from Iraq." Why didn't you just say that they were

08adyoum

MOTION

American weapons stolen from Iraq?

MR. BROWN:  Clearly based on your question, judge, we should have and I wish we had.  I think, though, that the reason you're asking the question is really the essential point that I would like to make, which is the evidence supports that we could have alleged that and it supports that.  That was the case.  That is the statement of the co-conspirators, that the clear import of the statement of the co-conspirator is that these are American weapons stolen from the U.S. Military. Remember, Judge, this is a motion to dismiss so all inferences and presumptions are drawn in favor of the government.

THE COURT:  Are you claiming that the weapons were actually stolen from our military, or are you claiming that somebody just said that they were?

MR. BROWN:  Well, as of right now, of course I only have the statement.  I don't know that they were or were not. Ms. Sarafa is right, we have not recovered the weapons.  So that's clear.  But again, Judge, on a motion to dismiss, the inference is that these defendants are saying these things because they are true.

THE COURT:  There is only one defendant.

MR. BROWN:  This co-conspirator.  But your Honor made the point in the context of Ms. Sarafa's argument that it is true that Mr. Yousef is chargeable with knowledge, he is chargeable with the fact that this co-conspirator made that

08adyoum

MOTION

statement.  She is wrong that he can be isolated as an individual within the context of the conspiracy in terms of the analysis for due process nexus requirements.

THE COURT:  Is an evidentiary hearing necessary here to resolve disputed facts, contested issues of fact concerning the motion to --

MR. BROWN:  I don't believe so, Judge, no.

THE COURT:  Go ahead with your argument.  I will stop interrupting.

MR. BROWN:  The short of it, Judge, is that the allegations and the evidence support the following:  That this is an organize that is involved in weapons trafficking. They're claiming to be selling American weapons stolen from Iraq; and they know that they're selling them to an organization, the FARC, that specifically indicates to them in the course of the negotiations that what they do is traffic large quantities of cocaine to the United States.  That's clear those statements are chargeable to Mr. Yousef not only on general co-conspirator liability bodies of law but also because, remember, Judge, he's identified as the leader of this conspiracy by the co-conspirators.

And I'll give you an example of how information is transmitted between these co-conspirators and Mr. Yousef. Mr. Yousef is not present for any conversation in which these co-conspirators identify themselves as the FARC.  But in his

08adyoum

MOTION

post-arrest statements, he admitted that he knew that he and his co-conspirators were negotiating with the FARC. It is a clear evidentiary trail that leads to the conclusion that these guys were keeping him informed of everything that was happening, which they would in his capacity as a leader of the organization.

So, Judge, what you have is a case where stolen U.S. weapons are being sold to support an organization that traffics cocaine to the United States. That's not only true in the world but it's true and known to these defendants based on the course of the negotiations they conducted as part of this proposed transaction.

In light of those facts, we don't even think it is a close case, judge. We don't think you need to examine the contours of due process jurisdiction or the lengths or limits of them because we don't think they are implicated in any fashion whatsoever by these facts. We think this is a case straight down the middle; it is not at the edges.

Judge, I think it is important to point out the lengths to which the defense and to which Ms. Sarafa would go to reinterpret those statements that are in the record, to dilute them or to blunt them, is effectively a perfect example of how persuasive they are that jurisdiction is appropriate here and that there is a nexus. So, you know, the fact that they have to work so hard to defeat them I think is basically

08adyoum
MOTION

illustrative of their persuasive effect on the ultimate question.

THE COURT: Doesn't the fact that the co-conspirators referred to the FBI and the DEA, is that in any way relevant on this motion?

MR. BROWN: I think it is marginally relevant, Judge.

You made the point -- at least you made a question that I think made the point that there is an established body of law that there is no mens rea requirement with respect to jurisdiction. It is not about what the defendant knew, subjective impressions of the defendant; it is about what a reasonable defendant can expect, but not really. That is a companion analysis. The real question is a nexus analysis.

The question is would it be arbitrary or fundamentally unfair for the U.S. to assert jurisdiction? It is not about would it upset the expectations of the defendant, although I think that is a relevant companion analysis. And I think the fact that these people feared the DEA and the FBI is relevant to what their understanding was of the nexus of their conduct. In other words, it reflects the notion that it was true that these were weapons stolen from Iraq. It reflects the notion --

THE COURT: Are you saying it reflects the notion that there was a nexus?

MR. BROWN: I think, yes, Judge. I think, yes, but I don't think it is the primary analysis. In other words, I

08adyoum

MOTION

think it's evidence but I don't think it is a stand-alone inquiry about what their subjective impressions were, and that is the distinction that I meant to draw. But I think your Honor is obviously aware of all of the issues that they have to surmount, that the defense has to surmount in this case. And I think that when you talk about the absence of a mens rea requirement, I think when you talk about co-conspirator liability clearly applying, I think that it's not a close question.

And there was an argument that was made about a distinction between, for example, Al Kassar and this case and there were some analogies that were made about a German, you know, and a Russian somewhere, and those analogies I don't think bear any relation to the facts of this case. But the thing about Al Kassar, although there was explicit discussion about harming Americans in that case, there was an explicit discussion about harming Americans in Colombia.

Here you have an extraterritorial impact on Americans in Colombia. In this case, you have a discussion, an explicit discussion, about cocaine going to the United States. So you not only have an impact on American citizens but you have an impact on American citizens in the United States, not in Colombia. So I don't think a disanalogy exists between Al Kassar and this case. And I think that if it is not as persuasive because there is not an explicit discussion about

08adyoum
MOTION

killing Americans or it is not as stark, there is no disanalogy; it's ultimately a very similar case in a lot of ways.

So, Judge, I don't think that in light of the case law -- and there is not a tremendous amount of it, but it is worth saying that no court has ever overturned or dismissed an indictment on the basis of a lack of due process. This is not -- certainly not that case. And I don't think it is a difficult question, Judge. I think it is an important question. I don't mean to belittle the significance of it in any way, but I don't think that it's even remotely arbitrary for the U.S. to assert jurisdiction over these acts or remotely fundamentally unfair. I just don't think it's close.

And if your Honor wants to hear anything else, I'm certainly happy to answer questions but I don't want to belabor the point.

THE COURT:  Thank you very much.

Did you want to say something briefly in rebuttal? You may.

MS. SARAFA:  Briefly, your Honor. I would just like to address two points.

One, with respect to the your question about the concerns about the DEA and the FBI. I think really what that reflects is the obvious activity of the DEA and the FBI in that region of the world. I mean, this case, after all, is a case

08adyoum

MOTION

entirely manufactured by the DEA in Honduras.  So it should come as no surprise that because the DEA and the FBI and the United States law enforcement is very active in that region, that there may be some statements made about their potential -- about their awareness or, you know, potentially being viewed by them.  I don't think it goes at all to the question of whether there is a nexus between the defendant and the United States, nor do I think it really addresses the question of expectation because really what it does is I think it just reflects the reality on the ground there and nothing more.

With respect to the government's point about trafficking of drugs into the United States by the FARC, the first thing I would say about that is this is not a case about trafficking drugs to the United States.  There is nothing in this case to suggest that the drugs involved here were coming from the United States, going to the United States, going through the United States.  The drugs here were going to be supplied by the FARC to the coast of Honduras, period.  There are no drugs to or from the United States in this case.

And I think as I've laid out in my reply brief, the supposed explicit statements about drugs going to the United States really are an exaggeration.  What the confidential source emphasizes is that the FARC's primary market is Mexico, period.  There really isn't anything to establish that the FARC is trafficking drugs to the United States.

08adyoum

MOTION

So I really, you know, rest primarily on my pleadings. I think they really set everything out.

Again, I just urge the Court to really carefully consider this, because I think at the end of the day what you have here is a case where what it boils down to is a statement that an American-made weapon or American-made weapons were going to be sold to an organization outside the United States. And really what it is is it is trying to tie the defendant to the United States based on the fact that an American-made instrumentality was used somehow in furtherance of this alleged conspiracy. But there really isn't a connection between the defendant and the United States or the crime charged here and the United States in the sense that there were any intended effects on the United States or on United States nationals.

It sets a very frightening precedent in my opinion, and I think that's worthy of very careful consideration and review.

THE COURT: Thank you very much.

I am going to reserve decision. I am not going to rule immediately.

There was an issue again raised about his dental treatment, I believe. And as far as I understand, I mean, I've directed the MCC to be sure that he receives appropriate dental treatment. I believe he is receiving it there. I'm not going to get involved in sending him to a dentist outside the MCC.

08adyoum

MOTION

So if he needs any more dental treatment at the MCC, bring it to my attention and I'll settle that.

Thank you very much.

MS. SARAFA:  Thank you very much, your Honor.

MR. BROWN:  Thank you, your Honor.

THE COURT:  All right.

Oh, I believe, unless I am in error, I think we have a conference scheduled for August 23, 2010, at 10:15 a.m.  Right?

Thank you.

MS. SARAFA:  Thank you, your Honor.

MR. BROWN:  See you then, Judge.

- - -

**Exhibit D**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :

            -v.-                  :    S3 08 Cr. 1213 (JFK)

JAMAL YOUSEF,                     :
      a/k/a "Talal Hassan
            Ghantou,"            :

            Defendant.           :

- - - - - - - - - - - - - - - - X

            I, JEFFREY A. BROWN, Assistant U.S. Attorney for the
Southern District of New York, pursuant to Title 28, United
States Code, Section 1746, hereby declare under penalty of
perjury:

            1.    I make this declaration in response to the
pre-trial motions filed by defendant Jamal Yousef in the
above-captioned matter.

            2.    Attached hereto as Exhibit A is a discovery letter
dated April 30, 2010, sent from the Government to counsel for
Yousef.

            3.    Attached hereto as Exhibit B are redacted copies
of DEA Form-6 reports of separate interviews of Hassan Rammal in
Belize.

            4.    Attached hereto as Exhibit C is a redacted copy of
a DEA Form-6 report of Yousef's post-arrest statement to DEA
Special Agents Gregory S. Ball and Federico Alvarez.

            5.    Attached hereto as Exhibit D are redacted copies
of FBI Form 302 reports of separate interviews of Yousef in
Mexico City, Mexico in June and July of 2006.

Executed on
this 31st day of May 2011
New York, NY

                              _____
                              JEFFREY A. BROWN

# EXHIBIT B

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 4

| 1. Program Code | 2. Cross File    Related Files | 3. File No. ▉▉▉▉▉▉▉▉ | 4. G-DEP Identifier ▉▉▉▉ |
|---|---|---|---|
| 5. By: ▉▉▉▉▉▉▉▉<br>At: Belmopan CO | ☐<br>☐<br>☐ | 6. File Title ▉▉▉▉▉▉▉ | |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | ☐<br>☐ | 8. Date Prepared<br>12/12/08 | |
| 9. Other Officers: ▉▉▉▉▉▉▉▉ | | | |

10. Report Re: Interview with Yasser Safa & Hassan Rammal on 12-12-2008.

## DETAILS

1. Reference is made to all previous reports and DEA-6's regarding this case file.

2. On December 12, 2008, at approximately 11:00 AM, SA's ▉▉▉▉▉▉▉ and ▉▉▉▉▉▉▉ met with Yasser SAFA and Hassan RAMMAL at a local hotel located in Ladyville, Belize. This meeting occurred as a follow up to a phone call from SAFA to SA ▉▉▉▉, requesting a meeting on December 11, 2008. During that time SAFA provided SA Thorne with a secondary cell phone number for which to reach him, ▉▉▉▉▉▉.

3. Yasser introduced agents to Hassan RAMMAL as his cousin from Lebanon who currently lived in Belize and resided in the same house as SAFA. SAFA further stated that RAMMAL spent a year in Honduras and maintained a friendship with a Honduras prisoner / DTO member named Talal aka Jamal Hassan GANTOUS. RAMMAL stated that Talal was formally known as Jamal El'YOUSSEF, prior to changing his name. SAFA stated that his cousin, RAMMAL, had maintained a relationship with GANTOUS while pretending to be an arms dealer and had some information that he wanted to share with SA's ▉▉▉▉▉▉▉▉.

4. RAMMAL stated that GANTOUS was once a three star captain with the Syrian military. SAFA stated that GANTOUS escaped from Syria to Lebanon and took on that nationality by purchasing documents, and now goes by Talal GANTOUS. RAMMAL stated that GANTOUS was once caught by law

| 11. Distribution:<br>Division SARI | 12. Signature (Agent) ▉▉▉▉▉▉ | 13. Date |
|---|---|---|
| District | 14. Approved (Name and Title) ▉▉▉▉▉▉ | 15. Date |
| Other  CAST | | |

DEA Form   - 6
(Jul. 1996)
    trt

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| *(Continuation)* | 3. File Title HABET, Orlando | |

4.
Page 2 of 4

| 5. Program Code | 6. Date Prepared |
|---|---|
| | 12/12/08 |

enforcement with two passports, one with the name Jamal El'YOUSSEF, and the other with the name Talal Hassan GANTOUS. SAFA and RAMMAL further stated that GANTOUS is currently incarcerated in Honduras. RAMMAL stated that GANTOUS attempted to plan an escape by trying to arrange to come out on weekends, Friday through Sunday, but his request was denied or discovered by law enforcement. RAMMAL further stated that currently, GANTOUS is attempting to pay an individual off to remove his information from Interpol. RAMMAL added that although he did not know the name of the Interpol employee, he knows that the individual works for the Interpol office in Honduras.

4. RAMMAL stated that even from prison, GANTOUS was operating his weapons business and still commanding "his people" on the outside. RAMMAL further stated that in an effort to steel / scam money from GANTOUS's people, he set up a website, pretending to be a weapons dealer, which can be accessed on line. RAMMAL stated that his picture appears on the website along with some weapons that he is not actually in possession of, but was just pretending to be in possession of, in order to pull off the scam. RAMMAL provided agents with the following website/ email address and code to gain access, sumasiempre123@yahoo.com, or @ hotmail .com RAMMAL claimed to be unsure if it were a yahoo or hotmail address, but believed it to be yahoo. RAMMAL stated that the code to gain access would be "solo123". RAMMAL stated that he once had a picture of GANTOUS on the website, but now has his (RAMMAL) picture on it. RAMMAL stated that GANTOUS was interested in a host of weapons including M16's, military weapons and others. **AGENTS NOTE: (Agents in the Belmopan CO did not attempt to access this website and would advise caution to anyone attempting to gain access with regard to the compromise of the integrity of the computer terminal being used.)**

5. RAMMAL stated that while in Honduras, he visited GANTOUS in prison on many occasions, and worked with one of GANTOUS's people named Miguel Angel RAMIREZ. RAMMAL also worked with another associate named SANEEN LNU. RAMMAL recalled that SANEEN LNU took a trip to Columbia and met with members of the FARC in the mountains in an attempt to get a large quantity of cocaine on credit to bring back to Honduras and exchange for weapons from RAMMAL. RAMMAL stated that SANEEN did obtain the

DEA Form - 6a
(Jul: 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title HABET, Orlando | |

4.
Page  3  of  4

| 5. Program Code | 6. Date Prepared 12/12/08 |
|---|---|

cocaine from Columbia.  RAMMAL further stated that RAMIREZ, aka the Colonel, wanted RAMMAL to give up the weapons on credit.

6. RAMMAL suggested that he could meet with an agent in Honduras, and show him/her where all of the significant locations are that are associated with the weapons ring.  RAMMAL further stated that although he does not remember all of the specific names, he could point out all of the houses where these individuals live.  RAMMAL provided the BCO with the following phone numbers for RAMIREZ and other associates of the organization.  Miguel Angel RAMIREZ ▓▓▓▓▓▓▓▓▓▓, Daniel LNU (associate) ▓▓▓▓▓▓▓▓▓ Wilmer LNU (associate) ▓▓▓▓▓▓▓▓▓. AGENTS NOTE:  SA ▓▓▓▓ copied numbers exactly as they were written in RAMMAL's note pad.  RAMMAL stated that RAMIREZ opened a new business / company named Digicel, and that his cell phone number is ▓▓▓▓▓▓ ▓▓▓▓  RAMMAL further stated that GANTOUS uses the following two phone numbers from "Tigo" Phone Company from prison to talk with Mexicans & Columbians to transact business, 504-9765-9104, and 504-9659-0652.

7. RAMMAL stated that he is still in contact with all of the individuals from Honduras, and they still request that he supply them with weapons, however, they have not yet provided any money to pay for the weapons. RAMMAL stated that before leaving, he informed them that he was going to return to Belize, and that is where he will be when they were ready to pay.  RAMMAL further stated that he was then told that they are waiting to get the money from the Columbians. RAMMAL stated that after his return to Belize; the Columbians did not bring money, but brought cocaine instead, which was to be sold in Honduras to obtain the money for the weapons.

8. RAMMAL further stated that members of the organization still believe that he is currently in possession of the weapons that they seek and that they have buyers already set up to purchase the weapons. RAMMAL insists that his only motive was to scam money from these individuals, and that he never intended on supplying any weapons.

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION *(Continuation)* | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| | 3. File Title | |
| 4.<br>Page 4 of 4 | | |
| 5. Program Code | 6. Date Prepared<br>12/12/08 | |

INDEXING



**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 5

| 1. Program Code | 2. Cross File | Related Files | 3. File No. | 4. G-DEP Identifier |
|---|---|---|---|---|
| 5. By: ▓▓▓▓▓▓▓▓▓▓▓▓▓ At: SOD/BIU | ☐ ☐ ☐ ☐ ☐ | | 6. File Title ▓▓▓▓▓▓▓▓▓▓▓▓▓ | |
| 7. ☐ Closed ☐ Requested Action Completed ☐ Action Requested By: | | | 8. Date Prepared 01/28/09 | |

9. Other Officers: S/As ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10. Report Re: Interview of Hassan RAMMAL on January 16, 2009, in Belize City, Belize.

### SYNOPSIS

On January 16, 2009, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ along with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of the Belmopan, Belize Country Office (BCO) interviewed Hassan RAMMAL in Belize City, Belize.

### DETAILS

1. Reference is made to the following:
   - All prior DEA Reports of Investigation written to the above captioned case file.

   - A DEA Report of Investigation written to case file ▓▓▓▓▓▓▓ by SA ▓▓▓▓▓ titled: Interview with Yasser SAFA and Hassan RAMMAL on December 12, 2008.

2. On January 16, 2008, at approximately 9:30 a.m., SAs ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ met RAMMAL in Belize City, Belize. RAMMAL agreed freely to meet with SAs ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for an interview and to further discuss his involvement in the weapons and drug-trafficking activities of Talal Hassan-GHANTOU and Miguel Angel Ramirez-LANZA. *Agent Note: RAMMAL identified LANZA as "Miguel Angel Ramirez"; however the subject's full name is Miguel Angel Ramirez-LANZA and is hereafter referred to as LANZA.*

| 11. Distribution: Division | 12. Signature (Agent) | 13. Date |
|---|---|---|
| District | ▓▓▓▓▓▓▓▓▓▓▓ | |
| | 14. Approved (Name and Title) | 15. Date |
| Other   SARI | ▓▓▓▓▓▓▓▓▓▓▓ | |

DEA Form    - 6
(Jul. 1996)

### DEA SENSITIVE
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. ▓▓▓▓ | 2. G-DEP Identifier ▓▓▓▓ |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title ▓▓▓▓▓▓▓▓▓▓ | |
| 4. Page 2 of 5 | | | |
| 5. Program Code | | 6. Date Prepared 01/28/09 | |

3. RAMMAL stated that he was born and raised in southern Lebanon near Lebanon's border with Israel. RAMMAL stated that he later moved to the surrounding areas of Beirut. ▓▓▓▓ *asked RAMMAL if he ever saw or engaged in any of the fighting which has occurred in Lebanon and RAMMAL replied no and added that he has never seen, held or fired a gun of any kind.*

4. RAMMAL stated that he moved to Belize from Lebanon approximately seven to eight years ago. RAMMAL stated he met GHANTOU approximately five years ago in Belize through Yasser SAFA. RAMMAL stated GHANTOU was staying in Belize after having been imprisoned in Mexico. RAMMAL stated he (RAMMAL) and GHANTOU developed a friendship through their common Middle Eastern background.

5. RAMMAL stated GHANTOU is now imprisoned in Honduras and that he (GHANTOU) and LANZA sell weapons in exchange for money, drugs or both with the aid of Senen MEMBRANO. RAMMAL stated that LANZA was a retired Colonel from the Honduran Military, who had been arrested for illegal possession of weapons and was under house arrest for a time. RAMMAL stated LANZA now runs a private bodyguard and security firm with armed guards who also engage in LANZA's illegal activities. RAMMAL stated MEMBRANO owned a large construction company in Honduras and over the past three to four months had traveled to Colombia and met with members of the FARC in order to receive shipments of cocaine. RAMMAL stated MEMBRANO was involved in obtaining cocaine in Colombia and shipping it to Lebanon, Syria and Europe for distribution. RAMMAL stated the Colombian cocaine sources of supply were supplying MEMBRANO with cocaine on credit because MEMBRANO was using his substantial business holdings as collateral. RAMMAL stated he has been present at LANZA's house, MEMBRANO's house and a car wash owned by DANIEL LNU, who works for MEMBRANO and where GHANTOU, LANZA, and MEMBRANO discuss the illegal activities. ▓▓▓▓ *asked RAMMAL how he learned of LANZA's and MEMBRANO's prior and current illegal activities. RAMMAL responded that GHANTOU informed RAMMAL of these and other illegal activities the three were engaged in during telephone conversations with GHANTOU, and provided the following Honduran telephone numbers for GHANTOU: (504) 9568-3274, and (504) 9928-8477.*

---

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** | ▮▮▮▮▮▮ | ▮▮▮▮ |
| *(Continuation)* | 3. File Title | |
| | ▮▮▮▮▮▮ | |

| | |
|---|---|
| 4.<br>Page  3  of  5 | |
| 5. Program Code | 6. Date Prepared<br>01/28/09 |

6.  RAMMAL stated he learned of GHANTOU's weapons and drug-trafficking activities approximately seven or eight months ago. RAMMAL stated GHANTOU revealed his (GHANTOU's) and LANZA's weapons and drug-trafficking activities in casual conversation with RAMMAL. RAMMAL stated GHANTOU described previous weapons transactions to RAMMAL and detailed how he (GHANTOU) was caught with approximately $400,000 to $500,000 by Honduran law enforcement leaving a weapons sale which resulted in his (GHANTOU's) current incarceration. RAMMAL stated GHANTOU also described how he (GHANTOU) obtained fraudulent Nicaraguan documents in order to escape prison and flee there. RAMMAL stated from that point forward, all three individuals (GHANTOU, LANZA and MEMBRANO) began freely discussing and coordinating their illegal activities in front of him. ▮▮▮▮▮ *asked RAMMAL why GHANTOU, LANZA and MEMBRANO began including him in there criminal planning and revealed there illegal activities to him and RAMMAL replied he did not know.*

7.  RAMMAL stated that after he learned of GHANTOU's, LANZA's and MEMBRANO's illegal activities, he (RAMMAL) decided to pose as a weapons source of supply to steal money from the three. RAMMAL stated he planned on receiving a down payment for a weapons shipment and fleeing with the money. ▮▮▮▮▮ *asked RAMMAL what led GHANTOU, LANZA and MEMBRANO to believe that he (RAMMAL) possessed and could supply these weapons; RAMMAL replied GHANTOU vouched for RAMMAL with LANZA and MEMBRANO, so LANZA and MEMBRANO trust and believe him.* ▮▮▮▮▮ *asked why GHANTOU would vouch for him (RAMMAL) and RAMMAL replied he did not know.* ▮▮▮▮▮ *asked RAMMAL if he had ever bought or sold weapons with GHANTOU before and RAMMAL replied no.* ▮▮▮▮▮ *then asked RAMMAL if he thought it was strange or unlikely for a person engaged in illegal activity such as GHANTOU, to vouch for someone with whom they had never conducted a transaction with; RAMMAL responded that he did not know.* ▮▮▮▮▮ *then asked RAMMAL again if his plan was to try and fraudulently pose as a weapons seller to these three individuals (GHANTOU. LANZA and MEMBRANO). whom RAMMAL believed were criminals and armed, despite having no knowledge of weapons and RAMMAL replied yes.*

---

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | ▮▮▮▮▮▮ | ▮▮▮▮▮▮ |
| | | 3. File Title | |
| | | ▮▮▮▮▮▮▮▮▮▮ | |
| 4. Page  4  of  5 | | | |
| 5. Program Code | | 6. Date Prepared  01/28/09 | |

8.  RAMMAL stated that GHANTOU and LANZA were negotiating with several weapons customers, including a Honduran who works with the FARC and brought a FARC member from Colombia to meet with LANZA in Honduras. RAMMAL stated the FARC member wanted a large weapons shipment including M-16s, RPGs, and grenades, which RAMMAL agreed to supply.

9.  RAMMAL stated he was given the e-mail address sumasiempre@yahoo.com to supply GHANTOU and LANZA with pictures of the weapons in order to show the FARC member the weapons shipment RAMMAL could supply. RAMMAL stated he created fraudulent pictures to deceive GHANTOU, LANZA and MEBRANO into believing he (RAMMAL) possessed the weapons. RAMMAL stated he would receive a down payment of between $500,000 and $1,000,000 for the weapons.  ▮▮▮▮▮  *asked RAMMAL if he believed GHANTOU, LANZA and MEMBRANO would give him a down payment that large without ever having conducted a transaction with him before, or ever seeing a weapon from him?  RAMMAL initially did not reply then shrugged his shoulders and said he did not know.*  ▮▮▮▮▮  *asked RAMMAL what he intended to do if he received a large down payment, and RAMMAL replied that he would flee to a country where GHANTOU, LANZA or MEMBRANO could not find him.*  ▮▮▮▮▮  *asked RAMMAL how he intended to transport the currency, and  RAMMAL replied he had no plan and had not thought of how he would move the money from were he received to where he planned to go.*

10. RAMMAL stated he saw both the Honduran and FARC member who were planning to purchase weapons from GHANTOU, LANZA and MEMBRNO at LANZA's house in late October 2008.  RAMMAL stated he was there briefly before visiting GHANTOU in prison later that day.  RAMMAL stated he was only there briefly and departed a few minutes after they arrived.  ▮▮▮▮▮  *asked RAMMAL if it was a coincidence that he (RAMMAL) was present at LANZA's while the weapons customers arrived or was RAMMAL there to be present during the negotiations, and RAMMAL replied no.*  ▮▮▮▮▮  *asked RAMMAL why he would not be present at negotiations for transaction he believed he could make between $500,000 and $1,000,000, and RAMMAL shrugged his shoulders and did not provide an answer.*

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | ▮▮▮▮▮▮ | ▮▮▮▮ |
| | 3. File Title | |
| | ▮▮▮▮▮▮▮▮▮▮ | |

| 4. | |
|---|---|
| **Page 5 of 5** | |
| 5. Program Code | 6. Date Prepared 01/28/09 |

11. RAMMAL stated the transaction with the Honduran and FARC had not yet been completed, and believed the FARC was sending cocaine to be distributed in Honduras for money, after which RAMMAL believed he would receive a down payment. RAMMAL stated in the interim, LANZA wanted RAMMAL to deliver a smaller shipment of weapons to Honduras to make some money in the interim. RAMMAL stated he asked for $10,000 in order to buy a truck to deliver the weapons to LANZA. ▮▮▮ *▮▮▮asked RAMMAL how he would complete this transaction if he (RAMMAL) did actually possess any weapons? RAMMAL did not answer immediately then replied that he would not do it (the transaction) and say no to LANZA.* ▮▮▮▮▮ *then asked RAMMAL why, if these transactions involve primarily weapons did he approach the DEA office in Belize with this information? RAMMAL replied in the past SAFA spoke with DEA and he hated GHANTOU.* ▮▮▮▮▮ *then asked RAMMAL that despite knowing him (GHANTOU) for five years, and visiting him in prison in Honduras you hate him? RAMMAL replied that he did.* ▮▮▮ *▮▮▮asked RAMMAL if his intention was to steal money from GHANTOU, LANZA and MEMBRANO why did he want to speak with law enforcement now and not complete the theft and possibly receive a large sum of cash? RAMMAL could not provide an answer.*

12. At approximately 10:45 a.m., on January 16, 2008, the interview with RAMMAL was concluded.

## INDEXING



DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.