# Exhibit E

16DSYOUSEF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

           v.                              08 Cr. 1213

JAMAL YOUSEF,

               Defendant.

------------------------------x

                                      June 13, 2011
                                      11:15 a.m.

Before:

                    HON. JOHN F. KEENAN,

                                      District Judge

                        APPEARANCES

PREET BHARARA
     Acting United States Attorney for the
     Southern District of New York
CHRISTOPHER LAVIGNE,
JEFFREY BROWN,
     Assistant United States Attorneys

MELINDA SARAFA, ESQ.
JOSHUA DRATEL, ESQ.
     Attorneys for Defendant

INTERPRETER:  MIRTA HESS

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

16DSYOUSEF

(Case called)

THE COURT:  This is in the matter of the United States against Jamal Yousef and Mr. Lavigne and Mr. Brown are here, and Ms. Sarafa, Mr. Dratel, nice to see you, and the defendant is present.  The official interpreter is present.

And this is oral argument on a multi-purpose motion brought by the defense to dismiss the indictment and to do other various things that are sought by the defense.

I will give each side a half hour to argue if you want it.  If the defense wants rebuttal the rebuttal time comes out of your half hour.  Whoever is going to argue may proceed.

MS. SARAFA:  Thank you, your Honor.

THE COURT:  Do you wish time to rebut?

MS. SARAFA:  I think we would like approximately 5 minutes.

THE COURT:  Fine.  Go ahead.

MS. SARAFA:  What I would like to do is I would like to address -- well, there are four components to our motion.

THE COURT:  I am aware of that.

MS. SARAFA:  I will address the first three, those having to do with discovery, surplusage, and suppression, and Mr. Dratel will address the abduction issue.

THE COURT:  Make sure you leave him enough time.

Go ahead.

MS. SARAFA:  I will do my best, your Honor.  I will

16DSYOUSEF

try to be brief.  The briefs are fairly comprehensive and I appreciate the court's indulgence.

Let me first address the discovery issue.  And what I would like to start with is just as a point of reference Justice Sutherland's 1935 statement in Berger v. United States about the role of the prosecutor.  And what Justice Sutherland said was "The United States Attorney is the representative --"

THE COURT:  That is the most famous quote in history.

You want to put it in, go ahead.  I know the quote by hard.

MS. SARAFA:  "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not as liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

I raise that, your Honor, not just because of its

16DSYOUSEF

inherent truth and wisdom but because that was really the cornerstone of the January 2010 memo from deputy Attorney General Ogden to department prosecutors regarding discovery. So that represents the current thinking of the current administration with respect to discovery.

This case brings extremely serious charges against my client. Indeed, he faces a guideline sentence of life imprisonment if he is convicted. One piece of discovery that we have been requesting from the beginning of this case as soon as we were able to read some of the existing discovery, and also since Mr. Brown specifically told me about the existence of this information, is information that the government has regarding Mr. Yousef's participation in a fraudulent weapons transaction. Now, we know this information is in the past, not related directly to this case, but we know this exists because we have an FBI report from 2006, July 2006 --

THE COURT: That is in the papers.

MS. SARAFA: It's in the papers. And this is where ALAT Marco Cordero after having met with Mr. Yousef in June 2006 in Mexico City goes to Honduras and interviews Mr. Yousef about a supposed weapons transaction. Now, the memo of the June 2006 meeting says nothing about that transaction but it's clear from the July 14 meeting notes that ALAT Cordero had conducted an investigation into a scam weapons transaction that Mr. Yousef had participated in and had, in fact, done follow-up

16DSYOUSEF

work and interviewed an individual known as El Padrino and also a woman in California. And those two individuals, in fact, contacted Mr. Yousef and told him that they were contacted by the FBI, and that is in Mr. Yousef's declaration.

In addition to the indications in the materials themselves, AUSA Brown did tell me in April of last year that in reviewing classified information in this case he had come upon potential Brady information concerning a scam weapons transaction that Mr. Yousef had participated in in the past. We believe that is relevant and discoverable in this case.

THE COURT: If there is Brady material it has to be turned over immediately. I intend to ask the government about the alleged statement by Mr. Brown to you because if there is Brady material we are not talking discovery, we are talking things much more serious than that. As a matter of fact, you should know, and it's a fact, that I am on the Advisory Committee on criminal rules of the Judicial Conference and at the last meeting, which was held out in Portland, Oregon in April, approximately three-quarters of the time at that meeting was spent on the question as to whether or not the discovery rules, Rule 16 of the Federal Rules of Criminal Procedure, should be amended, and whether or not the government's obligations should be broadened under 16. And Mr. Brewer, who is the deputy Attorney General in charge of the Criminal Division, was present at the meeting and my understanding is

16DSYOUSEF

that all United States attorneys and all assistant United States attorneys receive special training about their Brady obligations and have been informed that there is to be very careful and thoughtful compliance with everything relating to Brady. If that is not so, I will proceed accordingly. But I have to hear something from the government.

Go ahead.

MS. SARAFA: That is my understanding as well, your Honor, about the current administration view.

apart from Brady we do believe this is Brady material but the government might take the position it's not Brady and I would like to address other grounds for production because I believe it's Rule 16 and Brady.

THE COURT: Well, you have the FBI reports of the meetings with Yousef in Mexico in June and July 2006, don't you?

MS. SARAFA: We have June 2006 in Mexico, July 2006 in Honduras. Our point is that the June 2006 memo does not provide any information about weapons transactions. July 2006 is focused entirely on weapons transactions. They deliberately went to Honduras to interview Mr. Yousef on that. So something preceded that July 14, 2006 meeting. My original discovery request to the government, which still stands today, is all reports and information leading to the July 14, 2006 meeting. And information that Mr. Yousef previously engaged in a scam

16DSYOUSEF

weapons transaction is material to his defense because it really goes to his intent. It would be admissible under 404(b). He may have an entrapment defense. If so, the government would have to prove predisposition, and such evidence would go toward rebutting predisposition. It's relevant to our suppression motion because we believe it should have been disclosed in the affidavit in support of the search warrant.

THE COURT: But in the search warrant affidavit at paragraphs 7, 8 and 9 Magistrate Judge Fox was essentially told that one of the people was claiming it was a scam but that the agents didn't think it was a scam, and that is in the affidavit supplied for the search warrant.

Now, Magistrate Judge Fox knew that there was talk of a scam and he issued the search warrant anyhow.

MS. SARAFA: Magistrate Fox knew there was talk of a scam but let's put that in context. First of all, the agents also stated in that affidavit, the affiant states that photos were transmitted. At the time that affidavit was sworn out the agent knew, the affiant knew that those photos were fake. The agents had been affirmatively told that and yet the affidavit reads as if those photos were genuine, genuine weapons, genuine photos of weapons involved in sincere negotiation. There is nothing in the affidavit to explain why the agents rejected the scam theory. So the import of the affidavit is that there are

16DSYOUSEF

photos of weapons that are the subject of sincere negotiations that have been transmitted, even though that is not true, they know it's not true, and that Ramal, the individual in the photos who told agents that the photos were fake, said that he was engaged in a scam. And, in fact, if you read the interview notes of Ramal, it's clear that the agents had doubts about his credibility, but they had in their possession the photos. So when you look at everything in totality, we know the photos are fake and that part of his statement to the agents was true. And yet the affidavit does not reflect that at all.

THE COURT: Does not reflect what?

MS. SARAFA: The fact that the photos were fake. If the judge had known -- let me just say --

THE COURT: First of all, how do you know that the agents knew that the photos were fake?

MS. SARAFA: Because the DEA-6s of the meetings with Ramal say that. They say that Ramal told them that he was posing with weapons but was not in possession of any weapons. Those photos were not genuine photos. They were submitted to the court, a DVD of those photos, so you can see for yourself that on their face they are obviously fake. But forget on their face, the agents had actual knowledge they were fake. And that is not reflected.

It's very clear, your Honor, that a magistrate's reliance on a search warrant affidavit is due no deference if

16DSYOUSEF

there are material misstatements or omissions in that affidavit. That is from the Second Circuit decision in Canfield. So here we have a case where the affidavit as it is sworn out contains material omissions. It doesn't say anything about Mr. Yousef having been involved in a scam weapons transaction in the past which further supports Ramal's statement that the whole thing was a scam and had that been disclosed would convey the more accurate impression that the entire thing was, in fact, a scam and that there wasn't probable cause to believe that searching the contents and records of that account would in fact yield evidence of a genuine weapons transaction.

There are other problems with the search warrant affidavit. I mean, some of them are small but they nevertheless indicate that there may be more problems lurking there that we are not even aware of and that is why a hearing is required. The affidavit says, for instance, that Ramal was the person who requested the meeting with the DEA. In fact, it wasn't Ramal who requested the meeting. What we now know is that it was Yasser Yousef Saffa who requested the meeting. Saffa identified himself as a relative of Ramal. Saffa is the person who Mr. Yousef provided information about when he went to the embassy in Mexico City in June 2006. So Mr. Saffa obviously had a vendetta against Mr. Yousef, and the agents I am sure knew that. These are DEA agents in Belize. Mr. Saffa

16DSYOUSEF

was arrested by Panamanian authorities in January 2007 in possession of cocaine. The agents certainly knew, and Mr. Ramal's statements also indicate, that Mr. Saffa had animus against Mr. Yousef and so anything Ramal said about pulling a scam against Mr. Yousef lacked credibility. The evidence that the government had in its possession at the time the search warrant affidavit was sworn out indicates that the whole thing was a scam. And that is not reflected in the affidavit. To the contrary, the affidavit --

THE COURT: The affidavit uses the word scam, doesn't it? Saffa Saffa.

MS. SARAFA: But the affidavit says that theory was rejected. It says that theory was rejected.

THE COURT: I get your point. Make sure you leave some time.

MS. SARAFA: On suppression, your Honor, we believe we have made a substantial showing that it entitles us to a Franks hearing. We have shown there are material omissions from the affidavit and material misstatements and we should be entitled to a hearing to explore really what the affiant knew at the time the affidavit was sworn out.

Let me address briefly the motion to strike surplusage from the indictment.

We have urged that the indictment, which contains a long list of violent activities, terrorist activities primarily

16DSYOUSEF

directed against the United States, those should be stricken because they are irrelevant to the charged offense and unduly prejudicial to Mr. Yousef. There are two things the government has to prove among other elements. The government has to prove two things that are relevant to this motion. One is they have to prove the status of the FARC as a terrorist organization or an entity that has engaged in terrorism; 2, they have to show Mr. Yousef's knowledge that the FARC engaged in terrorism or terrorist activity as defined under certain federal statutes.

The activities that are listed in the indictment concerning FARC's past activities really go to its status as a terrorist organization.

THE COURT: Do you think that FARC will be known to the prospective jurors in this case before they hear about it in this case? It's not al-Qaeda. It's an organization that exists and I don't think I ever heard of it until I got this case assigned to me. So my point being that the government is certainly entitled to set forth in the indictment the history of the terrorism of FARC.

MS. SARAFA: They are entitled to set forth the fact that the FARC is a terrorist organization that has engaged in terrorist activities. However, the government is not entitled to select a list of its preferred terrorist activities to inflame the jury. There is nothing in the statute that requires that the terrorist activities be connected to the

16DSYOUSEF

United States.  The government lacks any specific activities that they can link to Mr. Yousef.  So, in effect, they are asking for free rein to insert whatever activities they choose to insert.

There is no check on what the government includes.  In effect, they have chosen the most prejudicial activities and they have utterly failed to link any of it to Mr. Yousef.  So what we have proposed is that we enter into a stipulation that the FARC is an organization in Colombia engaged in armed struggle against its government that has engaged in government activities.  We believe under Old Chief that the court should compel and that it would, in fact, be an abuse of discretion not to accept that stipulation.  It's very much like -- I think it's analogous to Old Chief which concerned a felon-in-possession case and in Old Chief the defense had offered to essentially stipulate to the fact that he had a prior conviction.

THE COURT:  I remember Old Chief very well.

Go ahead.

MS. SARAFA:  I won't belabor the point.  But I think that the the status of the FARC as an organization that has engaged in terrorism is analogous to an individual who has a prior felony conviction in a felon-in-possession case and the government should of course be allowed to prove the fact of the organization's status but they should not be allowed to

16DSYOUSEF

introduce the most prejudicial evidence.  And its inclusion in the indictment is especially problematic, your Honor, because the government is not obligated to prove the facts that are alleged in the indictment.  So whatever proof they put on about the FARC the inclusion of these other facts in the indictment may have a very prejudicial effect on the jury and cause the jury to convict improperly.  So we feel very strongly that the portions of the indictment that we identify in our opening brief as prejudicial should be stricken from the indictment.

THE COURT:  You are arguing that it's okay for the government to prove that FARC is designated as a foreign terrorist organization by the government.  You are arguing that is okay.  But you are saying they shouldn't be allowed to plead or show the historical acts which justify the designation. That is what you are arguing.  That doesn't make any sense.

MS. SARAFA:  It's exactly like a felon in possession. The government is allowed to prove the fact of an individual's conviction but should not be allowed to go into the underlying activities related to that conviction because really what we are interested in here, what they have to prove is they have to prove two things:  (1) the status and (2) Mr. Yousef's knowledge of the status.  So those are separate.  And proof of the organization's status should be limited to what the defense has agreed to stipulate to.

THE COURT:  What I want to know about the search

16DSYOUSEF

warrant, and then I think after you answer this question I think you should let Mr. Dratel start, but what I would like to know is this:  Assuming that the affiant for the search warrant read the reports about Yousef meeting with the assistant ALAT Mr. Cordero, where in those reports does it say that the 2006 weapons deal with Padrino was a scam?  What was left out of the search warrant?

MS. SARAFA:  Let me back up because the affiant states that he references Ramal's meeting with the agents in which Ramal said that this was a scam.  So we know he was aware of that meeting or those meetings, at least one of those meetings, the December meeting.  And at that meeting Ramal said that the photos -- he indicated the whole thing was a scam and the photos were fake.  So we know the affiant was aware of the fake photos.

Although I would point one thing out with regard to fake photos, one thing we don't know for sure is whether the affiant was aware of the second memo, the January 28, 2009 memo in which Ramal makes it crystal clear that the photos were fake.

THE COURT:  My question is what information was left out?

MS. SARAFA:  The fact that the photos were fake and the affiant knew it or should have known it.

THE COURT:  All right.

16DSYOUSEF

MS. SARAFA: And the import of the affidavit -- there are two things we say were left out. One is the fact that the photos were fake and two is the fact that Yousef engaged in a scam weapons transaction in the past. We believe the July 14, 2006 memo indicates that the government had heard from Mr. Yousef previously about a fake weapons transactions and had investigated it and that we are missing that information. That is what we requested in discovery and that is why the discovery request is critical also to the search warrant -- to the suppression motion. So we believe we made a showing that entitles us to a hearing on the suppression motion because there are many unanswered questions but we know enough to know that there are material omissions and misstatements.

THE COURT: Thank you.

MS. SARAFA: Thank you.

THE COURT: Mr. Dratel.

MR. DRATEL: Thank you, your Honor. I will summarize because I don't want to eat into our rebuttal time as much.

Essentially with respect to the issue about the compelled production of Mr. Yousef, the abduction into the United States, four points essentially. One is that with respect to Toscanino we do acknowledge that it has been undermined by subsequent opinions and it has never been reversed, but in the context of Old Chief it's a separate issue. Is that extradition an exclusive remedy? No. Rather,

16DSYOUSEF

it is an exclusive remedy for the sovereign to obtain jurisdiction and Old Chief said no. But here we have a different situation because aside from the extradition treaty itself we have the Interpol red notes which is a commitment by the United States to seek a specific and exclusive means of producing Mr. Yousef to the United States absent "exceptional circumstances."

The government has not made any effort to suggest that there are exceptional circumstances. Instead, I think the government in response tries to say that extradition means something more than extradition and uses extradition in a way that makes it clear that it understands fully what extradition means, that it's a court and a formal procedure rather than the one that was implemented in this case, which by itself is quite fishy in the context of several issues. One is that the expulsion from Honduras, number one, the client denies. His affidavit does not contain any such procedure or any such stopover for that purpose. The letter handing over custody to Interpol is, in fact, dated the day after such custody would have occurred. Third is that there was no process whatsoever, no appeal, no counsel. He had an asylum petition pending in Honduras. So I think the validity of that is extraordinarily suspect, which gets us to the question of a hearing, which is what we think is necessary both in the context of what we have asked for in discovery and also in the context of what occurred

16DSYOUSEF

and what the United States' role, which is quite obviously a considerable role, given the close monitoring and the the fact that this was all done for the benefit of the United States. This was not an ordinary expulsion where you send someone to wherever his prior citizenship is, you essentially handed him over to people who are waiting and watching the whole time.

I think the bottom line for us is that there has to be some means for the court to evaluate the government conduct or misconduct, which is what we allege in a case like this. There has to be some means for the court to redress it.

THE COURT: You are frank enough -- and you will have rebuttal -- you are frank enough to acknowledge that Toscanino has been whittled away at, I will use those words, and you point out it has not been reversed. But is there any case at all authorizing me to dismiss an indictment due to the government's alleged violation of an extradition treaty, international war or an Interpol red notice? Is there any such thing other than Toscanino? And the Toscanino facts are shocking. They held the guy 17 days. They knocked him out with a pistol as I recall. I mean, that arguably still offends due process, whether it has been whittled away at it or not. But other than Toscanino, is there any case that authorizes me to dismiss an indictment?

MR. DRATEL: No, your Honor, but the principle exists. The principle exists to be enforced and we think this case,

16DSYOUSEF

particularly with the context of the red notice that takes it outside of extradition -- not extradition, the government has the option.  Here the government committed to a specific option and essentially wants to act with impunity in that regard.  So we think this is the case.

Thank you, your Honor.

THE COURT:  Thank you.

All right, who is going to argue for the government?

MR. LAVIGNE:  Your Honor, I will argue.  I just ask that to the extent there is any clarification the court wants if I can't answer it I will ask my colleague, Mr. Brown, to jump in.

THE COURT:  Well, my first question is this, and really I think she says it was Mr. Ramal told her that there was Brady material involving a scam weapons transaction in some classified documents.  That is the way I understand it.  And so what is the story about this?

MR. BROWN:  What I said, Judge, was we were reviewing classified materials for Brady.  That is what I said.  I didn't say --

THE COURT:  In other words, what you claim you said or what your recollection is that you said is that you were reviewing the documents essentially to see if there was Brady material.

MR. BROWN:  Exactly, your Honor.  And Ms. Sarafa had

16DSYOUSEF

made clear long ago that a scam was part of her defense so I said, we will look for Brady related to the scam.  I didn't say that I had found Brady related to the scam.  That wasn't what I said.  So I think that is just confusion, but I certainly did have a conversation where I described that we were reviewing classified materials for Brady.

THE COURT:  Have you found any Brady material?

MR. BROWN:  No, your Honor.  I found lots of inculpatory material but not Brady material.

THE COURT:  Thank you.

Go ahead, Mr. Lavigne.

Why don't you, if you can, argue from the lectern. That way they will be able to hear you better and not have your back to the other side.

MR. LAVIGNE:  Your Honor, I am going to start with the argument regarding the alleged kidnapping.  The bottom line is there has been a principle, the Ker-Frisbie doctrine from the 1880s, and --

THE COURT:  And Mr. Dratel very passionately and carefully argued and candidly I will add that there has to be some means for a court to redress a set of facts like this. That is not the law.  That is not the law.

MR. LAVIGNE:  This court, where there is a criminal case pending for Mr. Yousef, is not the court or the forum to argue whether his rights in being expelled from Honduras were

16DSYOUSEF

violated or otherwise. Ker-Frisbie makes that abundantly clear. Alvarez-Machain, that is a Supreme Court case, and that case held clearly that a forceful abduction even if in violation of international law, and that was a case where the government of Mexico sent formal letters of protest to the United States about the forceful abduction that U.S. agents made of that defendant, the Supreme Court said that was okay. Because the extradition treaty did not prohibit forceful abductions. The extradition treaty in this case does not prohibit that either.

Now, one line of cases I want to point the court to which is in our brief is the Mata Ballesteros, three different cases from three different circuits which all dealt with a forceful abduction and torture of an individual from Honduras by Honduras black operation people in conjunction with the United States without the approval of the Honduras government. All the courts there said the same thing. The indictment cannot be dismissed and there is no right, no constitutional right here that was violated because of the Ker-Frisbie document.

Putting those cases aside, even under Toscanino, the facts here, as the court indicated, are a far cry from that. There is no allegation of torture at all. And the bottom line is there is no need for a hearing because the Second Circuit, the Supreme Court, has made clear if all this has taken us

16DSYOUSEF

through, if the defendant was in fact kidnapped, then there is no remedy. There is no remedy.

THE COURT: Let's get to the search warrants.

MR. LAVIGNE: Your Honor, the search warrant, the bottom line is even were the court to conclude there was an omission, the test now is is there probable cause, is that still good, and there absolutely is. All the stuff we are hearing about scams, what Mr. Ramal said during that interview was that he was going to scam the customers, meaning Mr. Yousef, so there is still PC to search that account because it can show evidence that Mr. Yousef himself was trying to gather these weapons. I would also add in the DEA-6 form that summarizes the interview, Mr. Ramal, who said he was the owner of that account, gave consent for DEA agents to search it. So this is also inevitable discovery.

THE COURT: What about the fact that the pictures are phony?

MR. LAVIGNE: The fact the pictures are phony just show that Mr. Ramal himself in using that account was going to defraud Mr. Yousef. They don't show Mr. Yousef was in on the scam. Mr. Ramal says the exact opposite thing. If Mr. Yousef is out trying to get weapons and somebody supplying them to him is trying to scam Mr. Yousef he is not any less culpable at all.

THE COURT: Shouldn't the search warrant have said the

16DSYOUSEF

photographs were phony?

MR. LAVIGNE:  I submit that is not material because the search warrant does say that Mr. Ramal said he was involved in a scam.  And was that omitted?  Yes, it was omitted.  Does that make the PC any less?  I submit it doesn't.

THE COURT:  PC standing for probable cause.

MR. LAVIGNE:  Yes, your Honor.

THE COURT:  We use initials for everything.

Now, what about the suggestion, not suggestion, the claim by the defense that there is surplusage in the indictment and that its prejudicial, it's inflammatory.  Why can't you enter into a stipulation?

MR. LAVIGNE:  Well, let me take a step back from that, your Honor.  The first time I heard about a stipulation to acknowledge that the FARC was a designated foreign terrorist organization was through the papers.  So --

THE COURT:  So you got the reply paper.

MR. LAVIGNE:  I understand that, your Honor, but I don't think --

THE COURT:  Do you have a telephone?

MR. LAVIGNE:  I do have a telephone.

THE COURT:  Do you pick up the phone and say to Ms. Sarafa, let's talk about this stipulation?

MR. LAVIGNE:  At this stage, your Honor, we need to prove that Mr. Yousef acted to assist the FARC and he knew what

16DSYOUSEF

it was.  The evidence we have of that is circumstantial and we feel we need to show what the FARC has done.

THE COURT:  So you are not willing to enter into a stipulation?

MR. LAVIGNE:  Not at this time, your Honor.

THE COURT:  What do you mean by "not at this time"?

Does that mean today, June 13, but you might do it tomorrow, June 14, or does that mean you are not going to do it?

MR. LAVIGNE:  Your Honor, it means if we drafted a stipulation and if the defense were willing to stipulate to that, I think we can probably do it.  I don't think based on what Ms. Sarafa has said they want to stipulate to what we want to stipulate to.

THE COURT:  I am going to tell you what, I am going to direct you to prepare a proposed stipulation, let me see it and let her see it and let Mr. Dratel -- and when I say "her," Ms. Sarafa and certainly Mr. Dratel too, let them both see it and let me see it.  And whatever I do on the decision I will hold off until I have seen the proposed stipulation.

Go ahead.

MR. LAVIGNE:  The other point on the surplusage motion, your Honor, is again it's essentially a motion in limine and if the stipulation does not work out between the parties, the defense certainly can argue to limit the proof for

16DSYOUSEF

trial and obviously the indictment will be amended accordingly.

THE COURT: Now, yesterday afternoon I was looking at the papers is what I did my primary reading on this, and I noticed the fact that the order transferring the defendant from the Honduras police to Interpol was executed after the transfer actually occurred.

What significance does that have?

MR. LAVIGNE: Your Honor, it does not have significance in terms of the remedy that the defense is seeking. Whether he was forcibly abducted, whether a bag was forced over his head and he was taken by the United States unilaterally, that would be abhorrent and we don't endorse that, but even if that happened -- dismissal, suppression -- they would not have a remedy for it based on the Ker-Frisbie line of cases.

THE COURT: So, in other words, the fact that the date is subsequent to the transfer is irrelevant?

MR. LAVIGNE: Legally irrelevant, your Honor. It's legally irrelevant. I point the court to two Second Circuit cases which we cite in our brief, Gangler and Reed, Second Circuit cases which dealt with abductions, purely abductions, no torture, where the Second Circuit affirmed the district court's denial on the motion to dismiss the indictment based on the Ker-Frisbie doctrine.

If the court has any other questions I am happy to

16DSYOUSEF

answer them.

THE COURT:  What about this discovery issue?  You haven't touched on that.

MR. LAVIGNE:  Your Honor, as my colleague Mr. Brown indicated, we are not aware of Brady information.  As I indicated to Ms. Sarafa this morning, we did make a Section 4 application to the court and we can flesh that out some more. I submit we have complied with our obligations in this case and will continue to comply with them.

THE COURT:  In other words, you believe you have complied with Rule 16 not only with the spirit of it but with the letter of it?

MR. LAVIGNE:  Yes, your Honor.

THE COURT:  Or not only the letter but also the spirit, going both ways.

MR. LAVIGNE:  Yes, your Honor, and on the classified material the section 4 will lay that out.  There is a limited amount I can say here but, yes.

THE COURT:  That is different, unless there is Brady material in it.  But you think that anything that you have not turned over at this point is either 3500 material or that they are not entitled to it, is that it?

MR. LAVIGNE:  Yes, your Honor.

THE COURT:  Thank you.

I will hear you on rebuttal.  And if you want to split

16DSYOUSEF

the rebuttal that is okay. Mr. Dratel can certainly argue.

MR. DRATEL: Let me check for a second, your Honor.

MS. SARAFA: Your Honor, we would like to split the rebuttal. We will both be very brief.

Let me address the discovery issue. I have with me my contemporaneous notes of my phone conversation with Jeff brown on April 9, 2010. My notes read, and this is from Mr. Brown, "I am reviewing classified materials. I found one piece of potential Brady material. It does not relate to the transaction charged. Scam transaction proposed, getting that to me."

I subsequently embarked on an eight-month process of getting a security clearance in order to be able to review classified information. My clear understanding from that phone call was that the government had identified potential Brady material. There was some discussion with other government agencies about whether or not to turn that over. I should get a security clearance in the event it is turned over.

I submit, your Honor, and I will discuss with Mr. Dratel the appropriate submission or application that we should make to the court, but I believe under these circumstances we should be entitled to review the classified material because it appears that there is at a minimum potential Brady information in there. And that is indicated not only by Mr. Brown's statements to me --

16DSYOUSEF

THE COURT:  By what you claim Mr. Brown said.

MS. SARAFA:  Not only by my recollection and notes of that conversation but also by the discovery materials that have been provided.  Those two --

THE COURT:  What is the discovery materials that are before me on this motion that show there is any Brady material?

MS. SARAFA:  Exhibit 2 is the FBI report of June 10, 2006.

THE COURT:  Exhibit 2?

MS. SARAFA:  Exhibit 2 is just an omission.  Exhibit 2 does not say anything about --

THE COURT:  Just a minute.  Let me get it.  Hold it.

That is Exhibit 2 to your papers?

MS. SARAFA:  Correct.

THE COURT:  Go ahead.

MS. SARAFA:  Exhibit 2 is a redacted 302 from the FBI drafted by Marco Cordero.  It memorializes an interview with Mr. Yousef that took place on June 10, 2006 regarding the sale of Belizean passports.  This document only memorializes statements that Mr. Yousef made about Mr. Saffa and his family's engagement in the sale of false Belizean passports. In his declaration Mr. Yousef states unequivocally that he also provided information in June 2006, and that the meeting occurred over 2 days, about a scam weapons transaction that he had engaged in with an individual known as El Padrino.

16DSYOUSEF

Exhibit 4 is an FBI 302.  It's an FBI report dated July 24, 2006, drafted by Marco Cordero memorializing an interview with Mr. Yousef that took place on July 14, 2006 when ALAT Cordero and ALAT Rafael Ruiz traveled to Honduras to visit Mr. Yousef in prison and asked him about information regarding a transnational shipment of weapons between Lebanon and Mexico.

Now, let's just look at this report.  It says that on July 13 ALATs Ruiz and Cordero traveled to Honduras to meet with the Honduran prosecuting authorities and Yousef.  During that time they were advised Yousef had been arrested.  They were given permission to visit with Mr. Yousef.

Now I am going to read from the report.

"On July 14, 2006, ALATs Ruiz and Cordero interviewed Jamal El Yousef, born 10/15/1958 a/k/a Talal Hassan Ghantous, born 1/1/1969 in a detention cell within a Honduran national police sub-office in Tegucigalpa, Honduras regarding a transnational shipment of weapons between Lebanon and Mexico. El Yousef advised he had specific information regarding the shipment of the weapons."

Okay, let's just stop right there.  Obviously these agents had information that prompted them to go to travel from Mexico to Honduras to interview Mr. Yousef about a weapons shipment, and let's go to the third paragraph.

It states "El Yousef --"

THE COURT:  So what?

16DSYOUSEF

MS. SARAFA:  They had information about Mr. Yousef's supposed participation in a shipment of weapons from Lebanon to Mexico --

THE COURT:  So what?

MS. SARAFA:  -- prior to this time and yet we have no documentation of that.  We believe --

THE COURT:  Why are you entitled to documentation?

MS. SARAFA:  We believe that that information was information that Mr. Yousef had participated in a scam weapons transaction with this individual El Padrino who is referenced in the third paragraph who it's clear from this document --

THE COURT:  Where does it say anything about it being a scam?

MS. SARAFA:  It doesn't, your Honor.  In this document it doesn't.  That is what we are missing.  The government has information that Mr. Yousef participated in a scam weapons transactions and refuses to turn it over because it's exculpatory.  Okay?  It's that simple.  Paragraph 3 makes it clear that they have investigated this individual named El Padrino and, in fact, have identified his real name.  Mr. Yousef's declaration makes it clear that El Padrino contacted him and told him that the FBI told him that Mr. Yousef was trying to defraud him.  All the evidence, the statements in this, the interviews with Ramal, indicate that this was a scam and the government knew Mr. Yousef had previously participated

16DSYOUSEF

in a scam weapons trantransactions. That is what we are requesting and we believe we are entitled to it.

I am going to cede the rest of my time to Mr. Dratel.

MR. DRATEL: Thank you, your Honor.

With respect to remedy in the context of the abduction issue, obviously the dismissal of the indictment is what we are asking for but there are remedies short of that, such as suppression or sanctions, that would at least provide some relief and I just call the court's attention to Ghalani in which Judge Kaplan --

THE COURT: I remember what he did. He suppressed certain testimony.

MR. DRATEL: Right, but a novel situation applying fundamental principles so that the defendant's rights were protected from the process essentially of being corrupted at a level that would affect his ability to have a fair trial. And that is what we think is appropriate here as well as a hearing to get to the bottom of what did occur.

Thank you, your Honor.

THE COURT: All right.

Decision is reserved. But I have indicated that I want the government to draft a proposed stipulation concerning the "surplusage" issue relating to the language in the indictment that is highlighted by the defense in their motion, and to submit that stipulation to both me and to the defense.

16DSYOUSEF

Today is Monday, I don't think it's unreasonable that you should do it by the close of business Friday, which is June 17. And I expect the defense to let me know by Friday, June 24, whether they agree to the stipulation or whether they don't agree to the stipulation.

I will reserve decision on the overall motion and the other aspects of the motion. I may decide those before June 24; I may not. But I am going to hold off on the surplusage issue until I have received both my copy and whatever the defense seeks to do.

Thank you.

Decision reserved.

MR. DRATEL: Your Honor, on the government's section filing which we learned about this morning, we would like the opportunity before the court rules to submit a letter which doesn't have to be classified.

THE COURT: You mean before the court rules on the propriety of showing it to you?

MR. DRATEL: Yes, what they are asking for in their relief is not have to produce it.

THE COURT: You are not asking me to not read it.

MR. DRATEL: Just not to rule. If we can get the court a letter and if we can have -- I am going to be away the end of this week at a conference in California that I am presenting at but if we can have until Monday of next week.

16DSYOUSEF

THE COURT:   You have until Tuesday.

MR. DRATEL:   Thank you, your Honor.

MS. SARAFA:   Thank you, your Honor.

MR. LAVIGNE:   Thank you, your Honor.

- - -

**Exhibit F**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------X
UNITED STATES OF AMERICA,     :

                                   :     No. S3 08 Cr. 1213 (JFK)

    - against -             :

                                   :      **Opinion & Order**

JAMAL YOUSEF,                :

                                   :

               Defendant.    :
------------------------------------X
APPEARANCES:

    FOR THE GOVERNMENT:

        Preet Bharara, Esq.
        UNITED STATES ATTORNEY FOR THE
        SOUTHERN DISTRICT OF NEW YORK
        Of Counsel: Jeffrey C. Brown, Esq.
                  Christopher L. Lavigne, Esq.


    FOR DEFENDANT JAMAL YOUSEF:

        Melinda Sarafa, Esq.
        SARAFA LAW, LLC


**JOHN F. KEENAN, United States District Judge:**

Before the Court is defendant Jamal Yousef's ("Defendant" or "Yousef") motion to dismiss the Third Superseding Indictment. Yousef contends that the Due Process Clause of the Fifth Amendment requires dismissal because there is an insufficient nexus between his allegedly unlawful conduct and the United States to justify the extraterritorial application of United States law. For the reasons that follow, Defendant's motion is denied.

Case 1:06-cr-01215-JFK Document 23 Filed 08/23/10 Page 2 of 18

## I. BACKGROUND

According to the Third Superseding Indictment (the "Indictment"), Yousef is a former member of the Syrian military and a known international arms dealer. (S-3 Indictment ¶ 7.) The Government alleges that Yousef and his unnamed co-conspirators agreed to provide a cache of military-grade weapons to an individual purporting to represent the Fuerzas Armadas Revolucionarias de Colombia (the "FARC") in exchange for thousands of kilograms of cocaine. (Id. ¶ 6.)

The FARC is designated as a terrorist organization by the United States Government pursuant to Section 219 of the Immigration and Nationality Act. (Id. ¶ 1.) According to the Indictment, the FARC is the world's largest supplier of cocaine and is dedicated to the violent overthrow of the democratically-elected government of Colombia. (Id.) The Indictment alleges that the FARC uses targeted acts of violence to protect its interest in the drug trade, such as attacks against coca fumigation aircraft and other Colombian infrastructure and the kidnapping and killing of United States nationals. (Id. ¶ 2.)

At the time of the charged conduct, Defendant was imprisoned in Honduras for actions unknown to the Court, but apparently unrelated to the instant matter. (Id. ¶ 7.) Because of Defendant's incarceration, the majority of the charged overt acts were made by co-conspirators on Defendant's behalf who kept

him apprised of the progress of the deal while he was in custody. The following factual allegations regarding the charged conspiracy are taken from the Indictment and the transcripts of recorded conversations submitted to the Court by the Government in opposition to the instant motion:

On or about September 25, 2008, a confidential source ("CS-1") working for the United States Drug Enforcement Administration in Central America met with a co-conspirator not named in the Indictment ("CC-1") at CC-1's home in Honduras to discuss the charged arms-for-narcotics transaction. (Id. ¶ 10(a).) CS-1 purported to represent the FARC and CC-1 indicated that he was acting on behalf of Yousef. (Id.)

At the meeting, CC-1 agreed in principle to sell weapons controlled by Yousef, including automatic rifles, M-60 machine guns, rocket propelled grenades, hand grenades, anti-tank munitions, and C-4 explosives. (Id. ¶¶ 6, 10(a).) Based on representations by CS-1 during the course of the negotiations, Yousef and his co-conspirators believed that the cocaine would be supplied by the FARC and the weapons involved in the transaction would be used by the FARC. (Id. ¶ 6.) CC-1 claimed that the weapons were stolen from Iraq and being stored in Mexico at the home of Yousef's relative, who, according to Yousef, is a member of Hezbollah. (Id. ¶¶ 6-7, 10(a).) With regard to the source of the weapons, CC-1 stated specifically:

3

> CC-1:   Look, what we have comes from . . . Most of
> them — as far as the M-16s, the AR-15s, the M-60s,
> the, uh, hand grenades, explosives, uh, the bullet-
> proof vests, uh, those come from Iraq.   They're
> totally new and it's the latest generation, what the
> 'gringos' are using in Iraq. How did we obtain them?
> From the gringos themselves[.]
>
> CS-1:   You took . . . you took the question from my
> mouth, because it's . . . I'll repeat once again.
> It's . . . it's . . . not normal.  I'm saying to him,
> "Where am I going to get five thousand rifles in
> Central America?"
>
>                 *   *   *   *   *
>
> CC-1:    So, I want to show you with the newspaper,
> look, and . . . and . . . with the video uh . . . what
> . . . what . . . what we have.  How did that get
> there?    I'll explain that as far as the American
> weapons are concerned, those were brought over from
> Iraq.  They were stolen and purchased in Iraq.

(Brown Decl., Ex. A, at 24, 27).

CC-1 and CS-1 continued to negotiate the transaction over the telephone, by e-mail, and in person over the next month. CS-1 often reiterated his affiliation with the FARC and in one instance detailed his organization's role in the drug trade, explaining that the FARC does not "have the infrastructure" to set itself "up on the highways and avenues of the United States" and so it "depend[s]" on "several organizations in Mexico" to deliver the product. (Brown Decl., Ex. D, at 83-85.)

On or about October 15, 2008, CC-1 sent CS-1 an e-mail which attached several photographs of the weapons cache, including one photograph of a man posing in front of the weapons

4

holding a Belizean newspaper dated September 21, 2008. (S-3 Indictment ¶ 10(d).)

On or about October 28, 2008, CS-1 met in Honduras with another co-conspirator ("CC-2") who identified himself as an associate of Yousef and CC-1. (Id. ¶ 10(g).) During that meeting, CC-2 called Yousef at the prison so that Yousef could participate in the meeting and speak with CS-1 regarding the logistics of the transaction. (Id.) The transaction was finalized at a meeting of CS-1 and CC-1 on or about October 29, 2008, with CS-1 agreeing to provide and ship to Honduras between 7,000 and 8,000 kilograms of cocaine in exchange for the weapons. (Id. ¶ 10(h).)

After being released from custody in Honduras, Yousef was brought to and arrested in this district by federal agents. He is charged for his alleged involvement in this "narco-terrorism conspiracy" under 21 U.S.C. § 960a, which provides a heightened sentence for those who engage in narcotics activity that would be punishable under 21 U.S.C. 841(a), or conspires or attempts to do so, while knowing or intending to provide "anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity . . . or terrorism."

## II. THE NEXUS STANDARD

Section 960a explicitly targets conduct occurring abroad. For example, the statute confers jurisdiction over offenses,

5

such as the conduct alleged here, where "an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States." 21 U.S.C. § 960a(b)(5).

"[A]s a general proposition, Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)). There is a general presumption that federal criminal statutes are to apply only within United States borders, but where, as here, Congress has "expressly indicated its intent to reach" extraterritorial conduct, the Court is "bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir. 1983) (quotation omitted). The constitutional challenge before the Court thus is limited to that narrow issue: whether the application of the narco-terrorism statute to Defendant's conduct, which occurred entirely abroad, violates the Due Process Clause of the Fifth Amendment.

Although there is surprisingly little case law in this circuit addressing the extraterritorial application of federal

6

criminal law,[1] the standard to be applied by the Court is not in dispute. In the Second and Ninth Circuits, "in order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." Yousef, 327 F.3d at 111 (quoting United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)) (modification omitted). The nexus test "ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." United States v. Al Kassar, 582 F. Supp. 2d 488, 494 (S.D.N.Y. 2008) (quoting United States v. Klimavicius-Viloria, 144 F.3d 1249, 1257 (9th Cir. 1998)).

The two courts in this circuit that recently have applied the "nexus" test in a criminal case have justified the extraterritorial application of federal law on the basis of a "substantial intended effect" in or on the United States. The appeal in Yousef followed a trial at which it was established that the "defendants conspired to attack a dozen United States-

---

[1] The Court is not aware of any case in which a federal court has dismissed an action on the ground that the extraterritorial application of a federal statue violates the Due Process Clause. Cf. United States v. Ruemayr, 530 F. Supp. 2d 1210, 1223 (D. N.M. 2008) ("[I]t appears that no federal court has invalidated the extraterritorial application of U.S. law on due process grounds.").

flag aircraft in an effort to inflict injury on this country and its people and influence American foreign policy." Yousef, 327 F.3d at 112. Applying the "nexus" standard, the court held that in view of the "substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." Id. Similarly, in Al Kassar, a criminal prosecution with allegations somewhat resembling those in the instant action, the indictment charged the defendants "with voluntarily conspiring to sell millions of dollars worth of weapons to the FARC, with the expectation that those weapons would be used to kill United States nationals." Al Kassar, 582 F. Supp. 2d at 494. The court in Al Kassar held that although the defendants were alleged to be arms dealers — not the attackers as in Yousef — the intent to kill Americans was a "substantial intended effect" sufficient as to not make the application of United States law "arbitrary or fundamentally unfair." Id.

Yousef and Al Kassar's finding of a "substantial intended effect" in or on the United States is sufficient but not necessary to justify the extraterritorial application of federal criminal law. In determining whether a sufficient nexus exists, courts also have considered factors such as the "defendant's

8

citizenship or residency, the location of the acts allegedly giving rise to the suit and whether those acts could be expected to or did produce an effect in the United States." Goldberg v. UBS AG, 690 F. Supp. 2d 92, 106 (E.D.N.Y. 2010); see, e.g., United States v. Ruemayr, 530 F. Supp. 2d 1210, 1223 (D. N.M. 2008) (finding a sufficient nexus because the defendant allegedly "reached out into the United States during the planning stages of his attack numerous times via email" and "the alleged purpose of his criminal activity was to violently disrupt the United States petroleum and financial markets"); United States v. Clark, 315 F. Supp. 2d 1127, 1133 (W.D. Wash. 2004) (finding the "nexus" requirement satisfied in a case involving illicit sexual conduct with a child in a foreign country because the defendant, as an American citizen, "could reasonably anticipate being haled into Court in the United States" for such conduct); United States v. Rasheed, 802 F. Supp. 312, 317-19 (D. Haw. 1992) (finding a sufficient nexus between the United States and a defendant found on a St. Vincent registered vessel carrying 70 tons of hashish bound for Canada based on several factors including meetings and phone calls in the United States and criminal acts committed by co-conspirators in the United States).

### III. ANALYSIS

The Government's interest in the charged conduct is obvious on two levels. First, the United States Government has clear incentive to prevent the arming of an international terrorist organization which brazenly targets Americans with acts of violence and traffics narcotics into its borders. The Government also has a legitimate interest in protecting the security of its military arsenal and prosecuting any individual who provides a market for stolen United States military hardware.

Defendant argues, though, that the application of United States criminal law would be unfair in this case because, unlike in Yousef and Al Kassar, the charged conduct does not include a "substantial intended effect" on the United States. On this point, Defendant maintains that: (1) there is no evidence to suggest that the cocaine was to be shipped to, from, or through the United States; (2) there were no representations made to him or his co-conspirators that the weapons were intended for use against the United States or United States nationals; and (3) there is no evidence that he was aware that the FARC has a history of violence against United States nationals.

Although it may be true that the Defendant did not act with the specific purpose of harming interests of or related to the

10

United States, the evidence supports the conclusion that he was aware that the charged conduct would have such an effect.

First, the recorded conversations between the confidential source and a co-conspirator regarding the "American" weapons stolen from the "gringos . . . in Iraq" make clear that the weapons at issue were taken from the United States military arsenal.[2] Even if Defendant was not directly responsible for the theft, certainly he and his co-conspirators knew that brokering the black-market sale of American weaponry stolen from an active war-zone would affect the United States Government's military and security interests.

In addition, CS-1 represented to Defendant's co-conspirators that the FARC relies on Mexican drug cartels to transport narcotics into the United States. The recorded conversations further evidence that the co-conspirators negotiated the arms-for-narcotics transaction on Defendant's behalf and kept him apprised of the status of their negotiations and details regarding CS-1's identity. Therefore, even if Defendant did not have independent knowledge of the FARC's

---

[2]   The Court is not persuaded by Defendant's argument that it cannot infer his knowledge from the recorded statements of his co-conspirator regarding the source of the weapons for sale. The statements would be admissible at trial under Federal Rule of Evidence 801(d)(2)(E) as one made by a "co-conspirator of a party during the course and in furtherance of the conspiracy," and Defendant provides no authority to support his claim that the Court cannot consider at this stage of the proceeding evidence that would be admissible against him at trial.

11

notorious drug activity relating to the United States, the Court concludes that CC-1 enlightened him. With such knowledge, it follows that in conspiring to provide weapons to the FARC, Defendant knew that arming an international drug-trafficking organization which smuggles narcotics across United States borders would have a considerable effect on United States interests.

Moreover, statements by Defendant's co-conspirators during the course of the investigation show that they worried about intervention by United States law enforcement. See, e.g., Brown Decl., Ex. C, at 57 ("When I was on my way to see you now I had my reservations about you. My reservations. I'm like 'hmm, the DEA, the FBI.'"). Whether the fear of an American law-enforcement presence stems from knowledge of the source of the weapons or knowledge of the FARC's narcotics activity in the United States, these statements further reinforce the conclusion that Defendant reasonably could have anticipated being haled into court in the United States for the charged conduct.

The clear government interest in the charged conduct and the convincing evidence that Defendant knew his alleged activity would have a pronounced effect on United States interests form a sufficient nexus between Defendant and the United States such that the extraterritorial application of the narco-terrorism

12

statute in this matter would be neither arbitrary nor fundamentally unfair. As such, the motion is denied.

## IV. CONCLUSION

The extraterritorial application of 21 U.S.C. § 960a to the charged conduct complies with the Due Process Clause of the Fifth Amendment. Accordingly, Defendant's motion to dismiss is denied.

**SO ORDERED.**

**Dated:** **New York, New York**
**August 23, 2010**

JOHN F. KEENAN
**United States District Judge**

13