UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

UNITED STATES OF AMERICA

    - against -

JAMAL YOUSEF,
      a/k/a "Talal Hassan Ghantou,"

                    Defendant.

----------------------------------------------------------------------X

S4 08 Cr. 1213 (JFK)


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Jeffrey A. Brown
Jenna M. Dabbs
Assistant United States Attorneys
- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                        :
UNITED STATES OF AMERICA                                                :          S4 08 Cr. 1213 (JFK)
                                                                        :
            - against -                                                 :
                                                                        :
JAMAL YOUSEF,                                                           :
            a/k/a "Talal Hassan Ghantou,"                               :
                                                                        :
                                        Defendant.                      :
                                                                        :
------------------------------------------------------------------------X

       Sentencing in this matter is scheduled for October 11, 2012 at 11:30 AM.  The

Government respectfully submits this memorandum in advance of the defendant's sentencing.

The defendant pled guilty, pursuant to a plea agreement, to conspiring to provide military-grade

weapons to a known terrorist organization.  The Government respectfully requests that the Court

impose a sentence of 180 months' imprisonment – the highest available sentence by statute and

the Stipulated Guidelines Sentence contained in the plea agreement – as such a sentence is

necessary and justified by reference to the seriousness of the offense alone, notwithstanding

additional aggravating factors described herein.

## **BACKGROUND**

### A.      **The Indictment**

       On July 6, 2009, a Grand Jury sitting in this district returned Indictment S3 08 Cr. 1213,

charging Yousef with narco-terrorism conspiracy, in violation of Title 21, United States Code,

Section 960a, and with conspiring to provide material support to the FARC, in violation of Title

18, United States Code, Section 2339B.  On August 19, 2009, the indictment was unsealed and

the case was assigned to Your Honor.  On April 5, 2012, the Grand Jury returned Indictment S4

1

08 Cr. 1213 (JFK).   The S4 Indictment, which was returned in anticipation of trial, contained

identical statutory allegations against Yousef but removed all other legally non-essential matter.

**B.     Procedural History**

At his initial appearance in August of 2009, Philip Weinstein of the Federal Defenders

was appointed to represent Yousef.   In October of 2009, at Yousef's request, Mr. Weinstein was

relieved, and Melinda Sarafa was appointed to represent him.   At Ms. Sarafa's request, in March

of 2011, Joshua Dratel, an additional CJA lawyer, was appointed to jointly represent Yousef with

Ms. Sarafa.   Both Ms. Sarafa and Mr. Dratel currently represent Yousef.

During the pendency of the case and over the next two and a half years, Yousef filed

motions 1) to dismiss the Indictment on Constitutional grounds for lack of nexus between the

offense and the United States; 2) to compel discovery; 3) to strike certain factual allegations

regarding the terrorist activities of the FARC from the Indictment; 4) to dismiss the Indictment

on the basis of outrageous Government conduct; 5) to suppress the fruits of an e-mail search

warrant based on an allegation of agent misconduct; 6) for reconsideration of the Court's prior

denial of Yousef's motion to dismiss the Indictment for lack of nexus to the U.S. based on an

allegation of prosecutorial misconduct, and 7) requesting Rule 15 depositions of a witness in

Honduras.

Each of the motions was either mooted or denied as meritless without a hearing.   Shortly

after the denial of his last substantive motion, Yousef pled guilty.

**C.     The Plea**

On May 4, 2012, two days prior to trial, Yousef appeared before Chief Judge Preska,

acting as the Part I District Judge in Your Honor's absence, and entered a plea of guilty to Count

Two of the S4 Indictment, the material support conspiracy.   The plea was pursuant to a plea

agreement with the Government in which the parties stipulated that the terrorism enhancement

applied and that Yousef's applicable Guidelines sentence was the statutory maximum sentence of 15 years in prison.

### D.     The Offense

In or about July 2008, DEA agents in Bogota, Colombia, learned from a confidential source ("CS-1") that a Honduras-based criminal organization had military weapons available for sale.  CS-1 informed the DEA that he had discussed the weapons with an individual named Talal Hassan Ghantou, the head of the organization, whom he was told was imprisoned in Honduras, and who was referred to as "Talal" or "Jamal Yousef" by Ghantou's associates with whom CS-1 had met, including former Honduran Army Colonel Miguel Angel Ramirez Lanza.  The DEA then directed CS-1, who had formerly served in the Honduran Army with Lanza, to introduce a U.S.-based, long-serving DEA CS ("CS-2") to the organization as a potential buyer of weapons, who would represent that he intended to supply the weapons to the FARC.  CS-2 then took over the negotiations with Lanza and Yousef under the close direction of the DEA.

CS-2 then engaged in a series of recorded telephone calls and meetings with the targets of the investigation.  During those discussions CS-2 clearly identified himself as a member of the FARC and emphasized that his interest in the transaction was not financial, but was an outgrowth of his personal convictions and his membership in the FARC, and that the weapons were to be used in the FARC's revolutionary war against the Government of Colombia.

Yousef  was described as, and at all times self-identified as, the head of the organization and the owner of the weapons.  During the negotiations, Lanza produced a list of weapons available for sale, and wrote on the back of the list additional weapons and explosives that Lanza could sell on behalf of his organization.  Among the weapons on the list were AR-15 rifles, M-16s, RPGs, and several pounds of C-4 explosives.  Lanza informed CS-2 that the weapons were

stolen from Iraq and were stored in Mexico at a hotel.[1]  Lanza identified the source of supply of the weapons as a cousin of Yousef who is also a member of Hezbollah and a member of the Syrian government.  CS-2 stated that the FARC could pay for the weapons either with cocaine or money.  The two discussed price, and agreed initially upon 938 kilograms of cocaine for the entire cache of weapons.

At various points during the negotiations, Yousef participated via telephone, either by speaking directly to Lanza, directly to CS-2, or to all parties by speakerphone.  For example, on October 28, 2008, both CS-1 and CS-2 met with an individual named Senen Membrano, who represented himself to be one of Yousef's financial backers.  About an hour into the meeting, Membrano put Yousef on the speakerphone, whereupon Yousef, CS-2, and Membrano discussed various aspects of the deal, including logistical issues relating to payment and transportation.

---

[1]        In this first meeting between CS-2 and Lanza, Lanza informed CS-2 that the FBI had interviewed Yousef in Honduras about this cache of weapons in Mexico to be sold.  Like practically everything else conveyed during the recordings obtained pursuant to the DEA investigation, this was true:  The interview between Yousef and the FBI in fact took place, and was part of an investigation of Yousef by the FBI that began in 2006.  The FBI investigation was based in large part on information that Yousef himself unwittingly told Mexican confidential sources working for the FBI.   According to those sources, and as eventually confirmed by Yousef to the FBI in Mexico, Yousef had offered to broker a weapons deal between, on the one hand, former Mexican military figures buying the weapons for a Mexican drug cartel, and, on the other hand, Hezbollah sources in Lebanon who owned and controlled the weapons.  The FBI later learned from the individual brokering the transaction on behalf of the buyers (Yousef acted as the sellers' broker) that he and Yousef and one of the putative buyers had traveled to Lebanon to view representative samples of the weapons offered for sale, and that the broker had taken photographs of Yousef posing with the weapons, which photos were eventually provided to the FBI, and show Yousef posing with various pieces of military weaponry.  The broker informed the FBI that upon his and Yousef's return to Mexico, the negotiations for the planned sale broke down, but that Yousef told the broker that Yousef intended to import the cache of weapons nonetheless – something Yousef was readily able to do, as he ran an import/export business that moved cargo containers of goods.   The broker's account is corroborated by the photos themselves (the originals of which are in the Government's possession), travel records showing his and Yousef's travel to Lebanon, and of course the statements of Yousef and his co-conspirators throughout the recorded conversations in this investigation, all of which tend to demonstrate that the weapons offered for sale to the FARC were the same weapons negotiated for by the Mexican cartel.

At one point during the negotiations, Lanza proposed that the organization supply CS-2 and the FARC with weapons sourced from Syria, and provided a handwritten list of weapons available from the Syrian source of supply, out of fear that the Government had become aware of the existence of the Mexican cache.  Ultimately, however, Lanza informed CS-2 that he had spoken with Yousef, who approved the Mexican cache transaction, and indicated that the deal was ready to be finalized.  CS-2 then stated that his organization would move a large shipment of cocaine (between 7500 and 8000 kilograms) to the coast of Honduras over the next ten to twelve days, where it would sit pending the viewing of the weapons.  The increase in the amount of cocaine from 938 kilograms to 7500-8000 was due to Lanza's representation at the meeting that there were additional weapons in storage for sale.  CS-2 and Lanza agreed that CS-2 would purchase the entire cache of weapons, including the additional ones that were not on the original list provided during the September 25, 2008 meeting.  The two agreed that they would work through the precise amount of cocaine to be provided once CS-2 inspected the weapons in storage, but that the 7500-8000 kilogram shipment of cocaine to be moved to Honduras would serve as a guarantee.

The two agreed not to speak during that time period, but agreed to meet in Mexico at the conclusion of the ten to twelve day period to view the weapons in person.  After he viewed the weapons, CS-2 would arrange to release the cocaine, and CS-1 agreed to serve as collateral during the exchange.

 In August of 2009, Yousef was expelled from Honduras by the Honduran authorities, arrested on an Interpol Red Notice, and his custody was transferred to the DEA.  He was flown to the United States on a charter flight that landed at the White Plains airport in the Southern District of New York and subsequently presented before a magistrate judge.  During the flight to

New York, Yousef signed a written Miranda waiver and told DEA agents, among other things, that he had negotiated a weapons transaction with buyers he understood to be the FARC.

## ARGUMENT

### A.    Applicable Law

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). In furtherance of that goal, judges are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." Id. at 259-60.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).

In light of Booker, district courts now engage in a three-step sentencing procedure.  See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).  First, the Court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate. Id.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

Although the Guidelines are no longer mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing. Crosby, 397 F.3d at 114. "Booker did not signal a return to wholly discretionary sentencing." United States v. Rattoballi, 452 F.3d 127, 132 (2d Cir. 2006) (citing Crosby, 397 F.3d at 113). Indeed, the Second Circuit has held that the Guidelines range for a particular defendant is "a benchmark or a point of reference or departure" when considering a particular sentence to impose. United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005); see also United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (observing that sentencing judges should "begin all sentencing proceedings by calculating . . . the applicable Guidelines range" before reaching "individualized judgment in each case"). As the Court of Appeals has observed, the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'" Rattoballi, 452 F.3d at 133 (quoting United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 49-50 & n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions,"

7

Gall, 552 U.S. at 46; see also Rita, 551 U.S. at 349.  Thus, to the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Gall, 552 U.S. at 50.

One of the important reasons why the Guidelines should be given substantial weight is that they represent the reasoned judgment of the United States Sentencing Commission.  See Rattoballi, 452 F.3d at 133.  The Sentencing Commission is a body of experts whose statutory mission is to apply "research, experience, and analysis" to promulgate guidelines that will "further the basic purposes of criminal punishment: deterrence, incapacitation, just punishment, and rehabilitation."  U.S.S.G. Ch. 1, Pt. A, § 2.  Because these basic purposes of criminal punishment – which essentially mirror the purposes that this Court must consider pursuant to Section 3553(a)(2) – are inherently abstract, it is difficult to overstate the value of the perspective of a national commission whose charter is to collect and analyze data on sentences imposed throughout the nation.  Absent the national perspective they provide, it is hard to imagine how the sentencing factor identified in Section 3553(a)(6) – namely, "the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct" – could be meaningfully considered at all.

### B.    Applicable Guidelines Range

The Probation Department's guidelines calculation, as reflected in the PSR, is the same as that set forth in the plea agreement.  The applicable guidelines sentence is 180 months, calculated as follows.  Yousef pled guilty to providing material support or resources to a designated foreign terrorist organization, namely, the FARC, and accordingly the applicable guideline for the offense of conviction is U.S.S.G. § 2M5.3.  Pursuant to U.S.S.G. § 2M5.3(a),

the base offense level is 26. Because the offense involved the provision of firearms, pursuant to U.S.S.G. § 2M5.3(b)(1)(B), the offense level is increased by two levels. Moreover, because the offense involved or was intended to promote federal crimes of terrorism, pursuant to U.S.S.G. § 3A1.4(a), the offense level is increased by twelve levels. For the same reason, Yousef's criminal history category is VI, pursuant to U.S.S.G. § 3A1.4(b). Because Yousef pled guilty in advance of trial, thereby accepting responsibility for his actions, the offense level is decreased by three levels pursuant to U.S.S.G. §§ 3E1.1(a) and (b). Accordingly, the applicable offense level is 37. Based on an offense level of 37 and a criminal history category of VI, the applicable guidelines range is 360 months to life imprisonment. The guidelines term of imprisonment is capped in this case, however, by the statutory maximum penalty of 180 months that applies to the offense of conviction. Accordingly, the Guidelines term of imprisonment is 180 months.

With respect to the three level reduction in offense level for Yousef's acceptance of responsibility, described above and contained in both the plea agreement and the PSR, the Government notes that certain arguments contained within the defendant's submission to the Probation Department, which presented a starkly different version of the facts in this case, cast serious doubt on Yousef's acceptance of responsibility.[2] For example, defense counsel states that "this entire case is based upon Mr. Yousef's efforts to extract advance payment from the purported FARC representative for weapons that he did not have and *had no intention of ever delivering*." (Sept. 26, 2012 Ltr. to Probation at 2) (emphasis added); see also id. at 10 ("Yousef's objective in negotiating [with an individual he believed represented the FARC] was to obtain advance payment for supposed weapons that he had no intention of delivering."). Whether Yousef is credited with three levels for accepting responsibility or not is a question that

---

[2] The Government has not yet received Yousef's sentencing submission. We assume, however, that the version of facts and arguments contained therein will be similar to those contained in the defendant's letter to the Probation Department raising objections to the draft PSR.

ultimately does not impact the applicable guidelines range.  Either way, the applicable guidelines

sentencing range is 360 months to life imprisonment, capped by the statutory maximum penalty

of 180 months.  The Government was fully prepared to proceed to trial in this case, and assumes

that Yousef elected to plead guilty to conspiring to provide material support – in the form of

millions of dollars in military grade weapons – to the FARC because he is in fact guilty, as

expressly stated in the plea agreement signed by the parties.

      **C.**      **Consideration of the 3553(a) Factors**

      Title 18, United States Code, Section 3553(a) provides that (in addition to the Guidelines)

the Court should consider the following factors at sentencing:

> (1) the nature and circumstances of the offense and the history and characteristics
> of the defendant;
>
> (2) the need for the sentence imposed –
>
>> (A) to reflect the seriousness of the offense, to promote respect for the
>> law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most effective
>> manner.

      Various aspects of this case counsel in favor of the sentence called for under the

Guidelines.  The nature and circumstances of the offense are extremely serious.  Yousef agreed

with others to provide millions of dollars in military grade weapons to a designated terrorist

organization, the FARC.  The FARC's anti-American views and willingness to engage in

violence to further that agenda were well known to Yousef, as he made clear during his

conversations with the confidential source in this case.   Notably, Yousef agreed to sell the

weapons in exchange for a quantity of cocaine that could only be received and monetized by a sophisticated, large-scale narcotics-trafficking organization, which in itself illuminates the nature, sophistication, and potential impact of the criminal activities of Yousef and his associates.

Despite defense arguments to the contrary, it cannot seriously be contested that the defendant had access to the promised weapons and was in a position to deliver on the terms of the negotiated agreement; the photographic proof alone, of Yousef smiling and brandishing various machine guns, puts the lie to any such suggestion.  As described in footnote 1, supra, only two years before the specific negotiations that formed the basis of the charge in this case, Yousef traveled to Lebanon with a group of individuals from Mexico, one of whom was prepared to testify at trial, in order to show them an arsenal of weapons he was prepared to sell to them.  The fact that Yousef's ultimate motivation may have been sheer greed does not in any way lessen the significance of his actions, and perhaps emphasizes his disregard for the possible consequences.  Had Yousef actually accomplished what he set out to do, namely, providing a veritable military arsenal to the FARC in exchange for ton quantities of cocaine, one can only imagine the damage that could have resulted.  A lengthy sentence is therefore necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and also to adequately deter criminal conduct.

A lengthy sentence is also necessary to protect the public from further crimes of the defendant.  In 1996, Yousef relocated to Mexico City due to his arrest for narcotics-trafficking activity in Norway.  (PSR ¶ 53).  According to Interpol documents, Yousef was convicted in 1992 for trafficking in heroin, among other offenses, and absconded in 1996; he is wanted today by authorities in Norway to serve a 15 year prison sentence.  Yousef additionally served a four

year term of imprisonment in Mexico, from in or about 2001 until in or about 2005, for

orchestrating an extensive telecommunications fraud.  Yousef himself admitted to the FBI in

Mexico in 2006 that he was brokering a weapons deal worth in excess of $1 million between two

Mexican drug cartels and a Hezbollah officer in Lebanon.  He also told the FBI that he was

working on a shipment of 100 pounds of plastic explosives for another Mexican cartel.

Also at that time, Yousef admitted to the FBI that he has himself used false passports

from several different countries, and further that he had Hezbollah contacts who could provide

genuine Belizean passports, and that working with those contacts, Yousef had provided false

passports to Iraqis seeking to enter the United States.  When pressed for information about the

location of the weapons and for details regarding the Hezbollah alien smuggling scheme, Yousef

refused to answer; he refused to disclose the location of the weapons unless he was paid by the

FBI.[3]  Finally, it should be noted that Yousef committed the instant offense while he was in jail,

serving a prison term in Honduras for false use of a passport and unlawful possession of a

handgun.[4]  Given the defendant's history, it is clear that a significant prison term is necessary in

order to deter him from engaging in future criminal conduct.

The only factor that is fairly considered a mitigating factor is Yousef's current medical

condition, which has been described by the defense as "extremely fragile."  (Sept. 26, 2012 Ltr.

to Probation at 10).  Yousef's medical condition has been sufficiently serious at certain points

during this case to require adjournments of the schedule and accordingly has previously come to

---

[3]      This refusal typifies a pattern of behavior by Yousef that demonstrates complete disrespect for the law.  On numerous occasions Yousef has ostensibly provided information, including to the FBI, about the criminal activity of himself and others.  However, on closer inspection, the information provided proves insufficient to act upon, suggesting that his true motivation is to glean information about whether he is a target of investigation, to sow disinformation, to pursue vendettas against rivals, or pure financial gain.

[4]      Yousef apparently told the Probation Department that he was incarcerated in Honduras for "narcotics and firearms-related offenses."  (PSR ¶ 55).

the attention of the Court and the Government.  Yousef should certainly be afforded all necessary

medical treatment, and while in the custody of the Bureau of Prisons ("BOP"), he has been

provided with treatment for several different ailments.  There is no indication that he suffers

from a terminal illness, or a medical condition that the BOP is not equipped to manage.

Accordingly, while the defendant's complicated medical history should be taken into

consideration by the Court as a relevant factor at sentencing, particularly given the seriousness of

the offense, and the need for the sentence imposed to further the objectives listed in Section

3553(a), the Government does not believe that Yousef's current medical condition, standing

alone, warrants a below Guidelines sentence.

A severe sentence in this case is necessary.  It is necessary to protect the public from

future crimes by Yousef, it is necessary to reflect the seriousness of the offense, and it is

necessary to promote respect for the law and provide just punishment.  While Yousef's health

problems of course merit consideration by the Court, they do not in this case warrant a below

Guidelines sentence.

**D.**     **Conclusion**

For all of the foregoing reasons, the Government requests that the Court impose the

applicable Guidelines sentence of 180 months' imprisonment.

Dated: New York, New York
       October 8, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     _____/s/_____

13

Jeffrey A. Brown
Jenna M. Dabbs
Assistant United States Attorneys
(212) 637-1110/2212

## CERTIFICATE OF SERVICE

JEFFREY A. BROWN, pursuant to Title 28, United States Code, Section 1746, hereby

declares under the penalty of perjury that a true and correct copy of the foregoing was served via

electronic filing on the below-listed date on:

Melinda Sarafa
Sarafa Law LLC
80 Pine Street, Floor 33
New York, NY 10005

Joshua Dratel
14 Wall Street, 28th Floor
New York, NY 10005

Dated: New York, New York
October 8, 2012

_____/s/_____
Jeffrey A. Brown
Jenna M. Dabbs
Assistant United States Attorneys
(212) 637-1110/2212