UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

                                      :

UNITED STATES OF AMERICA          :

                                        :

            v.                    :       S4 08-CR-1213 (JFK)

                                        :

JAMAL YOUSEF,                    :

                                        :

                    Defendant.      :

-------------------------------------------------------------------x

## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF JAMAL YOUSEF

Melinda Sarafa, Esq.
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575

Joshua L. Dratel, Esq.
Lindsay Lewis, Esq.
Law Offices of Dratel & Mysliwiec
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: 212-732-0707

*Attorneys for Defendant Jamal Yousef*

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................1

II.     PERSONAL BACKGROUND OF JAMAL YOUSEF...................................................2

III.    CASE BACKGROUND ........................................................................................................3

IV.     OFFENSE CONDUCT ........................................................................................................4

        A.      The 2006 Phony Arms Transaction & Meetings with U.S. Authorities in Mexico.4
        B.      Mr. Yousef's Relocation to Honduras ...................................................................6
        C.      Mr. Yousef's Activities In Honduran Custody ......................................................8
        D.      The 2008 Purported Weapons Negotiations ..........................................................9
        E.      Expert Analyses .....................................................................................................15
        F.      Corroboration by Ramon Funes.............................................................................16
        G.      Mr. Yousef's Post-Arrest Statement and Culpability ..........................................18

V.      MR. YOUSEF'S MEDICAL CONDITION....................................................................18

VI.     ACHIEVING A JUST AND FAIR SENTENCE IN THIS CASE.................................25

        A.      Applicable Sentencing Considerations ..................................................................25

        B.      An Extended Period of Incarceration is Not Necessary to Achieve
                The Goals of Sentencing ........................................................................................27

                1.      Given the Circumstances of the Offense and Mr. Yousef's Background,
                        Automatic Application of Extreme Guidelines Enhancements Should be
                        Remedied by Consideration of the §3553(a) Sentencing Factors..............27

                        a.      The Terrorism Enhancement and Two-Level Weapons Enhancement
                                Overstate the Seriousness of Mr. Yousef's Conduct ....................28

                        b.      The Terrorism Enhancement Overstates the Seriousness of Mr.
                                Yousef's Criminal History............................................................30

                2.      Mr. Yousef Has Endured Unduly Harsh and Extended Conditions of
                        Pretrial Confinement.................................................................................31

                3.      Mr. Yousef Does Not Represent a Future Danger to the United States ....34

VII.    CONCLUSION....................................................................................................................35

# I.  <u>INTRODUCTION</u>

On behalf of defendant Jamal Yousef, who is scheduled to be sentenced on October 11, 2012, counsel respectfully submit this memorandum, pursuant to Rule 32(f) of the Federal Rules of Criminal Procedure, to aid this Court in determining a just and fair sentence in this case. Mr. Yousef stands before this Court having pleaded guilty to conspiracy to provide material support to a foreign terrorist organization. This offense carries no mandatory minimum. For the reasons discussed in this Memorandum, Mr. Yousef respectfully requests that the Court impose a sentence of time served.

Mr. Yousef has pleaded guilty to introducing a purported representative of FARC to a person whom Mr. Yousef believed to have access to weapons for sale in the Middle East. This introduction took place during a sting operation in Honduras wherein a paid confidential informant of the United States Drug Enforcement Administration ("DEA") posed as a FARC representative seeking to purchase weapons in exchange for cocaine. Mr. Yousef, who was incarcerated in Honduras at the time and desperately trying to survive financially, pretended to have a cache of available weapons stored in Mexico. With the help of friends who handled the negotiations, Mr. Yousef unsuccessfully attempted to extract an advance payment for the purported weapons, which he planned to use to flee his imprisonment and begin a new life elsewhere.

Mr. Yousef, who has admittedly participated in past frauds, has never before been charged with or prosecuted for a terrorism-related offense.

With this Memorandum Mr. Yousef seeks to provide the Court with the background and evidence necessary to view Mr. Yousef's conduct in its proper context. Much of this information is drawn from the Government's 302s, including Yousef's own statements, many of which were not produced until the eve of trial despite repeated defense Rule 16 requests. While the presentence investigation report  ("PSR") in this case accurately sets forth certain aspects of the

offense conduct, its presentation, based entirely upon the Government's account, is grossly incomplete and, as a result, misleading.

This Memorandum also details Mr. Yousef's fragile medical condition, which is relevant to determining a just and fair sentence. Based on the particular facts and circumstances presented here, the sentencing factors set forth in 18 U.S.C. §3553(a), and the more than three years that Mr. Yousef has already spent confined at the MCC, Mr. Yousef respectfully submits that a non-Guideline sentence of time served is appropriate, and sufficient but not greater than necessary to achieve the goals of sentencing.

## II. PERSONAL BACKGROUND OF JAMAL YOUSEF

Jamal Yousef, now 54 years of age, is the fourth of 11 children born to Abdul Aziz El Said Youssef and Fatima Mousa. His father, now deceased, was born in Syria, and his mother, now living in Norway, was born in Lebanon. Because of his paternity, Yousef acquired Syrian citizenship at birth and with it an obligation to serve in the Syrian military.

Yousef was born and raised in Lebanon, where, at age 20, he married Amal Abdul Rahman El Rafehi. They left Lebanon in 1978 due to war. For approximately seven years Yousef lived and worked in several different countries, including Greece, Nigeria, Germany and the United Arab Emirates. He traveled with a Lebanese passport issued under an assumed name because he could not get a passport using his true name without serving in the Syrian military.

Yousef returned to Lebanon in 1985, at which time his father persuaded him to serve his time in the Syrian military. For approximately two years he served in Aleppo as secretary to a general in charge of the military intelligence unit. Yousef fled Syria in 1987, however, after providing assistance to nationals of a country in conflict with Syria. He and his wife sought safety in Europe, and Yousef was granted asylum in Norway in 1988.

In Norway, Yousef operated a number of small businesses, including a modest restaurant, a store selling baby clothes and cosmetics, and a kiosk selling cigarettes and candy. His first child, a daughter, was born in Olso. He and his wife divorced in 1990.

Yousef moved to Mexico in 1996. He remarried and fathered additional children, all of which is documented in the PSR and need not be repeated here. He remained in Mexico until 2006, when he moved to Honduras to open a small retail business. The circumstances of his departure from Mexico and move to Honduras provide the background for the instant offense, and are detailed in Part IV below.

On August 18, 2009, immediately following his release to probation in Honduras, Yousef was taken into custody and transferred by U.S. authorities to New York.

### III. CASE BACKGROUND

Jamal Yousef was arraigned in this district on August 19, 2009, on an indictment charging a single count of conspiring to engage in "narco-terrorism," in violation of 21 U.S.C. §960a. In essence, the charge against Yousef was that in 2008 he and others conspired to sell weapons to someone they believed to represent FARC in exchange for cocaine. In reality, the purported weapons buyer was a confidential informant for the DEA who was paid to set up a deal to purchase weapons supposedly located in Mexico.

On April 5, 2012, the Government obtained a superseding indictment adding one count of conspiring to provide material support or resources to a foreign terrorist organization, in violation of 18 U.S.C. §2339B(a)(1), (d)(1). The alleged object of this conspiracy was to provide the FARC with weapons and explosives and other support and resources.

There has never been any allegation that weapons or drugs were actually exchanged in this case, nor is there any credible evidence that Yousef owned a cache of weapons in Mexico. Yousef has consistently maintained and the Government has never refuted that Yousef never possessed the weapons he purported to posses. Rather, this entire case arises from Yousef's

efforts to extract advance monetary payment from the purported weapons buyer for weapons that Yousef did not have and never intended to deliver. Indeed, viewed in that context – that Yousef was interested in perpetrating a scam designed to procure a down payment without the need to deliver the phantom weapons – the narrative, as well as the actions and statements of the participants, make perfect sense, regardless whether, purely on the surface, Yousef appeared to be engaging in an arms transaction.

Yousef ultimately entered a guilty plea in this case to one count of conspiring to provide material support to a terrorist organization. The Government agreed to accept a plea in satisfaction of the entire indictment based on Yousef's admission that he agreed to introduce the purported FARC representative to an individual whom Yousef believed had access to weapons for sale in the Middle East.

At his plea hearing, Yousef made the following statement about what he did:

> In late 2008 I was introduced over the phone to a person I believed to be a representative of the FARC which I know to be a terrorist organization and another person. I introduced this person from the FARC to a person from the Middle East who would supposedly sell weapons to them. That's my guilt. That is trouble I got myself into.

Ex. 1, at 14. A copy of Yousef's personal letter to the Court is attached hereto as Exhibit 2.

Understanding how Yousef got himself into this trouble requires review of events from 2006 which laid the groundwork for Yousef's attempted 2008 weapons scam.

## IV. OFFENSE CONDUCT

### A.   The 2006 Phony Arms Transaction & Meetings with U.S. Authorities in Mexico

In early 2006, Yousef was living in Mexico and seeking to start a retail business. He needed capital. He borrowed $200,000 through Jose Alejandro Espitia Monroy, known as "Padrino," whom he had met through a mutual friend. Padrino did not personally have the funds to lend, but was willing to find a lender who promised him a significant percentage of the loan

interest. Padrino brokered the loan with Victor Diaz Martinez, known as "El Capitan," who in turn claimed to have obtained the funds from Victor Zuniga, known as "El Mayor." Yousef offered to repay the loan with weapons located in Lebanon, a plan that El Capitan approved. Ex. 3 (FBI 302 – Feb. 23, 2012).

Yousef arranged a trip to Lebanon in April 2006 with Padrino, El Capitan and others. *Id.*. In Lebanon, Yousef paid local contacts to provide him access to a cache of military-grade weapons. Ex. 4 (Yousef Decl. – May 4, 2011) at ¶17. Padrino photographed Yousef with the weapons, and these photos were sent to El Mayor, who expressed interest in obtaining the weapons. Ex. 3 at 4. Yousef asked for additional money to ship the weapons. *Id.* El Mayor refused. *Id.* No weapons were shipped to Padrino, El Capitan or El Mayor, and the loan remained unpaid. *Id.*

Yousef's contact in Lebanon was Yasser Yousef Safa ("Safa"), a Lebanese national with ties to Hezbollah. Ex. 5 (FBI 302 – June 12, 2006) at 5. During the trip to Lebanon, Yousef learned not only about Safa's apparent access to someone with weapons for sale, but also that Safa had an arrangement to obtain and sell Belizean passports. Ex. 4 at ¶18.

On June 9, 2006, back in Mexico, Yousef reached out to Assistant Legal Attaché ("ALAT") Marco Cordero of the FBI Legal Attaché office at the U.S. Embassy in Mexico City. Ex. 5. That evening, ALAT Cordero spoke by telephone with Yousef. *Id.* Yousef said that he wanted to tell the U.S. Government about U.S. military weapons being stolen by U.S. military personnel in Iraq and sold to Hezbollah in Lebanon. Yousef also said that he wanted to discuss a deal to sell such weapons to a Mexican general as well as the sale of Belizean passports. *Id.*

The next day, ALAT Cordero met with Yousef in Mexico City. Yousef provided a Swedish passport in the name Talal Hassan Ghantous as identification, but disclosed that his real name was Jamal El Youssef. *Id.* Yousef provided detailed personal background information, told ALAT Cordero that he had used false passports, and disclosed detailed

information about traveling to Lebanon to arrange the supposed sale of weapons. He identified both Victor Diaz Martinez and Victor Zuniga as potential buyers working on behalf of a Mexican general. *Id.* During this meeting, Yousef told ALAT Cordero that his contact in Lebanon who provided access to weapons was Safa, and provided telephone numbers for Safa in both Lebanon and Belize. *Id.* He further identified the ties between Safa and the actual seller of weapons in Lebanon. Yousef told ALAT Cordero, and the Government has not refuted, that no weapons had been shipped and there was no imminent threat to the U.S. or Mexico. *Id.*

Yousef also told ALAT Cordero about Safa's procurement and sale of Belizean passports. Ex. 6 (FBI 302 – June 14, 2006). Yousef detailed the method by which Safa obtained the passports from Belize and provided them to clients in Lebanon, for whom Safa also arranged transportation to Belize. Yousef produced sample passports that had been provided to an Iraqi family residing in Mexico en route to the U.S. *Id.* During the interview, Yousef allowed U.S. Government authorities to photocopy the contents of his notebook and wallet. Ex. 5. He provided numerous names, telephone numbers, email addresses and other relevant information. *Id.*; *see also* Ex. 6.

Yousef made these overtures to the U.S. authorities for three principal reasons. First, he wanted the U.S. to have the information. Second, he viewed his disclosures as a way to obtain protection should he need it if and when the supposed weapons buyers threatened him. Third, he hoped to establish a cooperation relationship with the U.S. that could lead to personal financial gain.

**B.    Mr. Yousef's Relocation to Honduras**

Yousef relocated to Honduras during the spring of 2006 and began preparations for opening a small business there. Using the funds he had obtained in Mexico, he brought containers of merchandise, such as clothes, shoes and electronics, to Honduras. He met Colonel Miguel Ramirez Lanza through a mutual friend, and shortly thereafter agreed to go into business with Colonel Lanza and his son. On June 27, 2006, Yousef, Colonel Lanza and Colonel Lanza's

son jointly established a commercial company to import, export and sell clothing, shoes, toys, electronics and other items. Ex. 7 (Notarized Instr. of Co. Formation – June 27, 2006).[1]

The day before Yousef and Colonel Lanza established their company, ALAT Cordero learned that Yousef was reluctant to travel to Mexico because he feared being kidnapped or killed by El Mayor and his associates. Ex. 8 (FBI 302 – June 30, 2006) at 7. ALAT Cordero contacted Yousef and attempted unsuccessfully to arrange a meeting with Yousef in Mexico. *Id.* at 2-3. On June 28, 2008, having learned that Padrino was aware of his meeting with U.S. authorities, Yousef directly expressed to ALAT Cordero his fear that El Mayor would also learn of this and seek reprisal. *Id.* at 7-8.

Yousef continued preparations to open a small store in Tegucigalpa with Colonel Lanza and his son. On July 7, 2006, however, just three days before the store was to open, Yousef was arrested by Honduran authorities and charged with using a false passport and unlawfully possessing a handgun.[2] *See* Ex. 9 (Interlocutory Sentence – Aug. 18, 2009). Yousef was taken into custody, *id.*, and Honduran authorities seized all of the merchandise that he had purchased for his business. Much of this merchandise, including children's toys, women's clothing and shoes, remains in government custody. *See* Ex. 10 (Inventory of Seized Items – Mar. 13, 2012).

On July 13, 2006, ALAT Cordero and another agent traveled to Tegucigalpa to interview Yousef. Yousef provided information about the location of the warehouse in Lebanon where he believed weapons were stored, and drew a map to the location. Ex. 11 (FBI 302 – July 24, 2006).

ALAT Cordero continued to investigate Yousef, but never found that Yousef had shipped weapons from Lebanon to Mexico. In a report dated October 20, 2006, ALAT Cordero noted that information about Yousef's involvement in selling Lebanese weapons to military

---

[1]  Yousef appears as Talal Hassan Ghantous on this document.
[2]  The handgun, found in Yousef's car at the time of arrest, was the lawful property of Colonel Lanza, whose name was engraved on the gun. Colonel Lanza's son had left it at Yousef's home, and Yousef was en route to return it. Colonel Lanza volunteered this information during one of the conversations recorded by the confidential informant.

personnel in Mexico was "mostly discredited by Legat Mexico City's [redacted] investigation." Ex. 12 (FBI 302 – Oct. 20, 2006). The Government has had more than six years to investigate this matter and still has found no evidence that Yousef ever shipped weapons from Lebanon.

## C.   Mr. Yousef's Activities In Honduran Custody

During the next two years, while serving time in Honduras, Yousef actively tried to find ways to make money and support his family. He maintained contact with, among others, Colonel Lanza, his friend Ramon Funes, a friend and business associate named Zenin Membrano, and Hassan Rammal, a cousin of Safa.

Yousef and Membrano were particularly close. Membrano advanced money to Yousef to commute Yousef's sentence on the firearm charge, *see* Exs. 13 (Doc. of Payment – Nov. 28, 2007); 14 (Definitive Release Ltr. – Nov. 28, 2007); 15 (Sentence Recalculation – Nov. 28, 2007),[3] and also helped to support Yousef's wife, Marybeth, by providing her with a home. Along with Colonel Lanza and Ramon Funes, they discussed several potential business deals, including, among others, the importation of cardamom and a plan to sell U.S. Treasury bonds. *See* Ex. 16 (Transcript of Funes Int. by Def. Invest. – Feb. 27, 2012) at 12, 27-28, 30, 32-33; Ex. 17 (Photographs of U.S. Treasury bonds provided by Funes). As Funes put it, Yousef "was, uh, trying to get money any way he could." Ex. 16 at 12.

As compared to prisons in the United States, the prison where Yousef was in custody had relatively liberal furlough policies. For instance, during November 2007, when Yousef's wife was ill, Yousef received permission on at least four occasions to leave the prison and visit with her for periods ranging from two hours to four days. *See* Exs. 18-21 (leave permits dated 11/20/07, 11/20/07, 11/26/07 and 11/28/07). In 2008 Yousef became eligible for the Early Release Program and was permitted to leave the prison one weekend per month as well as two days per week. *See*

---

[3]  After Yousef's sentence on the firearms charge was commuted, he became eligible to request conditional release on the passport fraud charge as of July 8, 2009. Ex. 15.

Ex. 22 (Early Release ID Card for Yousef). On July 2, 2008, Yousef received a special furlough in addition to the above based on his good conduct and significant contributions to the administration of the prison. Ex. 23 (Prisoner Rev. Board Ruling – July 2, 2008).

In this context, as Funes has explained, Yousef was able to leave the prison on a fairly regular basis and gather with friends to socialize and conduct business. Ex. 16 at 27. Funes specifically recalled a breakfast gathering at Colonel Lanza's home with Membrano and his wife, during which the potential cardamom business was discussed. *Id.*

**D.**   **The 2008 Purported Weapons Negotiations**

The events of Fall 2008 which led to Yousef's prosecution in this district were the product of yet another effort by Yousef to make money "any way he could." *Id.* at 12. Yousef had in his possession the photographs that had been taken of him posing with weapons in Lebanon. To Yousef, these represented an ideal opportunity to entice potential weapons buyers to agree to purchase weapons he felt he could credibly claim to possess. His plan was to secure an advance payment for the purported weapons by telling potential buyers that money would be needed for transport of weapons or to secure their release from storage.  Based on his experience of being able to come and go fairly freely from the prison, Yousef reasonably anticipated that if he were able to secure a sizable advance payment, he could leave the prison and travel to a safe distance.  Yousef also believed that his prior contacts with U.S. law enforcement served as an insurance policy for his protection.

The Government's own evidence, corroborated by defense investigation, indicates that Yousef and his associates did not actually have any weapons stored in Mexico. Demonstrating extraordinary incompetence as supposed arms dealers, they made inconsistent representations about available weapons, failed to produce a promised video of the weapons supposedly for sale, sent obviously computer-altered images using at least one photo from the Internet as proof that the weapons existed, failed to provide any photos of the vast majority of items they claimed

9

to have, and consistently demanded payment up front. It was such a bumbling operation that even the confidential source repeatedly expressed doubt about the existence of the supposed weapons. This is consistent with ALAT Cordero's failed efforts to confirm any shipment of weapons from Lebanon to Mexico.

July 2008. The investigation began when a paid confidential source for the U.S. DEA in Bogota, Colombia, Fausto Aguero Alverado, reported to agents in Bogota that he was negotiating to purchase weapons in exchange for narcotics from Yousef. Fausto had engaged in conversations with both Yousef and Colonel Lanza about supposed weapons for sale.

September 25, 2008.   Fausto brought a second paid confidential source to a meeting at Colonel Lanza's home in Tegucigalpa. This individual introduced himself as "Cristobal," claimed to be a representative of FARC, and stated that he wanted to purchase weapons for FARC. During the meeting, Colonel Lanza represented that they had weapons from Iraq for sale, "what the 'gringos' are using in Iraq. Ex. 24 (Transcript N-3), at 23. He stated that these were located in a warehouse in Mexico and included M-16s, AR-15s, M-60s, hand grenades, explosives, bullet-proof vests, RPG-7s, PKMs, PKMTs, SA-9s and AK-47s. *Id.* at 23, 26, 27, 36. Colonel Lanza also stated that his people were in the process of making a video of the weapons. *Id.* at 25. Cristobal asked for a detailed list of the items available. *Id.* at 45-46. Colonel Lanza agreed, but asked for payment in advance of delivery of the weapons. *Id.* at 48-49. Cristobal balked. *Id.* at 49. Colonel Lanza tried to persuade Cristobal that an advance would be a "show of trust," *id.* at 57, but Cristobal demurred. *Id.* at 58.

Later in the meeting, Colonel Lanza tried to convince Cristobal that he needed 300 kilos of cocaine or $400,000 in order to pay the man who was storing the weapons. *Id.*  at 58-63. Cristobal insisted on receiving a list before moving forward. *Id.* at 64.

September 26, 2008. The following morning, Fausto, Cristobal, Colonel Lanza and others met at a restaurant to discuss, among other things, the videotape of the weapons. During

a telephone conversation with Yousef during this meeting, Cristobal insisted that the video was essential: "He offered me yesterday, uh, a video. For me it's . . . for me this is essential . . . I have to . . . I have to uh, I almost have the authorization from . . . from all the members, and in order to get it I need to take . . . some . . . something with which to convinc . . . convince them. You understand?" Ex. 25 (Transcript N-8), at 11. Cristobal asked for the video to be produced that day, *id.*, and repeatedly stated that he needed the video to move forward. *Id.* at 14, 2, 45, 52, 53, 66. He noted in his debriefing of the call that Yousef stated that he needed a down payment because he owed money for storage of the weapons.

October 12-15, 2008. No video was ever produced. During an unrecorded telephone call on October 12, 2008, Colonel Lanza told Fausto that he had photos of the weapons, plus 17 to 18 missiles for purchase. On October 15, 2008, in another unrecorded telephone call, Colonel Lanza asked Fausto for an email address to which he could send photographs. Fausto subsequently received five photographs, including two showing weapons behind a person, Hassan Rammal, holding a Belize newspaper dated September 21, 2008.

October 21, 2008. Fausto, Cristobal and Colonel Lanza spoke by telephone. Cristobal complained bitterly about the lack of a video: "Look, the problem . . . let me explain what it has been. The problem is that I promised my people a video. When I came to them with photographs, they gave me all sorts of trouble. You have no idea what I had to do to convince these people. I almost had to bet my life on you." Ex. 26 (Transcript N-11), at 10. Colonel Lanza insisted that he has extended a great deal of trust in Cristobal and the only way to move forward would be to get money to move the weapons from the warehouse. *Id.* at 11, 13.

October 23, 2008. Two days later, Cristobal told Fausto by telephone that, "as a result of my friends reviewing the photographs . . . they want me to go over there and meet with him [Colonel Lanza] in person. There's no way of doing this situation if I don't go over there." Ex. 27 (Transcript N-13), at 5.

11

<u>October 28, 2008</u>. Fausto and Cristobal met with Zenin Membrano. Cristobal complained to Zenin about receiving photos instead of a video. Ex. 28 (Transcript N-15) at 4-5. Specifically, of his interactions on this point with Colonel Lanza, Cristobal states:

> So, when I go ahead and talk to him, and he says, "Well, the video does exist." I say, "So why didn't you show it to me? What's the problem showing it to me?" He says to me, "The truth is, I don't know the reason." And I'm still asking myself, what's the reason? If you guys are interested in selling me a product, and you know that by showing me the video you're going to . . . to make things easier for me . . . Because it's not true that I'm going to get the amount of money we're talking about, and that I can do whatever with it, as if it were from my own pocket. It's not my own pocket. . . . So, when he says to me . . . When . . . when he says to me, "Well, there really is a video." I say to him, "Why didn't you show it to me?" And he says to me, "Well, because there's someone who may have it." I said, "He should let us see it."

*Id.* at 6. Zenin asked, "So, they didn't show you a . . . a two minute video?" *Id.* at 7. Fausto replied: "No. . . . The thing is there are some photos that look like they were staged." *Id.*

Later in the conversation Cristobal again asked, "Because if there's a video, why doesn't he let me see it?" *Id.* at 13. Zenin himself admitted that he had not seen the weapons and could not confirm their existence. *Id.* at 14.

Cristobal explained that the unfulfilled promise of the video raised suspicion:

> [U/I] name – someone who's mistrustful who says, "No. He said a video. And when they change things on us along the way, uh, uh, uh . . . uh history tells us we know something's going on. When you're told one thing and it's changed along the way, something's not normal. There's a reason for it. Find out why. What's the reason there's no video, if they promised a video?

*Id.* at 23-24; *see also id.* at 25-26, 28, 37, 54, 93, 95 (voicing additional complaints and doubts).

Cristobal also raised concerns about Colonel Lanza's shifting representations about what weapons were available, and inconsistencies between those representations and the photos produced. *Id.* at 60-61, 95.

During the meeting Zenin called Yousef, who said that the video would be available the following day. *Id.* at 71. Yousef also explained how he expected the deal to work: Zenin would obtain money up front, and then Cristobal would go to the warehouse to pick up the supposed weapons. *Id.* at 82-85. It was an indispensable part of Yousef's plan that Zenin have the money in advance, since Yousef knew that no weapons would be waiting at the warehouse.

For Cristobal, it was imperative to obtain a video and an accurate list of available items, because otherwise it was impossible to agree on a price. *Id.* at 98-99. As he stated with regard to his discussions with Colonel Lanza, "Because I have a list he gave me and then he added some other goods, and up to now we haven't established how much nor what it is." *Id.* at 98.

October 29, 2008. The following day, Cristobal, Fausto and others gathered at Colonel Lanza's home. Hassan Rammal was introduced to Cristobal when he arrived, and a discussion ensued about Cristobal's failure to recognize Hassan as the person holding the newspaper in the weapons photos. Ex. 29 (Transcript of N-16), at 8-11. After Hassan departed, Cristobal confronted Colonel Lanza about the failure to produce a video and document the types and quantities of weapons available. *Id.* at 16-18. Colonel Lanza blamed Hassan, saying that Hassan had gone to the warehouse to document the weapons. Colonel Lanza said that he didn't send the video because it was "a piece of crap." *Id.* at 21. He claimed that Hassan initially shot the video with the lens cover on the camera, *id.* at 22, then claimed that Hassan shot the video but the people he took it to for production assistance "destroyed it." *Id.* This prompted outrage by Cristobal, who questioned the judgment of taking such a video to someone for editing. *Id.*

Unable to document the weapons supposedly in Mexico, Colonel Lanza proposed that they forget the weapons in Mexico and pursue "the Soviet stuff" supposedly in the Middle East. *Id.* at 26. Cristobal stated that he didn't think he could save face and obtain support for an alternative plan. *Id.* at 27. Cristobal complained that "with respect to the material you guys have right now, you're telling me we can't count on it." *Id.* at 34. He also complained that Colonel

Lanza could not even assure him about the location of the product, and stated that things could not move forward until the negotiations were "more solid." *Id.* at 35.

Cristobal questioned the competence of the entire operation, including the use of Hassan for the video and his involvement of others to edit it. *Id.* at 46. According to Cristobal, "What you're telling me is something not even a beginner would do. It's something that . . . that someone who has no idea what he's doing would do." *Id.* at 48. Cristobal also questioned the failure of Hassan, who supposedly went to the warehouse, to document what was there: "[D]oesn't this situation seem way out of the ordinary? Having a guy like this go to verify one of these things, someone who lacks the minimum level of intellect to bother to say, well, there's so much of this, so much of this, so much of this. . . . Don't you think?" *Id.* at 55.

Eventually, Cristobal made his doubts even more plain:

With all this stuff, I'm having more doubts than what I had before. And I would almost like to send someone to verify the existence of those arms. Do you want me to tell you why? Because there are too many incoherent things. Too many things that don't fit in. Too many things that don't  . . .  which are not normal. I hope you understand me when I say there are many things that don't . . . that are very difficult for me to understand, in my opinion. Like having one of those guys go, and not know what's there . . .

*Id.* at 65. Cristobal insisted that any deal would require Colonel Lanza to precisely document what was available, *id.* at 72, 78, 84 and allow Cristobal to verify its existence. *Id.* at 79, 92, 96, 108, 117, 120. Cristobal pointed out that Colonel Lanza's shifting representations about available weapons made it impossible to negotiate a deal: "[T]he difference between the original list and what you're telling me now is several . . . several million dollars." *Id.* at 119.

Apparently desperate not to let the opportunity for profit slip away, Colonel Lanza again proposed abandoning the Mexico deal and traveling to Middle East, which would require at least $180,000 up front. *Id.* at 129, 131. The meeting concluded with no deal in place. *Id.* at 134.

The final meeting among Cristobal, Fausto and Colonel Lanza took place at a local eatery later that same day. Colonel Lanza told Cristobal that Yousef wanted $400,000 cash in order to arrange simultaneous viewing and retrieval of the weapons. Ex. 30 (Transcript of N-18), at 9-11. Even though they still had not clarified the types and quantities of weapons, Cristobal and Colonel Lanza agreed to a fantastic plan: Cristobal would prepare the money and some approximate quantity of drugs to cover the weapons, then travel to the location of the weapons and call Colonel Lanza to meet him there. *Id.* at 12-14. Not surprisingly, no subsequent meeting or transfer of weapons took place. Also not surprisingly, as the meeting concluded, Colonel Lanza asked for $50,000 from Cristobal for expenses. *Id.* at 34.

**E.**  **Expert Analyses**

Defense counsel retained the services of a computer image expert and a weapons expert to analyze the photos provided to Cristobal. Their analyses support the conclusion that the weapons negotiations in this case were not genuine.

The computer image expert was William J. Stokes, a former special agent for the FBI and certified FBI Laboratory Examiner of Questioned Photographic Evidence. Mr. Stokes concluded that, based on established scientific principles and with a reasonable degree of scientific certainty, the photos of Hassan Rammal in front of a cache of weapons "are all fabricated images created using the FARS NEWS image as a background." Ex. 31 (Stokes Report); *see also* Ex. 32 (Stokes Curriculum Vitae). The FARS NEWS image is a 2005 image from the Iranian news agency FARS that Mr. Stokes located on the Internet. The photos that Mr. Stokes concluded were not altered were simply photos of M4 and M16 firearms, without identifying serial numbers or any indication of when or where the photographs were taken.

The weapons expert, Retired U.S. Army Special Forces Lieutenant Colonel Darrell G. Elmore, concluded that there was little in the photos provided that matched the weapons,

accessories, components, munitions and explosives or technical equipment that Colonel Lanza claimed were available. *See* Ex. 33 (Elmore Report); *see also* Ex. 34 (Elmore Curriculum Vitae).

## F.      <u>Corroboration by Ramon Funes</u>

Ramon Funes, who was interviewed at length by defense investigator Margaret Clemons, corroborates the defense view that Yousef's objective in negotiating with Cristobal was to obtain advance payment for supposed weapons that he had no intention of delivering. The complete transcript of Ms. Clemons' February 27, 2012 recorded interview with Funes is attached hereto as Exhibit 16.

Funes explained that Honduran authorities had confiscated all of Yousef's merchandise when Yousef was arrested, leaving him anxious to develop other sources of income. Ex. 16 at 5. According to Funes, "what [Yousef] needed was money." *Id.* at 9; *see also id.* at 12 ("in reality, he was, uh, trying to get money any way he could").

While Yousef was incarcerated, Funes helped him with errands, legal procedures and other tasks, including opening an email account to facilitate Yousef's receipt of family photos and other documents. *Id.* at 7. This was the email account, sumasiempre123@yahoo.com, through which Funes received the weapons photos from Hassan Rammal and which was later used to disseminate the photos. *Id.* at 7, 8. According to Funes, "Hassan was part of the operation in the sense of trying to get the money by any means, which is, defrauding, even, some persons." *Id.* at 15.

According to Funes, the photos were obviously fabricated. *Id.* at 9, 14. He stated that "once I saw the photographs, I personally saw that they were photographs of . . . of a montage. They were photographic montages and, therefore, not true." *Id.* at 13. Funes stated that he warned Yousef that he would get in trouble because people would be suspicious, but Yousef told him "'don't worry that, uh, I will take care of that later.'" *Id.* Funes recalled that Yousef "was confident that once they'd send him money, he would then give any explanation." *Id.* Funes

stated that Yousef "told me that what he needed was to get money. And that he was going to use these photographs to get that money." *Id.* at 13.

Funes recalled that, before Rammal sent the photographs containing the dated Belize newspaper, someone named Carlos Hernandez attempted to digitally alter the dates on old weapons photos in order to make them appear current. *Id.* at 20. When Funes received these images, he realized that they were very old pictures and that the attempt to alter the dates was "the most ridiculous possible." *Id.* As Funes put it, "I . . . was seeing that everything had a badly-done scam, right? To get money from someone." *Id.*

Funes also noted that the photos were distributed so widely that it was inconceivable that the proposed sales were genuine:

> [T]here were so many emails to so many people that when one's committing an act . . . that's really, uh, let's say, uh, illegal and, and, delicate as arms trafficking is, you don't just go publicly about it, because the Internet is public, practically, with information like this, because one risks too much, so, if he did it this way, together with me, of course, that helped him se, send emails, it was because it was known that it wasn't a truthful thing but what he wanted to accomplish was to get some money from these people who were emailed.

*Id.* at 11. Funes explained that Yousef reassured him that "he was in control of all these people and that what we needed was to gain their confidence, so they would send some money, even though afterwards it would be necessary to say that . . . the weapons had been confiscated by the authorities or anything, because he really didn't have weapons at all." *Id.* at 12.

Funes described the notion that Yousef was a genuine arms dealer as "ridiculous." *Id.* at 34. To put it in context, he suggested "just imagine an arms dealer who must borrow a house for his wife. . . . An arms dealer that has to borrow a car to show it off, uhm, to pretend that he had money. . . . Imagine a person who's involved in, uhm, supposed, uhm, uhm, drug trafficking uhm, whatever and makes me borrow for him and leaves me with a debt of 300,000 Lempiras. . . . That's an International Capo, isn't he?" *Id.* at 34-35.

17

**G.**   **Mr. Yousef's Post-Arrest Statement and Culpability**

The facts set forth above are consistent with Yousef's post-arrest statement that he never bought or sold any weapons in Mexico, and was negotiating with criminals in order to steal money. Yousef characterized his activities with Colonel Lanza and Hassan Rammal as a "fraud." Ex. 35 (DEA-6 – Aug. 21, 2009).

Yousef did, however, agree to introduce Cristobal, a purported representative of FARC, to Hassan Rammal, whom Yousef believed had access to weapons in Lebanon through his cousin, Yasser Yousef Safa. Safa, as discussed above, was the contact who had arranged for Yousef to display weapons for potential Mexican buyers during the 2006 trip to Lebanon. Because this introduction constituted something of value to the FARC, Yousef pleaded guilty to providing material support to a terrorist organization and accepts responsibility for this conduct.

## V. MR. YOUSEF'S MEDICAL CONDITION

During his more than three years in custody at the MCC, Jamal Yousef has suffered multiple life-threatening ailments and his medical condition has deteriorated markedly.[4]

When he arrived at the MCC in August 2009, Yousef had non-insulin dependent adult onset diabetes and high blood pressure. He did not have any cardiovascular problems or respiratory ailments. He did not suffer from fever, cough, chills, night sweats, weakness, weight loss or any infectious diseases. He wore eyeglasses. The only medication he was prescribed upon his arrival was captopril, for benign hypertension. He stopped taking this about one month later, complaining of shortness of breath. He was later put on lisinopril and glyburide for diabetes.

About one month after Yousef arrived at the MCC he had a routine chest x-ray. Medical staff noted an upper lobe nodule and referred Yousef for further scans to rule out lung cancer. On February 1, 2010, Yousef was admitted to New York Downtown Hospital ("NYDH") for lung

---

[4]   The following summary of Yousef's medical condition is a distillation of over 2,100 pages of medical records. Because the records are so extensive, they have not been included as exhibits. They are nevertheless available should the Court wish to review any portion of them.

disease based on the mass in his right lung. He underwent a lobectomy and lung resection. The biopsy revealed no malignancy, but inflammation with features suspicious for tuberculosis ("TB").

According to BOP records, although Yousef's AFB (acid-fast bacillus) tests, which are used to diagnose TB, were negative, and although Yousef was not deemed contagious, Yousef was started on a drug regimen for active TB treatment. This treatment involves a heavy combination of drugs: ethambutol (EMB), isoniazid (INH), pyrazinamide (PZA) and rifampin (RIF). Yousef was given pyroxidine (vitamin B6) as well. In late February 2010, the TB lab confirmed that all AFB smears and cultures were negative to date. In April 2010, Yousef was taken off the PZA and EMB due to pansensitivity to all four of the drugs, but he remained on the TB regimen until August 2010.

Meanwhile, beginning in January 2010 and continuing through August 2010, Yousef underwent a series of tooth extractions. By August 2010 all of his teeth had been extracted and he could no longer eat solid food. Impressions were taken for dentures, but it was well into the following year before Yousef received the dentures and could resume eating solid food.

By late 2010 Yousef was experiencing swelling in his right foot. By January 2011 he was experiencing heart palpitations. In early February 2010, he reported chest pain, swelling in both legs and shortness of breath. On February 8, 2011, he was admitted to NYDH for unstable angina caused by coronary atherosclerosis, following recurrent chest pain, nausea, vomiting, shakiness and palpitations. He also presented with recent acute renal insufficiency/failure.

Three days later Yousef was transferred to Methodist Hospital in Brooklyn for unstable angina. After an angioplasty was performed and three stents inserted for triple vessel disease, Yousef was placed on a new medication, metoprolol, for high blood pressure and angina, and told to continue with the following array of other medications:  amlodipine (for high blood pressure and angina), aspirin (for angina), clopidogrel (to prevent blood clots), glyburide (for type 2 diabetes), insulin (for diabetes), lisinopril (for high blood pressure) simvastatin (for cholesterol) and nitroglycerin (for angina).

19

On several occasions in June and July of 2010 Yousef reported chest pain, dizziness and shortness of breath to MCC medical staff. He had a heart attack on or about August 1, 2010, and was admitted to Methodist. At Methodist he underwent triple bypass surgery. On August 12, 2010, he was transferred to Kingsbrook Jewish Medical Center for acute cardiac rehabilitation, and remained there for a week. His chart indicated that his "medical complexity requires close physician supervision and 24-hour rehabilitation nursing care to address the etiological diagnosis, which is further complicated by the following: CAD [coronary artery disease], HTN [hypertension], DM [diabetes mellitus], Hyperlipidemia, Lung Cancer with partial lobectomy."

One week later, on August 26, 2011, Yousef reported to MCC medical staff increasing shortness of breath and chest pain. He was later admitted to NYDH for five days and treated for fluid buildup in the lungs; doctors removed 400 ml of pleural fluid from Yousef. During the following month, Yousef reported to MCC medical staff several episodes of dizziness and chest pain.  He was evaluated at NYDH in September 2011, and found to have chest pain, lightheadedness and anxiety.

In mid-October 2011, Yousef notified MCC medical staff of swelling in both legs, as well as recurrent chest pains. By late October he was experiencing dizziness and black stools. After a severe bout of dizziness and passing out in the food line at the MCC, Yousef was admitted to NYDH on October 27, 2010. Due to gastrointestinal bleeding, he underwent an emergency esophagogastroduodenoscopy (EGD), a procedure to arrest the bleeding and view the affected area. Yousef was diagnosed with a duodenal ulcer and chronic gastritis. Testing also revealed severe anemia. He was discharged on October 31, 2011.

Throughout November 2011, Yousef experienced leg pain, painful urination, lower back pain, persistent kidney pain, gastric pain, constipation, dizziness, headache and fatigue.

Yousef's leg pain continued through December 2011 and January 2012, along with leg swelling, general pain and deterioration of his vision. He had previously been diagnosed with

hypertensive retinopathy – damage to the retina due to high blood pressure – as well as diabetic

retinopathy. In early January 2012, due to inability to sleep, wheezing in his lungs, and heavy

limbs, he was admitted to NYDH and treated for edema, renal disease, anemia and congestive

heart failure. He continued to experience dizziness, fatigue, shortness of breath and chest pain

throughout January and February 2012.

On February 28, 2012, Yousef was evaluated at NYDH for renal failure, anemia,

coronary artery disease, diabetes and hypertension. He was described as suffering from "chronic

kidney disease with progressive renal failure." He continued to experience periodic chest pain

throughout March, April and May 2012. New York Eye and Ear Infirmary has diagnosed him

with diabetic macular edema, diabetic retinopathy and cataracts in both eyes.

As of September 5, 2012, Yousef had the following list of 15 active prescriptions:

Amlodipine (to control blood pressure)
Aspirin (for angina)
Atorvastatin (replaces simvastatin, to lower cholesterol and reduce risk of heart attack)
Calcium acetate (to regulate blood phosphate levels for dialysis patients)
Docusate Sodium (for constipation)
Ergocalciferol (to aid absorption of calcium and phosphorus and prevent bone disorders)
Ferrrous Gluconate (to treat anemia)
Furosemide (for fluid retention caused by congestive heart failure/kidney disease)
Gabapentin (to relieve nerve pain)
Hydrochlorothiazide (to control blood pressure)
Labetalol (to control blood pressure)
Omeprazole (to treat inflammation and ulcer due to excess stomach acid)
Sodium polystyrene sulfonate (to treat excess potassium)
Epoetin Alfa (to treat anemia)
Insulin (for diabetes)

In addition to the physical ailments documented above, Yousef has experienced

considerable psychological trauma during his more than three years at the MCC. On at least three

occasions Yousef was evaluated by MCC staff as a potential suicide risk. Although each

assessment concluded that he appeared to be at low risk for suicide, the assessments reveal the

extraordinary strain that he has been experiencing as a result of his confinement and circumstances, including isolation from his family.

The stresses expressed by Yousef to MCC staff include: (1) his sense that the U.S. Government kidnapped him from Honduras and charged him with a crime – narco-terrorism – that he did not commit; (2) the threat of a mandatory minimum 20-year sentence for the charged offense; (3) the suffering of his family in Honduras arising from seizure of his assets by Honduran authorities; (4) the fear that a U.S. jury would convict him on the basis of his Muslim religion; (5) his deteriorating health, pain and difficulty sleeping; (6) feeling overwhelmed by his legal case; (7) being away from his family, especially his two-year-old son, whom he has never seen nor held; (8) the tragic death of his older sister and her husband during his incarceration; (9) the extended loss of his phone privileges, further isolating him from family;[5] (10) the limited availability of fresh air and opportunity for outdoor recreation; (11) limited availability of fresh vegetables in his diet.

The Probation Department has suggested that Yousef's medical condition does not warrant additional consideration with regard to sentencing because, "[w]hile his physical health is cause for concern, we believe that he has received (and continues to receive) better medical care than he would have received while he was living in Honduras or Mexico." PSR Sentencing Recommendation.

The Probation Department's position lacks grounding in any evidence about available medical care in Honduras and Mexico. In addition, it fails to take into account numerous aspects of incarceration that very likely have exacerbated Yousef's ailments, as well as the effect that

---

[5]  Each inmate at the MCC is permitted 300 minutes of phone time each month. Because Yousef has a very large family and the phone is his only means of speaking with them, he easily uses the allotted time. To compensate, he has borrowed time from other inmates, for which he has been sanctioned by the BOP with loss of phone privileges. This situation has compounded itself and resulted in a loss of telephone privileges for well over one year.

Yousef's medical condition has had on his quality of life during the more than three years of imprisonment he has already served.[6]

First, being incarcerated is inherently stressful. In Yousef's case, the stress has been compounded by the factors identified above, including his forcible removal from his country, isolation from family and friends (Yousef does not have anyone in the U.S.; his lawyers are his only visitors and contacts in the U.S.), seriousness of his charges and constant threat of a mandatory minimum sentence of 20 years, and the extended nature of his pretrial detention.

Second, while incarcerated at the MCC Yousef has no control over the quality and variety of foods available, which dramatically affects his health. He had to have MCC medical staff specifically request that fresh vegetables and fruits be included in his diet, which concerned him because it consisted of "eggs and hot dogs," following triple bypass surgery.  This was not until late August 2011, more than two years after Yousef arrived at the MCC. Even then, his diet was largely supplemented with liquid nutrition. Similar requests had to be repeated in November 2011 and in May 2012. For many months of his incarceration Yousef could not eat solid food at all because procurement of his dentures was inordinately delayed. In contrast, at the prison where he was incarcerated in Honduras, which defense counsel visited, inmates had access to foods brought in by family members and could cook in their housing units. In addition, as noted above, Yousef had ample opportunity to leave the prison in Honduras with official permission, which allowed him greater access to a well-balanced diet and contact with his family.

Third, Yousef has had very little access to fresh air, outdoor recreation and even indoor exercise equipment at the MCC. He is permitted to visit the rooftop recreation area for one hour every two days. When defense counsel, with the Court's invaluable assistance, prevailed upon the MCC to provide exercise equipment in Yousef's unit following his bypass surgery, a

---

[6]  Nor is it a valid standard to compare Yousef's treatment here to what it might be in a developing country and then conclude that the superior treatment here means Yousef's medical conditions are not a factor in his sentencing.

stationary bike was transferred to his unit. The transferred bike, however, was in such poor condition that another inmate was injured while using it and it was promptly removed. No replacement equipment was provided.

In Honduras, despite his incarceration for three years as a diabetic with benign hypertension, Yousef did not suffer the rapid deterioration of his health that he has experienced at the MCC. While it is clear that the MCC has provided Yousef access to acute care when necessary, for which Yousef is extremely grateful, there is no basis for concluding that Yousef is physically better off because he is incarcerated in the United States. To the contrary, he clearly has suffered from ongoing nutritional imbalances and has been subjected to a dizzying array of prescription medications, each of which has the potential for adverse side effects, including strain on internal organs. Yousef's medical history at the MCC has been undeniably focused on the treatment of acute symptoms, with virtually no attention to preventive care or addressing the underlying causes of his symptoms.

Yousef's physical deterioration has reached the point where his kidneys are so impaired that he will need to go undergo regular dialysis. Indeed, his extended pretrial detention under extremely stressful conditions may well have resulted in irreparable damage to his health.

In light of all this, Yousef's medical condition warrants a sentence well below the Guidelines range and statutory maximum in this case. His medical condition makes each day he has served, and will serve, in prison more agonizing and difficult than for the average inmate. The limitations inherent in prison – in terms of diet, exercise, and family contact – will add to that equation, making each day in prison, for purposes of punishment, the functional equivalent of well more than a single day for the average inmate.

In addition, each day of incarceration will contribute to Yousef's physical and emotional stress, thereby worsening his conditions, and likely shortening his life span.  Yet Yousef's prison term should not constitute a death sentence.

24

## VI.  ACHIEVING A JUST AND FAIR SENTENCING IN THIS CASE

### A.    Applicable Sentencing Considerations

Pursuant to the United States Supreme Court's decision in *United States v. Booker*, 543

U.S. 220 (2005), and the Second Circuit's interpretation of *Booker* in *United States v. Crosby*,

397 F.3d 103 (2d Cir. 2005), this Court's sentencing decision must be based upon the factors set

forth in 18 U.S.C. §3553(a). Section 3553(a) requires the Court to impose a sentence "sufficient,

but not greater than necessary" to reflect the seriousness of the offense, to promote respect for

the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect

the public, and to provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment. 18 U.S.C. §3553(a); *see also Pepper v. United States*, 131

S.Ct. 1229, 1242-43 (2011) (emphasizing the sentencing court's "overarching duty" to comply

with the parsimony clause of §3553(a)). The Court is no longer required to impose a sentence

within the range specified by the Guidelines. *Crosby*, 397 F.3d at 111.

The factors the Court must consider in determining how to satisfy the enumerated goals

of sentencing are the nature and circumstances of the offense, the history and characteristics of

the defendant, the kinds of sentences available, the sentencing range set forth in the U.S.

Sentencing Guidelines, any policy statements issued by the Sentencing Commission, the need to

avoid unwarranted sentencing disparities, and the need to provide restitution to any victims of

the offense. 18 U.S.C. §3553(a). Thus, while sentencing courts must consider the Guidelines,

nothing in the statute provides any reason to treat the Guideline calculation as more controlling

of the sentencing decision than any of the other factors the courts must consider.

The Second Circuit has reaffirmed these sentencing principles while emphasizing that

"[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an

individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir.

2008) (*en banc*). "A district court may not presume that a Guidelines sentence is reasonable; it

must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *Id.* The Supreme Court recently confirmed that "[t]he Guidelines are not only *not mandatory* on sentencing courts, they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2010) (emphasis in original).

Sentencing must be undertaken with due consideration of the particular circumstances of any given case and the background and character of any particular defendant. As the Supreme Court observed in *Koon v. United States*, 518 U.S. 81 (1996), and reaffirmed in *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 598 (2007):

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

518 U.S. at 113; *see also United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in §3553(a)") (quoting *Gall v. United States*, 128 S.Ct. 586, 597 (2007)).

In this case, the Guidelines range for imprisonment is the statutory maximum of 180 months. The Probation Department recommends a sentence of 180 months. That recommendation, however, as well as the offense level and criminal history category to which it rigidly hews, prescribes a sentence well in excess of that "sufficient but not greater than necessary" to achieve the goals of sentencing, and provides little guidance in evaluating the relevant considerations under §3553(a).

**B.      A Extended Period of Incarceration is Not Necessary to Achieve
          The Goals of Sentencing**

As noted, the Sentencing Guidelines are but one of several factors that this Court must
consider in determining an appropriate sentence. Based upon all of the factors involved in this
case, it is respectfully submitted that a non-Guideline sentence substantially below the applicable
Guideline range would be sufficient to meet the goals of sentencing without, as cautioned against
in §3553(a), imposing a punishment "greater than necessary." *See* 18 U.S.C. §3553(a).

Specifically, this request is based upon the circumstances of the offense, the unduly rigid
and harsh application of the terrorism enhancement to increase both Yousef's offense level and
criminal history category, Yousef's medical condition, and the harsh conditions of confinement
Yousef has experienced during the prolonged pendency of this case. When viewed in the context
of the goals of sentencing, the facts and circumstances presented here combine to recommend a
non-Guideline sentence substantially below the advisory Guideline range.

**1.      Given the Circumstances of the Offense and Mr. Yousef's Background,
          Automatic Application of Extreme Guidelines Enhancements Should be
          Remedied by Consideration of the §3553(a) Sentencing Factors**

Strict application of the Guidelines in this case calls for a 12-level increase in the offense
level as well as automatic categorization of the defendant in Criminal History Category VI, despite
the fact that he has no prior qualifying convictions. *See* U.S.S.G. §§3A1.4(a), 3A1.4(b); PSR ¶¶37,
46-47. In addition, the Guidelines call for a two-level increase for the provision of weapons or
other resources with reason to believe they are to assist in the commission of a violent act.
U.S.S.G. ¶2M5.3(b)(1); PSR ¶36. These enhancements drastically increase the applicable
sentencing range, without regard to the particular circumstances present here.

a.   **The Terrorism Enhancement and Two-Level Weapons Enhancement Overstate the Seriousness of Mr. Yousef's Conduct**

In this case, Yousef did not intend to deliver any actual weapons, and did not deliver any actual weapons. He is guilty of introducing a purported representative of FARC to someone whom he believed could access weapons for sale in the Middle East. However, two years prior to this introduction, Yousef had provided the United States Government with details about the location of the weapons he believed to be for sale as well as the persons who controlled them. The introduction, moreover, was merely incidental to the weapons scam. Hassan Rammal was introduced as the person who supposedly went to film the non-existent weapons in Mexico, not as a source of weapons in the Middle East. Not surprisingly, given the incompetence he witnessed among this supposed group of arms dealers, Cristobal was critical and dismissive of Rammal.

A relevant factor in determining an appropriate sentence in a case such as this is the degree to which the conduct threatened a security interest of the United States. *See* U.S.S.G. §2M5.3, cmt. note 2(A). In this case, for the reasons set forth above, the degree of any threat was exceedingly low. In addition, Yousef had already provided U.S. authorities with detailed information about Yasser Yousef Safa, the cousin of Rammal whom Yousef believed had access to weapons. *See* Ex. 5 at 5; Ex. 6 at 3-4. Yousef had also already provided to U.S. authorities a literal map to the warehouse in Lebanon where he believed the weapons were stored. *See* Ex. 11 at 1-2. Thus, the 12-level terrorism enhancement and the 2-level weapons enhancement dramatically overstate the seriousness of the conduct undertaken.

The Second Circuit's decision in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), in which the Circuit addressed essentially automatic and severe guideline enhancements in child pornography cases that placed guidelines ranges at or near statutory maximums, is particularly pertinent here. In *Dorvee*, the Circuit addressed enhancements under U.S.S.G. §2G2.2, a guideline it described as "fundamentally different from most and that, unless applied with great care, can

28

lead to unreasonable sentences that are inconsistent with what §3553 requires." 616 F.3d at 184.

The Circuit noted that the high frequency which with the §2G2.2 enhancements applied typically

led to guideline ranges at or beyond the statutory maximum even in routine cases:

> An ordinary first-time offender is therefore likely to qualify for a sentence of at
> least 168 to 210 months, rapidly approaching the statutory maximum, based
> solely on sentencing enhancements that are all but inherent to the crime of
> conviction.

616 F.3d at 186. Under such circumstances, the Circuit found that adherence to the Guidelines

resulted in virtually "no distinction" between the sentences of defendants like Dorvee, whom

medical evidence indicated was neither a predator nor likely to actually assault a child, and "the

most dangerous offenders." *Id.* at 187. The Circuit found this result to be "fundamentally

incompatible with §3553(a)." *Id.* According to the Circuit:

> By concentrating all offenders at or near the statutory maximum, §2G2.2
> eviscerates the fundamental statutory requirement in §3553(a) that district courts
> consider "the nature and circumstances of the offense and the history and
> characteristics of the defendant" and violates the principle, reinforced in *Gall*, that
> courts must guard against unwarranted similarities among sentences for
> defendants who have been found guilty of dissimilar conduct.

*Id.* Also troubling to the Court in *Dorvee* was the fact that the §2G2.2 guideline was not

developed by the Sentencing Commission using an empirical approach based on data from past

sentencing practices. *Id.* at 184. This was likewise a defect in the crack guidelines at issue in

*Kimbrough v. United States*, 552 U.S. 85 (2007).

The concerns articulated by the Circuit in *Dorvee* apply with equal force in this case.

First, the 12-level terrorism enhancement is the product of a Congressional directive to the

Sentencing Commission and not a result of the Commission's institutional role of developing

guidelines based on empirical data. *See* U.S.S.G., App. C, Amend. 526. As such, the weight to be

accorded the guideline in any particular case "'will depend upon the thoroughness evident in [the

agency's] consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Dorvee*, 616 F.3d at 188 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Second, the scope of the enhancement is so broad that it applies in virtually every terrorism case. *See, e.g., United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009); *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010). This is also true of the two-point weapons enhancement, which broadly applies in any case where resources were provided with reason to believe that they "are to be used to commit or assist in the commission of a violent act." U.S.S.G. §2M5.3(b)(1)(E). This will apply in virtually every material support of terrorism case, since terrorist organizations by definition engage in violent acts and "material" support is support that assists the organization.

This case is fundamentally different from one in which a defendant actually provided or intended to provide weapons to a terrorist organization, and automatic application of the two enhancements, while technically correct, is at odds with the §3553(a) factors. Without these enhancements, the total adjusted offense level is 23.

> **b.** **The Terrorism Enhancement Overstates the Seriousness of Yousef's Criminal History**

The terrorism enhancement not only automatically increases the offense level, but it also automatically increases a defendant's Criminal History Category to Category VI regarding of the defendant's actual criminal history. U.S.S.G. §3A1.4 (b). In Yousef's case, this significantly overstates the seriousness of his criminal history.

The PSR correctly indicates that Yousef has no qualifying criminal history points. PSR ¶¶45-47. Absent the terrorism enhancement, Yousef would be in Criminal History Category I. The Government may contend that Yousef has foreign convictions that should be taken into account. Even if Yousef's conviction in Honduras, which is the only conviction for which

reliable information is available, were treated as if it were a conviction in the United States, this would result in three criminal history points and a Criminal History Category of II.

Encouraging flexibility in addressing the impact of §3A1.4 on a defendant's criminal history, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003). In addition, for the same reasons that automatic application of the 12-level offense level adjustment should be ameliorated by consideration of the §3553(a) factors, automatic categorization of Yousef in Criminal History Category VI should be as well. *See, e.g.*, United States Sentencing Commission, *Final Report on the Impact of* United States v. Booker *on Federal Sentencing* (March 2006), at 78 (finding that criminal history consistently is one of the four most common reasons for imposition of a below-range sentence under *Booker*).

### 2. Mr. Yousef Has Endured Unduly Harsh and Extended Conditions of Pretrial Confinement

Yousef has been incarcerated at the MCC for well over three years. The MCC is an administrative detention facility designed for short-term stays where the conditions of confinement are far harsher than they would be at a facility designed for long-term confinement. In Yousef's case, nearly a full year of his pretrial detention was due to delay occasioned by the Government's handling of classified material and the anticipated need for defense counsel to review relevant classified materials. The Government ultimately produced no classified material to security-cleared defense counsel.

Yousef's pretrial detention has also been unduly extended by his numerous hospital stays and the need to adjourn proceedings to accommodate his fragile health.

At the MCC, which houses inmates of all security levels for what are expected to be short-term stays, inmate movement is severely restricted, the facility is crowded and unsanitary, and inmates have little opportunity to participate in educational, social or personal development programs, very limited access to exercise facilities and outdoor recreation, and limited access to on-site medical care.

Yousef has had to aggressively monitor his own health and persistently bring symptoms to the attention of medical staff in order to ensure that he receive proper care. On more than one occasion he faced life-threatening issues that the MCC itself is not equipped to address. Nor is the MCC equipped with the facilities necessary for recovery from major surgery, which Yousef underwent on three occasions. Yousef's medical condition has significantly compounded the harshness of his extended stay at the MCC. At the same time, he has endured all of this without access to any family or friends for support.

A number of courts have recognized the generally harsh conditions at the MCC. *See, e.g.*, *United States v. Behr*, 2006 WL 1586563, *5 (S.D.N.Y. 2006); *United States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y. 1986); *see also Bell v. Wolfson*, 441 U.S. 520. In *Behr,* the court noted that a judge had recently "reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at the MCC." 2006 WL at *5. The court in *Behr* likewise reduced the defendant's sentence based in part on the harsh conditions at the MCC, where the defendant had been detained for 29 months. *Id.* Even prior to *Booker*, courts held that conditions of pre-sentence confinement could constitute a valid basis for a downward departure. *See, e.g., United States v. Carty*, 264 F.3d 191 (2d Cir. 2001); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997); *United States v. Francis*, 129 F.Supp.2d 612, 616 (S.D.N.Y. 2001).

Similarly, courts have granted downward departures based on the anticipated severity of confinement after sentencing. *See, e.g., United States v. Bruder*, 103 F.Sup.2d 155, 182-83 (E.D.N.Y. 200); *United States v. Volpe*, 78 F.Supp.2d 76, 89 (E.D.N.Y. 1999); *United States v.*

*Lara*, 905 F.2d 599 (2d Cir. 1990); *see also United States v. Smith*, 27 F.3d 649, 656 (D.C. Cir.

1994) (downward departure may be appropriate where defendant's status as deportable alien is

likely to increase severity of confinement).

The harshness of Yousef's confinement at the MCC bears on sentencing insofar as it has

devolved into actual punishment. The Supreme Court has recognized that because pretrial

confinement constitutes administrative detention, conditions of confinement may not rise to the

level of punishment. *Bell v. Wolfish*, 441 U.S. 520, 536-38 (1979). Accordingly, "pretrial

detention should be imposed in the least restrictive manner possible, only to the degree necessary

to vindicate the non-punitive aims of such detention." *United States v. Gallo*, 653 F.Supp. 320,

336 (E.D.N.Y. 1986). Prolonged pretrial detention has been recognized to have "undeniably

severe" and inevitable consequences:

> The morale and demeanor of the detainee are bound to deteriorate substantially,
> reflecting his or her idleness, isolation, and exposure to the vagaries of prison and
> the jailhouse crowd. *See* Wald, *Pretrial Detention and Ultimate Freedom: A*
> *Statistical Study – Foreward*, 39 N.Y.U. L. Rev. 631, 632 (1964). It is not
> surprising that such detainees are susceptible to heightened anxiety, depression,
> hostility and bitterness over their being kept from their family and social life.
> They are subjected to great stress, and invariably faced with social stigmatization.
> *See* Schlesinger, *Bail Reform: Protecting the Community and the Accused*, 9
> Harv. J. of L. & Pub. Policy 173, 176 (1986).

*Gallo*, 653 F.Supp. at 336-37. Indeed, Judge Feinberg, concurring in *United States v. Melendez-*

*Carrion*, 790 F.2d 1008 (2d Cir. 1986), stated that the eight-month pretrial detention in that case

is "rendered so harsh by its length that it . . . degenerates into punishment." 790 F.2d at 1008

(Feinberg, J., concurring).

Yousef's nearly 38-month incarceration at the MCC has been so lengthy that it

unquestionably constitutes punishment, and the conditions in his case so dismal that they

constitute extremely harsh punishment. Given Yousef's array of serious medical conditions and

continued isolation from family, any future period of incarceration will likewise be unduly onerous. These circumstances warrant a substantially reduced sentence.

### 3.        Mr. Yousef Does Not Represent a Future Danger to the United States

Prior to his forcible rendition to the United States, Jamal Yousef had never set foot in this country nor been accused of any crime that threatened this country. He has no family or other ties to the United States, and will be deported. He will likely serve some extended period of time in immigration custody while the somewhat complicated matter of his deportation is sorted out. Beyond that, he has no reason to return to this country and no interest in visiting harm on this country.

Yousef has paid dearly for his association with Safa and efforts to pose as a weapons dealer. He has been publicly and internationally humiliated, separated from his family, incarcerated for years in a foreign country and undergone a precipitous decline in his health. He has no history whatsoever of participating in terrorism-related activity, and the terrorism aspect of this case was injected entirely by the U.S. Government. Yousef, moreover, is in no position at this point to perpetrate any terrorism-related activity. He simply wishes to be reunited with his family and pursue some kind of small retail business, as he has in the past. There is no point in further incarcerating Jamal Yousef.

## VII.  **CONCLUSION**

Based on all of the facts and circumstances presented here, Jamal Yousef respectfully requests that this Court impose a sentence substantially below the applicable Guidelines range. Specifically, Mr. Yousef respectfully requests a sentence of time served, which constitutes more than three years of administrative detention in isolation from family and friends while suffering through life-threatening illnesses, which we respectfully submit would be sufficient, without being greater than necessary, to satisfy the goals of sentencing and serve the interests of justice.

Dated:  October 8, 2012
    New York, NY

<div style="margin-left:40%">

Respectfully submitted,


s/Melinda Sarafa
Melinda Sarafa
SARAFA LAW LLC
80 Pine Street, Floor 33
New York, NY 10005
Tel: 212-785-7575


s/Joshua Dratel
Joshua L. Dratel, Esq.
Law Offices of Dratel & Mysliwiec
2 Wall Street, 3rd Floor
New York, NY 10005
Tel: 212-732-0707


*Attorneys for Defendant Jamal Yousef*

</div>